HEDIN LLP
Frank S. Hedin (SBN 291289)
fhedin@hedinllp.com
1395 Brickell Ave, Ste 610
Miami, Florida 33131
Telephone: (305) 357-2107
Facsimile: (305) 200-8801

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT FOR THE**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANGELA HUTCHESON; SARA LAFLER; ALUCARD TAYLOR; KAMA DELK; ERIN RADCLIFFE; MIKHAILA DIEKMANN; CHELSEA GARDNER; ANDREW STARIN; SHARYL YEISLEY; ERICA NATHAN; PHYLLIS NICHOLS; KIRSTEN CURLEY; ROBIN COOK; and LAWRENCE NOVIDA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>VEROGEN, INC. D/B/A GEDMATCH; QIAGEN NORTH AMERICAN HOLDINGS, INC; and META PLATFORMS, INC.<br><br>Defendants. | Case No.: 24-CV-1977-JES/MMP<br><br>**<u>SECOND AMENDED CLASS ACTION COMPLAINT</u>**<br><br>**DEMAND FOR JURY TRIAL** |

On behalf of themselves and all others similarly situated, Plaintiffs Angela Hutcheson, Sara Lafler, Alucard Taylor, Kama Delk, Erin Radcliffe, Mikhaila Diekmann, Chelsea Gardner, Andrew Starin, Sharyl Yeisley, Erica Nathan, Phyllis Nichols, Kirsten Curley, Robin Cook, and Lawrence Novida ("Plaintiffs") allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based upon the investigation conducted by their attorneys.

## NATURE OF THE CASE

1. This case involves Defendant Verogen, Inc.'s ("Verogen") illegal disclosure of nearly two million individuals' genetic information to multiple unauthorized third parties, including Defendant Qiagen North American Holdings, Inc. ("Qiagen") and Defendant Meta Platforms, Inc. ("Meta", collectively with Verogen and Qiagen, "Defendants"). It also involves Qiagen unlawfully compelling the disclosure of, obtaining, retaining, and using this genetic information for its own commercial advantage.

2. Lawmakers across the country have increasingly recognized the importance of maintaining individuals' privacy in their genetic information. For example, the Oregon legislature, in enacting a statute aimed at protecting genetic privacy, found that "[g]enetic information is uniquely private and personal information," and that the "improper collection, retention or disclosure of genetic information can lead to significant harm to an individual and the individual's blood relatives[.]" Or. Rev. Stat. Ann. § 192.533(1). This is so, the Oregon legislature explained, because an analysis of an individual's DNA provides information "not only about the individual, but also about blood relatives of the individual, with the potential for impacting family privacy, including reproductive decisions." Or. Rev. Stat. Ann. § 192.533(1). In enacting a similar statute, the Illinois Legislature found

that "[d]espite existing laws, regulations, and professional standards which require or promote voluntary and confidential use of genetic testing information, many members of the public are deterred from seeking genetic testing because of fear that test results will be disclosed without consent in a manner not permitted by law or will be used in a discriminatory manner." 410 ILCS 513/5(2).

3. As a result of these growing concerns, these states—Alaska, Illinois, New Hampshire, New Mexico, and Oregon—have each enacted a genetic privacy law that prohibits the disclosure of a person's genetic information or DNA analysis without the person's written, informed consent. *See* A.S. § 18.13.010, *et seq.*; 410 ILCS 513/1, *et seq.*; N.H. Rev. Stat. § 141-H:1, *et seq.*; N.M.S.A. 1978, § 24-21-1, *et seq.*; O.R.S. § 192.531, *et seq.* (collectively referred to at times herein as the "State Genetics Statutes"). Further, the genetic privacy statutes of Illinois and Oregon prohibit compelling the disclosure of genetic information without written, informed consent; Alaska prohibits retaining genetic information without written, informed consent; and New Mexico prohibits obtaining, retaining, or using genetic information without written, informed consent.

4. Other state statutes, such as the California Invasion of Privacy Act ("CIPA"), do not directly regulate the disclosure or receipt of genetic information, but instead regulate a third-party's interception of private communications, including private communications that disclose a participant's genetic information without written, informed consent.

5. As alleged in detail below, Defendant Verogen, Inc. d/b/a GEDmatch ("Verogen") has violated each of the State Genetics Statutes on a massive scale, having disclosed the genetic information of nearly two million individuals to multiple third parties without any of these persons' informed, written consent. In some cases, Verogen disclosed individuals' genetic information to a group of third parties even after those individuals had expressly instructed Verogen

not to disclose their genetic information to that very group.

6. Verogen operates the website www.GEDmatch.com, where it provides in-depth DNA comparison tools and services. To use the services, a person must obtain a DNA analysis from another company, download the results of that test to a DNA file, and upload the DNA file into the GEDmatch database. The DNA file contains the individual's genetic information, specifically the results of the DNA analysis. A person can upload his or her own DNA file or that of another person, such as, for example, the DNA file of a dependent. When uploading a DNA file, the user must enter the full name of the person from whom the DNA came, along with the person's gender. GEDmatch then provides a variety of tools that allow the person who uploaded the DNA file to compare it to others in the database.

7. Verogen has amassed over 2 million DNA files from its users. It has done so, in large part, by making assurances to its users that the DNA files they upload will be disclosed *only* to the specific groups of third parties selected by them before uploading DNA files, and that their genetic information will otherwise remain absolutely private.

8. However, as explained below, after obtaining DNA files from its users, Verogen has repeatedly disclosed their genetic information to multiple third parties—without providing anyone notice of or obtaining anyone's consent to these disclosures—in clear violation of each of the State Genetics Statutes.

9. In January 2023, Verogen disclosed the genetic information of approximately 1.8 million of its users when it sold and made fully available its GEDmatch.com database to Qiagen, along with the rest of Verogen's business, for $150 million. Qiagen is a foreign company, operating under Dutch law with its

registered office in Venlo, The Netherlands.[1] This sale required Verogen to provide its entire database of user-uploaded DNA files, along with all the personal information connected to each DNA file, to Qiagen. Verogen failed to notify its users, let alone obtain any form of consent from its users, prior to disclosing their DNA files and associated personal information to Qiagen.

10. Moreover, Verogen has routinely disclosed to various law enforcement entities the genetic information of its users—also without notifying, or obtaining any form of consent from, any of these individuals. Notably, many of the users whose DNA files were disclosed by Verogen to law enforcement entities had expressly instructed Verogen *not to* disclose their genetic information to law enforcement entities.

11. Verogen has also disclosed the identities of its users who underwent genetic testing and who maintained Facebook accounts to Meta via the Meta Pixel technology installed by Verogen on its website—also without notifying, or obtaining any form of consent from, any of these persons. Verogen likewise aided Meta in intercepting its users' private communications with it, which communications revealed the identity of users who underwent genetic testing.

12. By disclosing its users' genetic information to Qiagen, law enforcement entities, and Meta—without first obtaining its users' informed written consent—Verogen violated the State Genetics Statutes and CIPA.

13. Defendant Meta violated CIPA and other California statutory and common laws when it utilized its pixel to intercept Verogen users' private communications with Verogen without users' informed written consent. These intercepted, private communications with Verogen revealed the users' identities and

[1] United States Security and Exchange Commission, Form 6-k filing, March 31, 2023; available at https://www.sec.gov/Archives/edgar/data/1015820/000101582023000026/a2023q16-k.htm#i0ecb684e66b649ab99a27a64e98cf303_118.

their genetic information to Meta, including the fact that they had undergone genetic testing. Meta also violated several state genetic laws which prohibit Meta from compelling the disclosure of or receiving genetic information without informed consent.

14. Similarly, Defendant Qiagen compelled the disclosure of the genetic information of the nearly two million individuals in Verogen's GEDmatch.com database as part of its $150 million purchase of Verogen. Qiagen's compulsion of this vast database of genetic information was not accidental. Rather, Qiagen required Verogen to include the database in the deal and to give Qiagen full access to the genetic information contained within for its own commercial advantage, enhancing Qiagen's genetic collection, preparation, and testing services it offers to law enforcement agencies and forensic teams. Qiagen did so without the written, informed consent of any of the individuals with genetic information in the database. Qiagen further retained and used the genetic information for profit without the written and informed consent of those individuals. Qiagen's conduct violated the genetic privacy laws of Alaska, Illinois, New Mexico, and Oregon.

15. And most recently, Qiagen and Verogen collectively disclosed the genetic information of all GEDmatch users to Bode Cellmark Forensics, Inc. d/b/a Bode Technology ("Bode")—also without notifying, or obtaining any form of consent from, any of these individuals—to enable Bode to use the database for its own genealogical research purposes.

## PERTINENT STATUTORY SCHEMES

### I. Alaska

16. Alaska's Genetic Privacy Act provides that "a person may not . . . retain a DNA sample or the results of a DNA analysis, or disclose the results of a DNA analysis unless the person has first obtained the informed and written consent

of the person, or the person's legal guardian or authorized representative, for . . . disclosure." A.S. § 18.13.010(a)(1).

17. "DNA analysis" means DNA or genetic typing and testing to determine the presence or absence of genetic characteristics in an individual, including tests of nucleic acids or chromosomes in order to diagnose or identify a genetic characteristic. A.S. § 18.13.100(2).

18. "Person" includes a corporation, company, partnership, firm, association, organization, business trust, or society, as well as a natural person. A.S. § 01.10.060(a)(8).

19. A person may bring a civil action against a person who collects a DNA sample from the person, performs a DNA analysis on a sample, retains a DNA sample or the results of a DNA analysis, or discloses the results of a DNA analysis in violation of this chapter. A.S. § 18.13.020. In addition to the actual damages suffered by the person, a person violating this chapter is liable to the person for damages in the amount of $5,000 or, if the violation resulted in profit or monetary gain to the violator, $100,000. *Id.*

**II. Illinois**

20. Illinois's Genetic Privacy Information Act ("ILGIPA") provides that "genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized" by that individual. 410 Ill. Comp. Stat. Ann. 513/15(a). The authorization must be a "specific written legally effective authorization for release" and designate the person to whom the genetic information is being released. 410 Ill. Comp. Stat. Ann. 513/30(a)(2). It further provides that "no person may disclose or be compelled to disclose the identity of any person upon whom genetic testing is

performed or the results of a genetic test in a manner that permits identification of the subject of the test." 410 Ill. Comp. Stat. Ann. 513/30(a).

21. ILGIPA defines "genetic information" as information pertaining to: (i) an individual's genetic tests; (ii) the genetic tests of family members of the individual; (iii) the manifestation of a disease or disorder in family members of such individual; or (iv) any request for, or receipt of, genetic services, or participation in clinical research which includes genetic services, by the individual or any family member of the individual. 410 ILCS 513/10, citing 45 CFR 160.103.

22. "Genetic testing" includes direct-to-consumer commercial genetic testing. 410 ILCS 513/10.

23. ILGIPA provides for statutory damages of $15,000 for each willful and/or reckless violation of ILGIPA or actual damages—whichever is greater—and, alternatively, damages of $2,500 for each negligent violation of ILGIPA or actual damages—whichever is greater. 410 ILCS 513/40(a)(3).

**III. New Hampshire**

24. New Hampshire's genetic privacy law provides that "no person shall disclose to any other person that an individual has undergone genetic testing, and no person shall disclose the results of such testing to any other person, without the prior written and informed consent of the individual, the parent, guardian, or custodian if the individual is a minor under the age of 18, or the legal guardian or conservator if the individual is an incompetent person." N.H. Rev. Stat. Ann. § 141-H:2(III).

25. "Genetic testing" means a test, examination, or analysis which is generally accepted in the scientific and medical communities for the purpose of identifying the presence, absence, or alteration of any gene or chromosome, and any report, interpretation, or evaluation of such a test, examination, or analysis. N.H. Rev. Stat. Ann. § 141-H:1(IV).

26. "Person" includes a human being, an association or organization, a trust, corporation, and partnership. N.H. Rev. Stat. Ann. § 141-H:1(XI).

27. New Hampshire provides for minimum damages of $1,000 for each violation, as well as costs and reasonable legal fees. *See* N.H. Rev. Stat. Ann. § 141-H:6.

**IV. New Mexico**

28. New Mexico's Genetic Information Privacy Act ("NMGIPA") prohibits the "collection, retention, transmission or use of genetic information without the informed and written consent of the individual or the individual's authorized representative." N.M. Stat. Ann. § 24-21-3(B). It further prohibits "obtain[ing] genetic information . . . without first obtaining informed and written consent from the individual or the individual's authorized representative." *Id.* at § 24-21-3(A).

29. "Genetic information" means information about the genetic makeup of an individual or members of an individual's family, including information resulting from genetic testing, genetic analysis, DNA composition, participation in genetic research or use of genetic services. N.M. Stat. Ann. § 24-21-2(D).

30. An individual whose rights under the provisions of NMGIPA have been violated may bring a civil action for damages or other relief. The court may order a person who violates the provisions of NMGIPA to comply with those provisions and may order other appropriate relief, including actual damages, damages of up to five thousand dollars ($5,000) in addition to any economic loss if the violation results from willful or grossly negligent conduct; and reasonable attorney fees and appropriate court costs. N.M. Stat. Ann. § 24-21-6(B)-(C).

**V. Oregon**

31. Oregon's genetic privacy statutes prohibit disclosing or compelling the disclosure of the "identity of an individual upon whom a genetic test has been

performed or the identity of a blood relative of the individual," or "genetic information about the individual or a blood relative of the individual in a manner that permits identification of the individual." Or. Rev. Stat. Ann. § 192.539(1).

32. "Genetic information" means information about an individual or the individual's blood relatives obtained from a genetic test. Or. Rev. Stat. Ann. § 192.531(11).

33. "Genetic test" means a test for determining the presence or absence of genetic characteristics in an individual or the individual's blood relatives, including tests of nucleic acids such as DNA, RNA and mitochondrial DNA, chromosomes or proteins in order to diagnose or determine a genetic characteristic. Or. Rev. Stat. Ann. § 192.531(14).

34. An individual or an individual's blood relative, representative or estate may bring a civil action against any person who violates Or. Rev. Stat. Ann. § 192.539. For a violation of § 192.539, the court shall award the greater of actual damages or:

a) $1,000, for an inadvertent violation that does not arise out of the negligence of the defendant;

b) $5,000, for a negligent violation;

c) $100,000, for a knowing or reckless violation;

d) $150,000, for a knowing violation based on a fraudulent misrepresentation; or

e) $250,000, for a knowing violation committed with intent to sell, transfer or use for commercial advantage, personal gain or malicious harm.

Or. Rev. Stat. Ann. § 192.541.

## VI. California

35. The California Invasion of Privacy Act ("CIPA") prohibits a party

from willfully—and without the consent of all parties to a communication—reading or learning the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California. CIPA also prohibits a party from aiding another party to do the same.

36. To establish liability under CIPA, a plaintiff need only establish that a defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

Cal. Penal Code § 631(a).

37. Violations of CIPA are not limited to phone lines, but also apply to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, No. 15-cv-04062, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, No. C06-05289 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on

Facebook's collection of consumers' Internet browsing history). Indeed, Meta's same tracking technology was examined by the Northern District of California with the Court concluding that the plaintiffs were likely to succeed on the merits with respect to both CIPA and the analogous Federal Wiretap Act. *See In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *11, 13 (N.D. Cal. Dec. 22, 2022).

38. CIPA affords a private right of action to any person who has been subjected to a violation of the statute to seek injunctive relief and statutory damages of $5,000 per violation, regardless of whether they suffered actual damages. Cal. Penal Code § 637.2.

## PARTIES

### I. Plaintiffs

#### A. Plaintiff Angela Hutcheson

39. Plaintiff Hutcheson is, and at all times relevant hereto was, a resident of Cook County, Illinois and a Facebook account holder.

40. Plaintiff Hutcheson created a GEDmatch.com account and uploaded her DNA file on GEDmatch.com in 2018, and her genetic information has remained in the database at all times between when she uploaded it and the present.

41. Plaintiff Hutcheson has never provided informed, written consent to Verogen to disclose her genetic information or the fact she had undergone genetic testing to Qiagen, Meta, or law enforcement actors.

42. In fact, at all relevant times, Plaintiff Hutcheson expressly told Verogen not to disclose her genetic information to law enforcement by selecting the "opt out" privacy setting for her file.

43. Plaintiff Hutcheson has never provided informed, written consent to Verogen to disclose her genetic information or the fact she had undergone genetic

testing to Qiagen or Meta.

44. Plaintiff Hutcheson has never provided informed, written consent to Meta to intercept her genetic information or the fact she had undergone genetic testing.

45. Plaintiff Hutcheson has never provided informed, written consent to Qiagen to compel the disclosure of her genetic information or the fact that she has undergone genetic testing.

**B. Plaintiff Sara Lafler**

46. Plaintiff Lafler is, and at all times relevant hereto was, a resident of Cook County, Illinois and a Facebook account holder.

47. Plaintiff Lafler created a GEDmatch.com account and uploaded her DNA file on GEDmatch.com in 2016, and her genetic information has remained in Verogen's database at all times between when she uploaded it and the present.

48. Plaintiff Lafler has never provided informed, written consent to Verogen to disclose her genetic information or the fact she had undergone genetic testing to Qiagen or Meta.

49. Plaintiff Lafler has never provided informed, written consent to Meta to intercept her genetic information or the fact she had undergone genetic testing.

50. Plaintiff Lafler has never provided informed, written consent to Qiagen to compel the disclosure of her genetic information or the fact that she has undergone genetic testing.

**C. Plaintiff Phyllis Nichols**

51. Plaintiff Phyllis Nichols is, and at all times relevant hereto was, a resident of Peoria County, Illinois and a Facebook account holder.

52. Plaintiff Nichols created a GEDmatch.com account and uploaded her DNA file on GEDmatch.com in 2021, and her genetic information has remained

in Verogen's database at all times between when she uploaded it and the present.

53. Plaintiff Nichols has never provided informed, written consent to Verogen to disclose her genetic information or the fact she had undergone genetic testing to Qiagen or Meta.

54. Plaintiff Nichols has never provided informed, written consent to Meta to intercept her genetic information or the fact she had undergone genetic testing.

55. Plaintiff Nichols has never provided informed, written consent to Qiagen to compel the disclosure of her genetic information or the fact that she has undergone genetic testing.

**D. Plaintiff Kirsten Curley**

56. Plaintiff Kirsten Curley is, and at all times relevant hereto was, a resident of Cook County, Illinois and a Facebook account holder.

57. Plaintiff Curley created a GEDmatch.com account and uploaded her DNA file on GEDmatch.com in 2022, and her genetic information has remained in Verogen's database at all times between when she uploaded it and the present.

58. Plaintiff Curley has never provided informed, written consent to Verogen to disclose her genetic information or the fact she had undergone genetic testing to Qiagen or Meta.

59. Plaintiff Curley has never provided informed, written consent to Meta to intercept her genetic information or the fact she had undergone genetic testing.

60. Plaintiff Curley has never provided informed, written consent to Qiagen to compel the disclosure of her genetic information or the fact that she has undergone genetic testing.

**E. Plaintiff Alucard Taylor**

61. Plaintiff Taylor is, and at all times relevant hereto was, a resident of Multnomah County, Oregon and a Facebook account holder.

62. Plaintiff Taylor created a GEDmatch.com account and uploaded his DNA file on GEDmatch.com in 2019, and his genetic information has remained in Verogen's database at all times between when he uploaded it and the present.

63. Plaintiff Taylor has never provided informed, written consent to Verogen to disclose his genetic information or the fact he had undergone genetic testing to Qiagen, Meta, or law enforcement actors.

64. In fact, at all relevant times, Plaintiff Taylor expressly told Verogen not to disclose his genetic information to law enforcement by selecting the "opt out" privacy setting for his file.

65. Plaintiff Taylor has never provided informed, written consent to Meta to intercept his genetic information or the fact he had undergone genetic testing.

66. Plaintiff Taylor has never provided informed, written consent to Qiagen to compel the disclosure of his genetic information or the fact that he has undergone genetic testing.

**F. Plaintiff Kama Delk**

67. Plaintiff Delk is, and at all times relevant hereto was, a resident of Lane County, Oregon and a Facebook account holder.

68. Plaintiff Delk created a GEDmatch.com account and uploaded her DNA file on GEDmatch.com in 2018, and her genetic information has remained in Verogen's database at all times between when she uploaded it and the present.

69. Plaintiff Delk has never provided informed, written consent to Verogen to disclose her genetic information or the fact she had undergone genetic testing to Qiagen or Meta.

70. Plaintiff Delk has never provided informed, written consent to Meta to intercept her genetic information or the fact she had undergone genetic testing.

71. Plaintiff Delk has never provided informed, written consent to Qiagen to compel the disclosure of her genetic information or the fact that she has

undergone genetic testing.

**G. Plaintiff Erin Radcliffe**

72. Plaintiff Radcliffe is, and at all times relevant hereto was, a resident of Bernalillo County, New Mexico and a Facebook account holder.

73. Plaintiff Radcliffe created a GEDmatch.com account and uploaded her DNA file, along with that of her husband and her father-in-law, to GEDmatch.com in 2015, and their genetic information has remained in Verogen's database at all times between when she uploaded the three DNA files and the present.

74. Plaintiff Radcliffe has never provided informed, written consent to Verogen to disclose her genetic information or the fact she had undergone genetic testing to Qiagen or Meta.

75. Plaintiff Radcliffe has never provided informed, written consent to Meta to intercept her genetic information or the fact she had undergone genetic testing.

76. Plaintiff Radcliffe has never provided informed, written consent to Qiagen to obtain, retain, or use her genetic information.

**H. Plaintiff Mikhaila Diekmann**

77. Plaintiff Diekmann is, and at all times relevant hereto was, a resident of Bernalillo County, New Mexico and a Facebook account holder.

78. Plaintiff Diekmann created a GEDmatch.com account and uploaded her DNA file to GEDmatch.com in 2019, and her genetic information has remained in Verogen's database at all times between when she uploaded it and the present.

79. Plaintiff Diekmann has never provided informed, written consent to Verogen to disclose her genetic information or the fact she had undergone genetic testing to Qiagen or Meta.

80. Plaintiff Diekmann has never provided informed, written consent to

Meta to intercept her genetic information or the fact she had undergone genetic testing.

81. Plaintiff Diekmann has never provided informed, written consent to Qiagen to obtain, retain, or use her genetic information.

**I. Plaintiff Chelsea Gardner**

82. Plaintiff Gardner is, and at all times relevant hereto was, a resident of Merrimack County, New Hampshire and a Facebook account holder.

83. Plaintiff Gardner created a GEDmatch.com account and uploaded her DNA file on GEDmatch.com in 2019, and her genetic information has remained in Verogen's database at all times between when she uploaded it and the present.

84. Plaintiff Gardner has never provided informed, written consent to Verogen to disclose her genetic information or the fact she had undergone genetic testing to Qiagen or Meta.

85. Plaintiff Gardner has never provided informed, written consent to Meta to intercept her genetic information or the fact she had undergone genetic testing

**J. Plaintiff Andrew Starin**

86. Plaintiff Starin is, and at all times relevant hereto was, a resident of Hillsborough County, New Hampshire and a Facebook account holder.

87. Plaintiff Starin created a GEDmatch.com account and uploaded his DNA file on GEDmatch.com in 2016 and then again in 2017, and his genetic information has remained in Verogen's database at all times between when he uploaded it and the present.

88. Plaintiff Starin has never provided informed, written consent to Verogen to disclose his genetic information or the fact he had undergone genetic testing to Qiagen or Meta.

89. Plaintiff Starin has never provided informed, written consent to Meta

to intercept her genetic information or the fact she had undergone genetic testing

**K. Plaintiff Sharyl Yeisley**

90. Plaintiff Yeisley is, and at all times relevant hereto was, a resident of Alaska.

91. Plaintiff Yeisley created a GEDmatch.com account and uploaded her DNA file on GEDmatch.com in 2019, and her genetic information has remained in Verogen's database at all times between when she uploaded it and the present.

92. Plaintiff Yeisley has never provided informed, written consent to Verogen to disclose her genetic information or the fact she had undergone genetic testing to Qiagen or Meta.

93. Plaintiff Yeisley has never provided informed, written consent to Meta to intercept her genetic information or the fact she had undergone genetic testing.

94. Plaintiff Yeisley has never provided informed, written consent to Qiagen to retain her genetic information.

**L. Plaintiff Erica Nathan**

95. Plaintiff Nathan is, and at all relevant times was, a resident of Alaska.

96. Plaintiff Nathan created a GEDmatch.com account and uploaded her DNA file on GEDmatch.com in approximately 2020, and her genetic information has remained in Verogen's database at all times between when she uploaded it and the present.

97. Plaintiff Nathan has never provided informed, written consent to Verogen to disclose her genetic information or the fact she had undergone genetic testing to Qiagen or Meta.

98. Plaintiff Nathan has never provided informed, written consent to Meta to intercept her genetic information or the fact she had undergone genetic testing.

99. Plaintiff Nathan has never provided informed, written consent to Qiagen to retain her genetic information.

**M. Plaintiff Robin Cook**

100. Plaintiff Robin Cook is, and at all relevant times was, a resident of Butte County, California.

101. Plaintiff Robin Cook created a GEDmatch.com account and uploaded her DNA file on GEDmatch.com in approximately 2017, and her genetic information has remained in Verogen's database at all times between when she uploaded it and the present.

102. Plaintiff Cook has never provided informed, written consent to Verogen to disclose her genetic information or the fact she had undergone genetic testing to Qiagen or Meta.

103. Plaintiff Cook has never provided informed, written consent to Meta to intercept her genetic information or the fact she had undergone genetic testing.

104. Plaintiff Cook has never provided informed, written consent to Qiagen to retain her genetic information.

**N. Plaintiff Lawrence Novida**

105. Plaintiff Lawrence Novida is, and at all relevant times was, a resident of San Francisco County, California.

106. Plaintiff Lawrence Novida created a GEDmatch.com account and uploaded his DNA file on GEDmatch.com in approximately 2024, and his genetic information has remained in Verogen's database at all times between when he uploaded it and the present.

107. Plaintiff Novida has never provided informed, written consent to Verogen to disclose his genetic information or the fact he had undergone genetic testing to Qiagen or Meta.

108. Plaintiff Novida has never provided informed, written consent to

Meta to intercept his genetic information or the fact he had undergone genetic testing.

109. Plaintiff Novida has never provided informed, written consent to Qiagen to retain his genetic information.

## II. Defendants

### A. Verogen, Inc.

110. Defendant Verogen Inc. is a company organized in Delaware with its principal place of business in San Diego, California.

111. Verogen is a technology company that develops and supplies products for advanced DNA identifications using "next-generation sequencing" technology. It also ran and maintained the GEDmatch.com and GEDmatch PRO databases.

### B. Qiagen North American Holdings, Inc.

112. Defendant Qiagen North American Holdings, Inc. ("Qiagen") is the United States division of Qiagen N.V., a global biotechnology company with its headquarters in the Netherlands. After it purchased Verogen in January 2023, it became the sole owner of Defendant Verogen. It maintains its U.S. headquarters in Germantown, Maryland.

### C. Meta Platforms, Inc.

113. Meta Platforms, Inc. is a corporation organized under the laws of Delaware with its principal place of business located at 1601 Willow Road, Menlo Park, California 94025. Meta is an advertising company that owns and operates several prominent social media platforms and communication services, including Facebook, Instagram, Threads, Messenger, and WhatsApp. Meta generates the vast majority of its revenue by selling advertising space on its various platforms.

## JURISDICTION AND VENUE

114. The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d)(2)(A) because there are more than 100 members of each of the proposed Classes (defined below), the aggregate amount in controversy with respect to the claim alleged on behalf of each of the proposed Classes exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one member of each of the Classes (including each of the Plaintiffs) is a citizen of a state different from Defendants.

115. The Court has personal jurisdiction over Defendants and venue is proper in this judicial district because Defendant Verogen maintains its corporate headquarters and principal place of business in San Diego, California, within this judicial district, and because the disclosures of the Plaintiffs' and Classes' genetic information that Defendants Qiagen and Meta compelled Verogen to make to them were made by Verogen from its headquarters in San Diego, California, within this judicial district, such that the claims alleged herein arose, in substantial part, from actions and conduct directed towards, occurring in, and emanating from California and within this judicial district.

116. Further, the Court has personal jurisdiction over Meta because its principal place of business is in California. Meta is also subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this State, including Meta's compulsion and receipt of Plaintiffs' sensitive genetic data from Verogen and use of that data for commercial purposes. Further, Meta designed and effectuated its scheme to intercept Plaintiffs' and Class members' Private Information from California, developed and implemented its tracking technologies from within California, and implemented its terms of service from within California, which provide that

California law shall govern the claims against Facebook.

## FACTS COMMON TO ALL CLAIMS

### I. Defendant Verogen's unlawful conduct

117. Verogen is an online service company that provides its users the ability to research their family and genetic history through DNA data and advanced, in-depth search tools.

118. It markets itself as a "place to explore your family history by matching DNA data you can get from a genetic DNA testing kit company like 23andMe or AncestryDNA, and then uncovering techniques used in genetic genealogy to track down relatives and learn about your ancestry."[2]

119. To use Verogen's services, a person first must create an account on Verogen's GEDmatch.com website. The person then uploads a DNA file (obtained from another provider)—which contains the results of a DNA analysis—on the GEDmatch.com website.[3] A user of Verogen's website can upload his or her own DNA file, the DNA files of dependents, or the DNA file of other people who have given the user specific authorization. For each DNA file uploaded, the person must enter the full name of the person from whom the DNA came, along with that person's gender. Once a DNA file is uploaded, Verogen then provides a variety of tools on its website that allow the user to compare the uploaded DNA file, to the other DNA files in its database.

120. Before uploading a DNA file, GEDmatch requires a user to select a privacy option for the file, and makes the following guarantees based on the privacy option selected:

1) **Private:** DNA kits will not be available for any matching comparisons with any other people (including law enforcement).

[2] GEDmatch, "Make the Most of Your Results | Why Join – GEDmatch," available at https://www.gedmatch.com/why-join/.
[3] GEDmatch refers to each DNA file as a "DNA kit."

No comparison results will be shown unless this privacy setting is changed by you later.

2) **Opt-in:** We will compare your DNA kit to all other kits in the GEDmatch database to find your matching genetic relatives. Kits in the database include those submitted by users undertaking personal genetic genealogy research and adoptee searches. Your kit WILL be compared with kits submitted by or on behalf of law enforcement to identify perpetrators of violent crimes or to identify human remains. The operators of GEDmatch encourage everybody to select this option.

3) **Opt-out:** We will compare your DNA kit to all other kits in the GEDmatch database to find your matching genetic relatives. Kits in the database include those submitted by users undertaking personal genetic genealogy research, adoptee searches, and users (including law enforcement) attempting to identify unidentified human remains. Your kit WILL NOT be compared with kits submitted by or on behalf of law enforcement to identify perpetrators of violent crimes.

4) **Research:** DNA kits will not be shown in match result reports generated for other kits (including kits submitted by or on behalf of law enforcement). Genealogy and Genetic Genealogy require the sharing of information. This option is provided primarily for artificially created research kits, but may be used for regular uploads if you have specific reasons for doing so.[4]

121. If options 2, 3, or 4 are selected for a particular DNA file before it is uploaded, the user can then use Verogen's search tools to find other DNA files that have any genetic similarity to the uploaded DNA file.

122. A user can also upload a file containing a family tree, created using another website or software program, called a "GEDcom," and can then compare that family tree to those uploaded by other users. A user can link DNA files to their family tree. Someone who has access to a person's GEDcom can see that person's

---

[4] GEDmatch, "Is GEDmatch Safe?", available at https://www.gedmatch.com/privacy-security/.

entire family history—e.g. parents, siblings, children, grandparents, grandchildren, etc.—and the DNA files attached to each person in the user's family tree.

123. GEDmatch.com also includes a related database, GEDmatch PRO Portal, that allows law enforcement to upload evidentiary DNA files from criminal investigations of violent crimes. Verogen charges law enforcement a fee per upload. Law enforcement can then run searches based on its evidentiary sample in the GEDmatch.com database. One of the tools law enforcement can use is the "One-to-Many Kinship" tool.[5] With this tool, the user can run a search that compares the uploaded DNA file with all of the DNA files in Verogen's vast database, and a search performed using this tool yields a list of users who "share some genetic similarities" with the user.[6] In other words, the individuals' DNA files that come up in this type of search are not necessarily close matches to the DNA file law enforcement is using. They simply need to "share some genetic similarity" with the primary DNA file.[7] Consequently, the use of this tool allows law enforcement to compare uploaded DNA files against all user-uploaded DNA files in Verogen's database and gives law enforcement a list of hundreds if not thousands of individuals' DNA files that share any genetic similarity to DNA related to a crime.

124. Verogen promises its users that they will not disclose to law enforcement any DNA files except for those that the uploading users specifically authorized to be used in law enforcement search queries. Specifically, according to Verogen, law enforcement are only permitted to access DNA files that were "opt-ed in" for law enforcement queries by the users who uploaded them (i.e.,

---

[5] GEDmatch, "GED Match One-to-Many Comparison," available at https://www.gedmatch.com/applications/one-to-many/.
[6] *Id.*
[7] A user can adjust the search parameters to narrow or widen the search results.

DNA files for which the uploading user selected option 2 above).

125. To date, GEDmatch.com has amassed over 2 million DNA files from its users. It has done so, in part, by making assurances to its users that their genetic information would remain private, and that it would only be disclosed to the specific third parties that the users expressly agreed may receive such information at the time of upload.

126. Those were false promises. As alleged below, during the time period relevant to this action, Verogen repeatedly disclosed to multiple third parties the genetic information uploaded by Plaintiffs and its other users, without any of their written informed consent, in three primary ways.

### A. Disclosure to Qiagen, a foreign corporation

127. First, Verogen violated the State Genetics Statutes by disclosing its entire database to Qiagen in connection with Qiagen's acquisition of Verogen in 2023.

128. To monetize the genetic information in its vast GEDmatch database, in January 2023, Verogen sold its GEDmatch.com and GEDmatch PRO databases, along with the rest of the company, to Qiagen for $150 million.[8]

129. Prior to Qiagen's acquisition of the genetic databases, upon information and belief, Verogen and Qiagen were not affiliated entities in that they neither shared common executives, founders, or other leadership.

130. As part of the sale, Verogen gave Qiagen "full access to Verogen's pioneering GEDmatch database and GEDmatch PRO portal."[9] Thus, Verogen

[8] Press Release, Qiagen, "Qiagen completes acquisition of Verogen, strengthening leadership in Human ID/Forensics with NGS technologies" (Jan. 9, 2023), available at https://corporate.qiagen.com/English/newsroom/press-releases/press-release-details/2023/QIAGEN-Completes-Acquisition-of-Verogen-Strengthening-Leadership-in-Human-ID--Forensics-With-NGS-Technologies/default.aspx.

[9] *Id*.

knowingly and purposefully disclosed to Qiagen the genetic information of every individual with a DNA file in its database at that time—including the genetic information of all of the Plaintiffs and members of the Classes.

131. Additionally, the information Verogen sold to Qiagen included the fact that each individual with a DNA file in its database had undergone genetic testing, as well as all of the accompanying information gathered by Verogen that was connected to each of these DNA files (including, inter alia, the first and last names and email addresses of the users who had uploaded the files, and the full name and gender of the person to whom the DNA file belonged). That information can be used to identify Plaintiffs and the other members of the Classes as the subjects of each DNA file uploaded to GEDmatch.com and as persons who had undergone genetic testing.

132. Verogen also sold to Qiagen the family trees, or GEDcoms, that its users had uploaded. This allowed Qiagen to access the genetic information of users' identified family members and the fact that these specific family members had undergone genetic testing. It also allowed Qiagen to access that user's entire family tree as well as any genetic information connected to those family members.

133. Verogen failed to obtain informed, written consent of any of the millions of individuals (including Plaintiffs and the members of the Classes) with genetic information in its database prior to disclosing it all to Qiagen. Upon information and belief, Verogen also failed to notify any of the individuals in its database of the upcoming sale, and failed to offer individuals the option to remove their data in advance of the upcoming sale.

134. Verogen disclosed the genetic information of all the individuals in its database (including of Plaintiffs and the members of the Classes) for profit and commercial gain. Indeed, profit and commercial gain was the very purpose of the sale to Qiagen. The approximately 1.8 million DNA files in Verogen's GEDmatch

database at the time undoubtedly added to Verogen's value in the acquisition. After the sale, Qiagen boasted of the specific purchase of the database in a press release, stating "Qiagen also gains full access to Verogen's pioneering GEDmatch database and GEDmatch PRO portal."[10] Verogen certainly benefitted financially from the disclosure of the genetic information in its database to Qiagen.

135. Verogen's disclosures of this incredibly sensitive information to Qiagen were highly offensive to Plaintiffs and would be viewed as such by the average person.

136. Verogen thus violated the genetic privacy laws of Alaska, Illinois, New Hampshire, New Mexico, and Oregon by disclosing, releasing, or transmitting to Qiagen Plaintiffs' and the Classes' genetic information without their written and informed consent.

**B. Disclosure to Meta**

137. Second, Verogen also violated the State Genetics Statutes and CIPA by systematically disclosing the identities of its users and the fact they had undergone genetic testing to Meta, without its users' written informed consent, through its use of the Meta Pixel technology it had installed on its GEDmatch.com website.

**i. The Meta Pixel and Meta's Operations**

138. On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta".[11] Since then, Meta has become the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birthdate, gender, and phone number or email.

139. Meta generates most of its revenue by selling advertising space.

---

[10] *Id.*

[11] Facebook, "Company Info," available at https://about.fb.com/company-info./.

Unlike traditional media where advertisements must appeal to broad demographics, Meta emphasizes that its advertising space can be targeted to specific Facebook users.

140. To support its targeted advertising business, Meta encourages and promotes entities and website owners, such as Verogen, to utilize "Business Tools" to gather, identify, target, and market products and services to individuals. Advertisers can also build "Custom Audiences," which helps them reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website." With Custom Audiences, advertisers can target existing customers directly and they can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities." Unlike Core Audiences, Custom Audiences and Lookalike Audiences are only available if the advertiser has sent its underlying data to Facebook. This data can be supplied to Facebook by manually uploading contact information for customers or by utilizing Facebook's "Business Tools."

141. Facebook's Business Tools, including the Facebook Tracking Pixel ("Pixel" or "Facebook Pixel") and Conversions API (CAPI), are bits of code that web developers can integrate into their webpages, mobile applications, and servers, and which allow Facebook to intercept website visitors' activity and collect information, including sensitive Private Information.

142. Meta's Facebook Business Tools are configured to automatically capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or uploads a file. Facebook Business Tools can track additional events, including the content a visitor views or purchases they make, and Facebook's menu of "standard events" allows advertisers to choose which types of content are

tracked.[12]

143. One such Business Tool is the Pixel, which is a piece of code that advertisers or website operators like Verogen can integrate into their website. As the name implies, the Facebook Pixel "tracks the people and type of actions they take." When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers. This second, secret transmission contains the original GET request that was sent to the host website and any additional data that the Facebook Pixel is configured to collect. Facebook's code initiates this second transmission simultaneously as communications occur with the host website. Thus, two sets of code are automatically created as part of the browser's attempt to load and read GEDmatch's website—GEDmatch's own code, and Meta's embedded code.

144. The Pixel tracks users as they navigate through the website and simultaneously transmits to Facebook the users' communications with the website, including Private Information. Upon information and belief, Facebook receives Private Information including but not limited to how long users spend on a particular web page, which buttons the users clicks, which pages they view, the text or phrases they type into various portions of the website, including their mitochondrial and Y haplogroup results from their DNA test and the kind of DNA test users took, and the fact that GEDMatch's users uploaded their DNA file to GEDMatch. The Pixel also sends Facebook identifying information including a

[12] *About Standard and Custom Webpage(s) Events*, FACEBOOK, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also F App Events API, META FOR DEVELOPERS*, https://developers.facebook.com/docs/marketing-api/app-event api/. (Last visited Aug. 21, 2024).

user's IP address and their unique Facebook ID ("FID").[13]

145. The transmission to Meta of users' FEDs allow Meta "to match . . . website visitors to their respective [Meta] User accounts."[14] Meta is able to do this because it has assigned each of its users FID numbers, which are unique and persistent identifiers that allow anyone to look up the user's unique Meta profile and thus identify the user by name.[15] Then, each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by the FID of the website's visitor. Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after clearing browser history.

146. To further illustrate the point in more detail, take an individual who navigates to the GEDmatch website and uploads his DNA file. When that site function is activated, the individual's browser sends a GET request to GEDmatch's server requesting that server to load the particular webpage. Because GEDmatch utilizes the Facebook Pixel, Meta's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Meta's code instructs the browser to secretly duplicate the unwitting individual's communication with GEDmatch, and to transmit it to Meta's Facebook servers, alongside additional information that transcribes the communication's content and/or action taken and the individual's identity.

147. After collecting and intercepting this information, Meta processes it, analyzes it, and assimilates it into datasets for advertisers Core Audiences and

---

[13] *Meta Pixel*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last visited Aug. 21, 2024).

[14] Meta, "Get Started – Meta Pixel," available at https://developers.facebook.com/docs/meta-pixel/get-started/.

[15] For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

Custom Audiences.

148. Additionally, Meta's Conversion API tool works in conjunction with Facebook Pixel, and it allows a second set of information to be transmitted via the GEDmatch server.

149. In this way, the Meta Pixel allows online-based companies like Verogen to build detailed profiles about their visitors by collecting information about how they interact with their websites, and to then use the collected information to service highly targeted advertising to them.

150. Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed. Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

151. Simply put: if a company chooses to install the Meta Pixel on its website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track[] the people and type of actions they take"[16] on the company's website, including whether they uploaded their genetic information and their use of the genealogical tools on GEDmatch.com.

**ii. Verogen Knowingly Used the Meta Pixel to Transmit to Meta its Users' Identities and the Fact They had Undergone Genetic Testing**

152. Upon information and belief, from at least as early as January 2020, when a person created an account, uploaded a DNA file, and used any of the tools

[16] Meta, "Retargeting: How to Advertise to Existing Customers with Ads on Facebook," available at https://www.facebook.com/business/goals/retargeting?checkpoint_src=any.

on the GEDmatch.com website, Verogen used the Meta Pixel technology it had installed on the website to disclose to Meta the unencrypted FID of the user along with the activities of the user on GEDmatch.com. This included, at a minimum, information that the user had uploaded her DNA file to GEDmatch.com. In other words, GEDmatch.com disclosed to Meta the identity of the user—identified by her unique FID—and the fact that she had undergone genetic testing.

153. With only a person's FID and the website activity, which Verogen knowingly provided to Meta, any ordinary person could learn the identity of the person to whom the FID corresponds and that they had undergone genetic testing.

154. At all relevant times, Verogen knew that the Meta Pixel disclosed to Meta its users FID and that they had uploaded DNA files to GEDmatch.com.

155. Upon information and belief, Facebook also received Plaintiffs' information directly through its Conversion API, which established a server-to-server data transmission from GEDmatch's Website server.

156. Verogen intentionally programmed its website (by following step-by-step instructions from Meta's website) to include the Meta Pixel that systematically transmits to Meta the FIDs of its users, along with their activity on the website. Verogen did so to take advantage of the targeted advertising and other informational and analytical services offered by Meta. This targeted advertising and other Meta services increased Verogen's revenue. Therefore, installing the Meta Pixel to transmit users' information was done for profit, monetary gain and commercial advantage.

157. Verogen could easily have programmed its website without the Meta Pixel. Instead, Verogen chose to install the Meta Pixel on its website and disclosed to Meta that every person with a DNA file uploaded had undergone genetic testing.

158. Prior to transmitting its users' identities and that they had undergone genetic testing to Meta, Verogen failed to notify Plaintiffs or any Class members

that it would do so, and neither Plaintiffs nor any other Class members consented (in writing or otherwise) to these practices.

159. Verogen's disclosures of this incredibly sensitive information to Meta were highly offensive to Plaintiffs and would be viewed as such by the average person.

160. By intentionally disclosing to Meta the identities of Plaintiffs Hutcheson, Lafler, Nichols, Curley, Taylor, Delk, Gardner, Starin, Cook, Novida and other Class members who were enrolled in Facebook, along with the fact they had undergone genetic testing, Verogen knowingly and systematically violated the genetic privacy statutes of Illinois, New Hampshire, and Oregon listed above, and also violated CIPA.

### C. Disclosure to Law Enforcement

161. Verogen further violated the State Genetics Statutes when it allowed law enforcement to access DNA files against the express wishes of its users.

162. As stated above, through GEDmatch PRO Portal, law enforcement can upload evidentiary DNA files and compare them to files in the GEDmatch.com database marked as "opt in" as part of an investigation of a violent crime. One of the tools law enforcement can use is the "One-to-Many Kinship" tool.[17] With this tool, law enforcement can run a search that results in a list of DNA files of individuals who "share some genetic similarities" with the law enforcement sample.[18] The bar to be included in a law enforcement "one-to-many" search is low: the individuals' DNA files that come up in this type of search need not be close matches to the DNA file law enforcement is using. They simply need to

[17] GEDmatch, "GED Match One-to-Many Comparison," available at https://www.gedmatch.com/applications/one-to-many/.
[18] *Id.*

"share some genetic similarity" with the law enforcement DNA sample.[19] Therefore, upon information and belief, the search can result in a list of hundreds or thousands of individuals' DNA files that law enforcement can then access. Further, from that list, law enforcement can evaluate possible relations and use the files to build and merge family trees and identify the most recent common ancestor.[20] In sum, GEDmatch.com's search tools give law enforcement access to thousands, if not hundreds of thousands, of individuals' DNA files without a warrant, and without those individuals ever being involved in or suspected of any crime.

163. Because of the serious privacy concern this entails, Verogen guaranteed its users that law enforcement would not have access to their DNA files unless the user selected the "opt-in" privacy level for the DNA file.

164. However, from approximately 2019 (perhaps earlier) through at least July 2023, GEDmatch had a "loophole" that allowed law enforcement or other users acting on behalf of law enforcement, to view DNA files not marked as "opt in".[21] In so doing, Verogen disclosed the DNA files of an unknown number of individuals to law enforcement not only without their consent, but against their specific wishes. The information disclosed to law enforcement included the DNA files, names, email address, DNA kit number, and the degree to which the file was

[19] A user can adjust the search parameters to narrow or widen the search results.

[20] Verogen, "SNP Typing in Universal Analysis Software and Kinship Estimation with GEDmatch PRO" (March 2021), available at https://verogen.com/wp-content/uploads/2021/03/snp-typing-uas-kinship-estimation-gedmatch-pro-tech-note-vd2020058-a.pdf.

[21] Verogen, "Notice regarding investigations into FIGG practitioners circumventing GEDmatch settings and violating Terms of Service, and actions taken" (November 2023), available at https://verogen.com/notice-regarding-investigations-into-figg-practitioners-circumventing-gedmatch-settings-and-violating-terms-of-service-and-actions-taken/#:~:text=We%20recently%20learned%20that%20a,for%20violent%20crime%20and%20homicides.

related to the law enforcement evidentiary sample.[22]

165. This was not the first time Verogen allowed law enforcement to access individuals' DNA files and other genetic information in its database against its express promises to its users. Prior to May 31, 2019, Verogen only allowed law enforcement to access the DNA files on GEDmatch.com for investigations of homicide or sexual assault. However, in November 2018, Verogen, without informing its users and without their consent, violated those promises and disclosed the genetic information of its users to law enforcement in Utah for an investigation of a regular assault.[23] Approximately two weeks after the press broke the story, Verogen changed its terms and conditions to allow law enforcement to access its users' DNA files for crimes beyond homicide and sexual assault.[24]

166. The Fourth Amendment to the United States' Constitution protects individuals from law enforcement viewing their genetic information at its whim. For law enforcement to obtain access to an individual's DNA file without the individual's express consent, they must first have probable cause that the person committed a crime. Then, the officer must obtain a warrant signed by a judge, who agrees that probable cause exists, before they can obtain and view a person's DNA file.

167. Here, Verogen allowed law enforcement to circumvent those constitutional protections by giving them access to numerous individuals' DNA

---

[22] *Id.*

[23] Buzzfeed, "The Arrest of a Teen On An Assault Charge Has Sparked New Privacy Fears About DNA Sleuthing", May 15, 2019, available at https://www.buzzfeednews.com/article/peteraldhous/genetic-genealogy-parabon-gedmatch-assault (Owner Curtis Rogers admitting he allowed law enforcement to use database in violation of GEDmatch's express policies.).

[24] Compare "Terms of Service and Privacy Policy" revised May 18, 2019 (available at https://web.archive.org/web/20190627225855/https://www.gedmatch.com/tos.htm) with "Terms of Service and Privacy Policy" on May 13, 2019 (available at https://web.archive.org/web/20190507124050/https://www.gedmatch.com/tos.htm).

information without a warrant and against the individuals' express wishes.

168. Verogen illegally disclosed these individuals' genetic information for profit, monetary gain, and commercial advantage. Verogen markets the use of its GEDmatch.com database for investigatory comparisons to police departments, charging them approximately $700 per upload.[25] The more DNA files law enforcement can access in their searches, the more valuable Verogen's service. Therefore, allowing law enforcement access to *all* the DNA files, including those that were not marked as "opt in," increased Verogen's value to law enforcement and increased its revenue. Alternatively, Verogen's disclosure was negligent.

169. Verogen's disclosures of this incredibly sensitive information to law enforcement entities were highly offensive to Plaintiffs and would be viewed as such by the average person.

170. Verogen's disclosures to Qiagen and law enforcement violated the genetic privacy laws of Alaska, Illinois, New Hampshire, New Mexico, and Oregon. Verogen's disclosures to Meta violated the genetic privacy laws of Illinois, New Hampshire, and Oregon.

## II. Defendant Qiagen's Unlawful Conduct

171. Qiagen violated the genetic privacy statutes of Alaska, Illinois, New Mexico, and Oregon by obtaining, retaining, using, and compelling the disclosure of the genetic information of the nearly 2 million individuals with DNA files in the GEDmatch database without the individuals' written, informed consent.

172. Qiagen violated the genetic privacy statutes of Illinois and Oregon by compelling Verogen to disclose all the genetic information contained in the GEDmatch database as part of the sale of Verogen, Inc. Unsurprisingly, Qiagen did not purchase the GEDmatch database solely for Verogen's benefit. The value

[25] Based on pricing information from 2022.

of a database containing genetic information of nearly 2 million individuals, including their genealogical connections, is obvious. The vast database allows Qiagen to offer enhanced services to law enforcement agencies and forensic teams, increasing its revenue and profit. Further, the tools available on GEDmatch.com that allow law enforcement to search for familial links in turn allow Qiagen to charge premium prices for access to its database, leading to higher profits. Qiagen clearly recognized the value of the database as it specifically boasted of the acquisition of and access to the database in its press release about its purchase of Verogen, stating that Qiagen gained "full access to Verogen's pioneering GEDmatch database and GEDmatch PRO portal".[26]

173. Since the acquisition, Qiagen has indeed leveraged this valuable resource for profit. It recently announced a new multi-year partnership with Bode Technology, the largest private U.S. forensics lab, where Bode will be the "exclusive global commercial partner for the GEDmatch PRO genealogy database."[27] Qiagen also announced a collaboration with Othram, a private DNA laboratory helping law enforcement solve various cases, in which the two companies will share access to the GEDmatch PRO tools.[28]

174. Given the enormous value of the database at the time of the sale, as well as its future value, Qiagen required Verogen to include the database, and importantly, access to the database, as part of the sale of Verogen to Qiagen. In doing so, Qiagen compelled Verogen to disclose the genetic information of all

---

[26] *Supra*, at 8.

[27] "QIAGEN and Bode Technology Partner to Advance Use of GEDmatch PRO Forensic Genetic Genealogy Database", https://www.globenewswire.com/news-release/2024/09/23/2951753/0/en/QIAGEN-and-Bode-Technology-partner-to-advance-use-of-GEDmatch-PRO-forensic-genetic-genealogy-database.html.

[28] "Othram, QIAGEN Collaborate on Tools, Standards for DNA", https://www.forensicmag.com/3594-All-News/615381-Othram-QIAGEN-Collaborate-on-Tools-Standards-for-DNA/

individuals in its database. It did so without the written, informed consent of any of those individuals. Qiagen's conduct in compelling the disclosure of the genetic information of millions of people violated the genetic privacy laws of Illinois and Oregon.

175. Further, in purchasing the GEDmatch and GEDmatch PRO databases from Verogen, Qiagen obtained the genetic information of nearly 2 million individuals without their written, informed consent. This conduct violates New Mexico's genetic privacy statute.

176. Qiagen further violated the genetic privacy statute of New Mexico by using the genetic information contained in the GEDmatch databases without the written, informed consent of the individuals to whom the genetic information belonged. In addition to the general use of the genetic information that access to the database allows, Qiagen used its ownership of the genetic information to procure financially beneficial partnerships, as described above.

177. Finally, Qiagen violated the genetic privacy statutes of Alaska and New Mexico by retaining the genetic information of nearly 2 million individuals after it purchased the databases from Verogen. It did so without the individuals' written, informed consent.

178. Qiagen obtaining, retaining, using, and compelling the disclosure of this genetic information was highly offensive to Plaintiffs and would be viewed as such by the average person.

179. Additionally, following Qiagen's acquisition of Verogen, Qiagen and Verogen collectively disclosed the genetic information of all persons with genetic data in the GEDmatch databases to Bode Cellmark Forensics, Inc. d/b/a Bode Technology ("Bode")—also without notifying, or obtaining any form of consent from, any of these individual—to enable Bode to use the database for genetics research.

180. Verogen and Qiagen made all of the genetic data in the GEDmatch databases available to Bode to use in performing genealogical comparisons and research. *See* "Comparative Evaluation of Genotyping Technologies for Investigative Genetic Genealogy in Sexual Assault Casework," Bode Technology, June 30, 2024, available at https://www.ojp.gov/pdffiles1/nij/grants/310017.pdf.

181. None of the Plaintiffs or Class members, nor anyone else whose genetic information is housed in the GEDmatch database, were notified of or provided consent to authorize Verogen and Qiagen's disclosure of their sensitive genetic information to Bode.

**III. Defendant Meta's Unlawful Conduct**

182. As set forth above with respect to Meta's operation of its Pixel on the GEDmatch.com website, Meta's use of its Pixel to intercept Verogen users' private communications with Verogen made on the GEDmatch.com website without users' informed written consent violated CIPA, which prohibits the interception of private communications without informed consent.

183. As also described above, these private communications between GEDmatch.com users and Verogen revealed the users' identities and their genetic information to Meta, including the fact that they had undergone genetic testing.

184. Further, Meta violated GIPA by compelling the disclosure of Plaintiffs' and Class members' genetic information when it entered into contracts with its customers (i.e. GEDMatch), which required them to disclose web traffic and user information, including the disclosure of all actions taken on the customers' website in exchange for such customers' ability to use its Facebook Pixel technology. As a result of the communications compelled by Meta via its Facebook Pixel and CAPI, Meta and its other advertising customers are better able to target individuals with advertisements. Thus, Meta's use of Facebook Pixel, and the information compelled from individuals through its use, permits Meta and its

customers, in this case Verogen, to better target individuals with ads on Facebook (or other Meta products like Instagram). In exchange, Meta and subsidiary Facebook receive more advertisement dollars since they're better able to target individuals.

185. Similarly, Meta's use of the Pixel to intercept website users' private communications with Verogen, including genetic information identifying the fact that those users received genetic testing and services, violates the genetic laws of New Hampshire, which prohibits the receipt of genetic information without informed consent, including information resulting from participation in genetic research or use of genetic services.

186. Regardless of the circumstance, Meta intercepted, compelled the disclosure of, and received Plaintiffs' and class members genetic information for its own business purposes.

187. Unsurprisingly, Meta does not offer its Pixel to companies like GEDmatch solely for those companies' benefit. "Data is the new oil of the digital economy,"[29] and Facebook has built its more-than $300 billion market capitalization on mining and using that 'digital oil'. Thus, the large volumes of genetic information Meta captured from GEDmatch are actively viewed, examined, analyzed, curated, and used by the company. Meta compels and acquires the raw data to transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. Indeed, Facebook offers the Pixel free of charge[30] and the price that website owners pay for the Pixel is the data that it allows Facebook to collect.

---

[29] Joris Toonders, *Data Is the New Oil of the Digital Economy*, WIRED, https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/ (last visited Aug. 21, 2024).

[30] *Facebook Pixel: What It Is and Why You Need It*, https://seodigitalgroup.com/facebook-pixel/ (last visited Aug. 21, 2024).

188. Defendant Meta achieves such compulsion of mass data through its contracts with companies like GEDMatch. Such contracts require that all web traffic data, including all user information and actions taken on GEDMatch, be tracked by the Facebook Pixel and transmitted to Meta.

189. This is worrying because such compelled data often includes or is associated with personal identities. Facebook describes itself as a "real identity platform,"[31] meaning users are allowed only one account and must share "the name they go by in everyday life."[32] To that end, when creating an account, users must provide their first and last name, date of birth, and gender.[33] Facebook's history of surreptitiously gathering other irreplaceable "identity" information like biometrics is also well documented.[34]

190. This is crucial to Facebook, because it sells its advertising space by emphasizing its ability to target users.[35] Facebook is especially effective at targeting users because it surveils user activity both on and off its own site.[36] This allows Facebook to make inferences about users beyond what they explicitly disclose, including their "interests," "behavior," and "connections."[37] Facebook

[31] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[32] *Community Standards, Part IV Integrity and Authenticity*, META TRANSPARENCY CENTER https://www.facebook.com/communitystandards/integrity_authenticity (last visited Aug. 21, 2024).
[33] *Sign Up*, FACEBOOK, https://www.facebook.com/ (last visited Aug. 21, 2024).
[34] *Facebook's $650M BIPA settlement 'a make-or-break moment*, https://iapp.org/news/a/facebooks 650m-bipa-settlement-a-make-or-break-moment/ (last visited Aug. 21, 2024)
[35] *Why Advertise on Facebook, Instagram, and Other Meta Technologies*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/205029060038706 (last visited Aug. 21, 2024).
[36] *About Meta Pixel*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Aug. 21, 2024).
[37] *Ad Targeting: Help your ads find the people who will love your business*, META ADS https://www.facebook.com/business/ads/ad-targeting (last visited March 20, 2024).

compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[38]

191. Advertisers can also build "Custom Audiences,"[39] which helps them reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[40] With Custom Audiences, advertisers can target existing customers directly. They can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[41]

192. Facebook does not merely collect information gathered by the Pixel and store it for safekeeping on its servers without ever viewing or accessing the information. Instead, in accordance with the purpose of the Pixel to allow Facebook to create Core, Custom, and Lookalike Audiences for advertising and marketing purposes, Facebook viewed, processed, and analyzed Plaintiffs' and Class members' confidential genetic information. Upon information and belief, such viewing, processing, and analyzing was performed by computers and/or algorithms programmed and designed by Facebook employees at the direction and behest of Facebook.

---

[38] *Easier, More Effective Ways to Reach the Right People on Facebook*, META CORE AUDIENCES, https://www.facebook.com/business/news/Core-Audiences (last visited Aug. 21, 2024).
[39] *About Custom Audiences*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited Aug. 21, 2024).
[40] *Ad Targeting, Help your ads Find the People Who Will Love Your Business*, META ADS, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 21, 2024).
[41] *About Lookalike Audiences*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited Aug. 21, 2024).

193. Facebook receives over 4 petabytes[42] of information every day and must rely on analytical tools designed to view, categorize, and extrapolate the data to augment human effort.[43] This process is known as "data ingestion" and allows "businesses to manage and make sense of large amounts of data."[44]

194. By using data ingestion tools, Facebook can rapidly translate the information it receives from the Pixel to display relevant ads to consumers. For example, if a consumer visits a retailer's webpage and places an item in their shopping cart without purchasing it, the next time the shopper visits Facebook, an ad for that item will appear on the shopper's Facebook page.[45] This evidences the fact that Facebook views and categorizes data as they are received from the Pixel.

195. Moreover, even if Facebook eventually deletes or anonymizes sensitive information that it receives, it must first view that information to identify it as containing sensitive information suitable for removal. Accordingly, there is a breach of confidentiality the instant the information is disclosed or received without authorization. As described by the HHS Bulletin:

> It is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place **and** requires that there is an applicable Privacy Rule

[42] A petabyte is equal to one million gigabytes (1,000,000 GB).

[43] https://medium.com/@srank2000/how-facebook-handles-the-4-petabyte-of-data-generated-per-day ab86877956f4. Facebook employees would not be able to view each piece of data individually – millions of them per second – without the aid of technology. Just as a microscope or telescope allows the user to see very small or very distant objects by zooming in, however, Facebook's big data management software allows the company to see all this data at once by zooming out.

[44] https://scaleyourapp.com/what-database-does-facebook-use-a-1000-feet-deep-dive/. Facebook uses ODS, Scuba, and Hive to manage its massive data stores. These technologies are not traditional databases; they are specialized databases for big data designed to process data specifically for analysis— "such as [viewing] hidden patterns, correlations, market trends and customer preferences."

[45] *A Complete Guide to Facebook Tracking for Beginners*, OBERLO, Oct. 5, 2021, https://www.oberlo.com/blog/facebook-pixel.

permission for disclosure.

(emphasis in original).[46] [47]

## CLASS ACTION ALLEGATIONS

196. Plaintiffs Hutcheson, Lafler, Nichols, and Curley seek to represent a class defined as all Illinois residents who had their DNA files uploaded on Verogen's GEDmatch.com website and subsequently had the genetic information pertaining to such DNA file disclosed without their written, informed consent, during the applicable limitation period(the "Illinois Class").

197. Plaintiffs Hutcheson, Lafler, Nichols, and Curley also seek to represent a subclass defined as all Illinois residents who, while maintaining a Facebook account, uploaded a DNA profile on Verogen's GEDmatch.com website and subsequently had the genetic information pertaining to such DNA profile disclosed to Meta during the applicable limitation period ("the Illinois Meta Subclass").

198. Plaintiff Hutcheson also seeks to represent a subclass of all Illinois residents who had their DNA file uploaded on Verogen's GEDmatch.com website, did not opt-in to permit law enforcement to access such DNA file, and who subsequently had their genetic information pertaining to such DNA file disclosed to law enforcement or others acting on their behalf during the applicable limitation period (the "Illinois Non-Consent to Law Enforcement Subclass").

---

[46] U.S. Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*; https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last accessed Apr. 11, 2025).

[47] While the U.S. District Court for the Northern District of Texas issued an order declaring unlawful and vacating a portion of this guidance (*See Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780 (N.D. Tex. 2024), that order did not address allegations involving disclosure of "potential [individually identifiable health information] along with an individual's Facebook ID, which very specifically identifies an actual individual". *Nienaber v. Overlake Mos. Med. Cntr.*, 2025 WL 692097, at *5-6 (W.D. Wash. Mar. 5, 2025) (declining to follow *Am. Hosp. Ass'n*).

199. Plaintiffs Delk and Taylor seek to represent a class defined as all Oregon residents who had their DNA file uploaded on Verogen's GEDmatch.com website and subsequently had the genetic information pertaining to such DNA file disclosed without their written, informed consent, during the applicable limitation period (the "Oregon Class").

200. Plaintiffs Delk and Taylor also seek to represent a subclass defined as all Oregon residents who, while maintaining a Facebook account, uploaded a DNA profile on Verogen's GEDmatch.com website and subsequently had the genetic information pertaining to such DNA profile disclosed to Meta during the applicable limitation period (the "Oregon Meta Subclass").

201. Plaintiff Taylor also seeks to represent a subclass of all Oregon residents who had their DNA file uploaded on Verogen's GEDmatch.com website, did not opt-in to permit law enforcement to access such DNA file, and who subsequently had their genetic information pertaining to such DNA file disclosed to law enforcement or others acting on their behalf during the applicable limitation period (the "Oregon Non-Consent to Law Enforcement Subclass").

202. Plaintiffs Diekmann and Radcliffe seek to represent a class defined as all New Mexico residents who had their DNA file uploaded on Verogen's GEDmatch.com website and subsequently had the genetic information pertaining to such DNA file disclosed, obtained, retained, or used without their written, informed consent during the applicable limitation period (the "New Mexico Class").

203. Plaintiffs Diekmann and Radcliffe also seek to represent a subclass defined as all New Mexico residents who, while maintaining a Facebook account, uploaded a DNA profile on Verogen's GEDmatch.com website and subsequently had the genetic information pertaining to such DNA profile disclosed to Meta during the applicable limitation period ("the New Mexico Meta Subclass").

204. Plaintiffs Gardner and Starin seek to represent a class defined as all New Hampshire residents who had their DNA file uploaded on Verogen's GEDmatch.com website and subsequently had the genetic information pertaining to such DNA file disclosed without their written, informed consent, during the applicable limitation period (the "New Hampshire Class").

205. Plaintiffs Gardner and Starin also seek to represent a subclass defined as all New Hampshire residents who, while maintaining a Facebook account, uploaded a DNA profile on Verogen's GEDmatch.com website and subsequently had the genetic information pertaining to such DNA profile disclosed to Meta during the applicable limitation period (the "New Hampshire Meta Subclass").

206. Plaintiffs Yeisley and Nathan seek to represent a class defined as all Alaska residents who had their DNA file uploaded on Verogen's GEDmatch.com website and subsequently had the genetic information pertaining to such DNA file disclosed or retained, without their written, informed consent, during the applicable limitation period (the "Alaska Class").

207. Plaintiffs Cook and Novida seek to represent a class defined as all California residents who, while maintaining a Facebook account, uploaded a DNA profile on Verogen's GEDmatch.com website and subsequently had the genetic information pertaining to such DNA profile disclosed to Meta during the applicable limitation period ("the California Class").

208. All Plaintiffs seek to represent a class defined as all individuals residing in the United States who, while maintaining a Facebook account, uploaded a DNA profile on Verogen's GEDmatch.com website and subsequently had the genetic information pertaining to such DNA profile disclosed to Meta during the applicable limitation period ("the Nationwide Class").

209. Plaintiffs reserve the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

210. The above-defined classes are referred to collectively at times herein as the "Classes."

211. Members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Classes number in at least the hundreds of thousands. The precise number of members of the Classes and their identities are unknown to Plaintiff at this time but may be determined through discovery. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the membership records of Defendants.

212. Common questions of law and fact exist for all members of the Classes and predominate over questions affecting only individual class members. Common legal and factual questions include, but are not limited to:

(a) Whether Verogen disclosed Plaintiffs' and the members of the Classes' genetic information to Qiagen;

(b) Whether Verogen disclosed Plaintiffs' and the members of Classes' identities and that they had undergone genetic testing to Meta;

(c) Whether Verogen disclosed Plaintiffs' and members of the Classes' genetic information to law enforcement actors;

(d) Whether Qiagen compelled the disclosure of Plaintiffs' and members of the Classes' genetic information;

(e) Whether Qiagen obtained, retained, or used Plaintiffs' and members of the Classes' genetic information;

(f) Whether Meta compelled the disclosure of Plaintiffs' and the members of the Classes' identities and that they had undergone genetic testing;

(g) Whether the conduct described constitutes a violation of A.S. § 18.13.010, *et seq.*;

(h) Whether the conduct described constitutes a violation of 410 ILCS 513/1, *et seq.*;

(i) Whether the conduct described constitutes a violation of N.H. Rev. Stat. § 141-H:1, *et seq.*;

(j) Whether the conduct described constitutes a violation of N.M.S.A. 1978, § 24-21-1, *et seq.*;

(k) Whether the conduct described constitutes a violation of O.R.S. § 192.531, *et seq.*;

(l) Whether the conduct described constitutes a violation of the California Invasion of Privacy Act, Cal. Penal Code § § 630, *et seq.*;

(m) Whether the disclosures were willful, negligent, intentional, or reckless;

(n) Whether the disclosures were committed with the intent to sell, transfer or use for commercial advantage, or resulted in profit or monetary gain; and

(o) Whether Plaintiffs and the Classes are entitled to damages and injunctive relief.

213. The named Plaintiffs' claims are typical of the claims of the members of the Classes in that the named Plaintiffs and the members of the Classes suffered invasions of their statutorily protected rights to genetic privacy as a result of Defendants' actions in disclosing, compelling the disclosure of, obtaining, retaining, or using their genetic information without proper consent.

214. Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the members of the Classes they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. Plaintiffs and counsel will fairly and adequately protect the interests of members of the Classes.

215. The class mechanism is superior to other available means for the fair and efficient adjudication of Classes members' claims. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Against Defendant Verogen
### Violation of A.S. § 18.13.010, *et seq.*
### (By Plaintiffs Yeisley and Nathan, Individually and on Behalf of the Alaska Class)

216. Plaintiffs Yeisley and Nathan incorporate by reference and re-allege all paragraphs above.

217. Plaintiffs Yeisley and Nathan are domiciled and suffered injury in Alaska.

218. Plaintiffs Yeisley and Nathan bring their claims individually and on behalf of the members of the Alaska Class.

219. A.S. § 18.13.010, *et seq.*, prohibits a person or corporation from disclosing the results of a DNA analysis without informed and written consent.

220. Plaintiffs Yeisley and Nathan and the Alaska Class members uploaded or had another upload their DNA analysis results to GEDmatch.com. They also provided accompanying personal identifying information, including at least their names.

221. The information Verogen obtained from Plaintiffs Yeisley and Nathan and the Class members is the type of information protected by A.S. § 18.13.010, *et seq*.

222. Verogen disclosed Plaintiffs' and the Alaska Class members' DNA analysis results to Qiagen without their written informed consent. In doing so, Verogen violated A.S. § 18.13.010, *et seq.*

223. Verogen disclosed Plaintiffs' and the Alaska Class members' DNA analysis results to Bode without their written informed consent. In doing so, Verogen violated A.S. § 18.13.010, *et seq.*

224. Verogen's violations resulted in profit or monetary gain. Verogen made $150 million in its sale to Qiagen, which was in part due to the value of the genetic information in the GEDmatch.com database. Verogen has also generated revenue from its partnership with Bode, pursuant to which Verogen makes the GEDmatch database and the genetic information stored in it to Bode.

225. Based upon Verogen's violation of A.S. § 18.13.010, *et seq.*, Plaintiffs Yeisley and Nathan and members of the Alaska Class are entitled to (1) an injunction requiring Verogen to cease disclosing Plaintiffs' Yeisley and Nathan and the Alaska Class members' genetic information without written, informed consent, and withdraw the genetic information disclosed to law enforcement and Qiagen, (2) statutory damages in the amount of $100,000 per violation to Plaintiffs Yeisley and Nathan and the Alaska Class members for the violations that resulted in profit or monetary gain, or statutory damages in the amount of $5,000 per violation if the Court finds the violations were not for profit or monetary gain, (3) an award of

punitive damages or exemplary damages, and (4) an award of reasonable attorneys' fees, court costs, and reasonable expenses.

**SECOND CAUSE OF ACTION**
**Against Defendant Qiagen**
**Violation of A.S. § 18.13.010, *et seq.***
**(By Plaintiffs Yeisley and Nathan, Individually and on Behalf of the Alaska Class)**

226. Plaintiffs Yeisley and Nathan incorporate by reference and re-allege all paragraphs above.

227. Plaintiffs Yeisley and Nathan are domiciled and suffered injury in Alaska.

228. Plaintiffs Yeisley and Nathan bring their claims individually and on behalf of the members of the Alaska Class.

229. A.S. § 18.13.010(a)(1) prohibits a person or corporation from retaining the results of a DNA analysis without informed and written consent.

230. Plaintiffs and the Alaska Class members uploaded or had another upload their DNA analysis results to GEDmatch.com. They also provided accompanying personal identifying information, including at least their names.

231. The information Plaintiffs Yeisley and Nathan uploaded to GEDmatch.com is the type of information protected by A.S. § 18.13.010, *et seq*.

232. Qiagen obtained Plaintiffs Yeisley's and Nathan's and the Alaska Class members' DNA analysis results through its purchase of Verogen and its GEDmatch database. It then retained Plaintiffs Yeisley's and Nathan's and the Alaska Class members' DNA analysis results without their written, informed consent. In doing so, Qiagen violated A.S. § 18.13.010, *et seq.*

233. Additionally, Qiagen disclosed Plaintiffs' and the Alaska Class members' DNA analysis results to Bode without their written informed consent. In doing so, Qiagen violated A.S. § 18.13.010, *et seq.*

234. Qiagen's violations resulted in profit or monetary gain. Qiagen's retention of the DNA analysis results in the GEDmatch.com database undoubtedly added to Qiagen's value. By maintaining control over this extensive genetic database, Qiagen can and has leveraged this valuable resource to offer premium services to law enforcement agencies and forensic investigators, as shown in its new multi-year partnerships with Bode Technology and Othram lab. The value of the extensive database is the reason Qiagen boasted specifically of its access to this genetic information in the press release announcing its acquisition of Verogen.[48]

235. Moreover, Qiagen has also generated revenue from its partnership with Bode, pursuant to which Qiagen makes the GEDmatch database and the genetic information stored in it to Bode.

236. Based upon Qiagen's violation of A.S. § 18.13.010, *et seq.*, Plaintiffs Yeisley and Nathan and members of the Alaska Class are entitled to (1) an injunction requiring Qiagen to cease retention of Plaintiffs' and the Alaska Class members' genetic information without written, informed consent, (2) statutory damages in the amount of $100,000 per violation to Plaintiffs and the Alaska Class members for the violations that resulted in profit or monetary gain, or statutory damages in the amount of $5,000 per violation if the Court finds the violations were not for profit or monetary gain, (3) an award of punitive damages or exemplary damages, and (4) an award of reasonable attorneys' fees, court costs, and reasonable expenses.

[48] *Supra*, at 8.

**THIRD CAUSE OF ACTION**
**Against Defendant Verogen**
**Violation of 410 ILCS 513/1, *et seq*.**
**(By Plaintiffs Hutcheson, Lafler, Nichols, and Curley, Individually and on Behalf of the Illinois Class and Meta Subclass, and by Hutcheson, Individually and on Behalf of the Illinois Non-Consent to Law Enforcement Subclass)**

237. Plaintiffs Hutcheson, Lafler, Nichols, and Curley incorporate by reference and re-allege all paragraphs above.

238. Plaintiffs Hutcheson, Lafler, Nichols, and Curley are domiciled and suffered injury in Illinois.

239. Plaintiffs Hutcheson, Lafler, Nichols, and Curley bring their claims individually and on behalf of the members of the Illinois Class. Plaintiff Hutcheson also brings her claims on behalf of the members of the Illinois Subclass.

240. Verogen is a corporation and is thus a "person" under 410 ILCS 513/15.

241. Illinois's GIPA, 410 ILCS 513/1, *et seq.*, prohibits disclosing a person's genetic information or the identity of any person upon whom a genetic test is performed without informed, written consent. The consent must be given in a specific written legally effective authorization and designate the person to whom the information will be released.

242. "Genetic information" includes the individual's genetic tests as well as the genetic tests of family members of the individual. 410 ILCS 513/10, citing 45 C.F.R. § 160.103.

243. Plaintiffs Hutcheson, Lafler, Nichols, and Curley and the Illinois Class members uploaded or had another upload their genetic information in the form of DNA data to GEDmatch.com. They also provided accompanying personal identifying information, including at least their names. Plaintiff Hutcheson and the

Illinois Non-Consent to Law Enforcement Subclass members did not opt in or consent to law enforcement having access to their genetic information.

244. The information Verogen obtained from Plaintiffs and the Class members is the type of information protected by 410 ILCS 513/1, *et seq*.

245. As described above, Verogen disclosed Plaintiffs' and the putative Illinois Class members' genetic information, along with their identities and the fact they had undergone genetic testing to Qiagen without their written, informed consent. Verogen further disclosed Plaintiffs' and the Illinois Meta Subclass members' genetic information, along with their identities and the fact they had undergone genetic testing, to Meta without their written, informed consent. Verogen also disclosed Plaintiff Hutcheson's and the Illinois Non-Consent to Law Enforcement Subclass members' genetic information, along with their identities and the fact they had undergone genetic testing to law enforcement actors without their written, informed consent and against their express wishes. Verogen also disclosed Plaintiffs' and the Illinois Class members' DNA analysis results to Bode without their written, informed consent. All such disclosures violated 410 ILCS 513/1, *et seq*.

246. Plaintiffs Hutcheson, Lafler, Nichols, and Curley and the Illinois Class members are aggrieved by Verogen's violations.

247. Verogen disclosed the genetic information of the Plaintiffs and the Illinois Class and Subclass members intentionally or recklessly, but at very least, negligently. Verogen knowingly sold its entire database of genetic information to Qiagen for financial gain, using the genetic information in the database to increase the sale price. Verogen also generated revenue from its partnership with Bode disclosed, pursuant to which Verogen makes the GEDmatch database and the genetic information stored in it to Bode. This conduct constitutes an intentional and reckless disclosure of its users' genetic information without written, informed

consent. Verogen also intentionally disclosed its users' identities and the fact that they had genetic testing performed to Meta to improve its advertising, and thus, increase its profits. Finally, Verogen intentionally or recklessly violated GIPA by establishing, maintaining, and failing to fix the loophole that allowed law enforcement to view the genetic information of the individuals who had expressly "opted out" of law enforcement access.

248. Based upon Verogen's violations, Plaintiffs and the Illinois Class and Subclass members are entitled to statutory damages of $15,000 for each willful and/or reckless violation of GIPA or actual damages—whichever is greater—and, alternatively, damages of $2,500 for each negligent violation of GIPA or actual damages—whichever is greater—along with reasonable attorney's fees and costs. 410 ILCS 513/40(a)(3).

**FOURTH CAUSE OF ACTION**
**Against Defendant Qiagen**
**Violation of 410 ILCS 513/1, *et seq*.**
**(By Plaintiffs Hutcheson, Lafler, Nichols, and Curley, Individually and on Behalf of the Illinois Class)**

249. Plaintiffs Hutcheson, Lafler, Nichols, and Curley incorporate by reference and re-allege all paragraphs above.

250. Plaintiffs Hutcheson, Lafler, Nichols, and Curley are domiciled and suffered injury in Illinois.

251. Plaintiffs Hutcheson, Lafler, Nichols, and Curley bring their claims individually and on behalf of the members of the Illinois Class.

252. Qiagen is a corporation and is thus a "person" under 410 ILCS 513/15.

253. Illinois's GIPA, 410 ILCS 513/1, *et seq.*, prohibits compelling disclosure of a person's genetic information or the identity of any person upon whom a genetic test is performed without informed, written consent. The consent

must be given in a specific written legally effective authorization and designate the person to whom the information will be released.

254. "Genetic information" includes the individual's genetic tests as well as the genetic tests of family members of the individual. 410 ILCS 513/10, citing 45 C.F.R. § 160.103.

255. Plaintiffs Hutcheson, Lafler, Nichols, and Curley and the Illinois Class members uploaded or had another upload their genetic information in the form of DNA data to GEDmatch.com. They also provided accompanying personal identifying information, including at least their names.

256. The information Plaintiffs and the Class members uploaded onto GEDmatch.com is the type of information protected by 410 ILCS 513/1, *et seq.*

257. As described above, Qiagen compelled Verogen to disclose Plaintiffs' and the Illinois Class members' genetic information, along with their identities and the fact they had undergone genetic testing without their written, informed consent, by requiring Verogen to include the database and access to the database as part of the sale. Qiagen compelling Verogen to disclose the genetic information in its GEDmatch.com database violated 410 ILCS 513/1, *et seq*.

258. Additionally, Qiagen also disclosed Plaintiffs' and the Illinois Class members' DNA analysis results to Bode without their written, informed consent.

259. Plaintiffs Hutcheson, Lafler, Nichols, and Curley and the Illinois Class members are aggrieved by Qiagen's violations.

260. Qiagen compelled disclosure of the genetic information of the Plaintiffs and the Illinois Class members intentionally or recklessly, but at very least, negligently. Qiagen knowingly required Verogen to include the GEDmatch database, and importantly, access to the database, in the sale of Verogen. Qiagen then used its access to the database for financial gain, using the value of the vast amount of genetic information it contains to increase its own market value and

increase revenue. Qiagen also generated revenue from its partnership with Bode disclosed, pursuant to which Qiagen makes the GEDmatch database and the genetic information stored in it to Bode. This conduct is intentional and reckless.

261. Based upon Qiagen's violations, Plaintiffs and the Illinois Class members are entitled to statutory damages of $15,000 for each willful and/or reckless violation of GIPA or actual damages—whichever is greater—and, alternatively, damages of $2,500 for each negligent violation of GIPA or actual damages—whichever is greater—along with reasonable attorney's fees and costs. 410 ILCS 513/40(a)(3).

**FIFTH CAUSE OF ACTION**
**Against Defendant Meta**
**Violation of 410 ILCS 513/1, *et seq*.**
**(By Plaintiffs Hutcheson, Lafler, Nichols, and Curley, Individually and on Behalf of the Illinois Meta Subclass)**

262. Plaintiffs Hutcheson, Lafler, Nichols, and Curley incorporate by reference and re-allege all paragraphs above.

263. Defendant Meta Platforms, Inc. is a corporation and, therefore, a "person" under 410 ILCS 513/10.

264. The information that Defendant obtained from Plaintiffs and the Illinois Meta Subclass includes the type of information protected by GIPA. 410 ILCS 513/10.

265. GIPA states that no person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test. *See* 410 ILCS 513/30(a).

266. Plaintiffs and the members of the Illinois Meta Subclass are individuals who uploaded their DNA data to GEDmatch.

267. Defendant Meta, through the use of its Facebook Pixel and CAPI, then obtained Plaintiffs' and subclass members' genetic information which consists, at a minimum, of their identities and the fact that they uploaded their genetic information and had a genetic test performed.

268. Crucially, this information was compelled by Defendant Meta when it entered into contracts with its customers (i.e. GEDMatch) to permit the disclosure of all web traffic and all user information, including the disclosure of all actions taken on their customers' website, for Meta's analytics and advertising business.

269. In other words, Meta compelled the disclosure of Plaintiffs' and the other subclass members' identities who had been the subject of genetic tests. See 410 ILCS 513/30(a).

270. Meta failed to obtain written authorization from Plaintiffs or the members of the subclass to obtain their genetic information, as required by 410 ILCS 513/30(a) and 410 ILCS 513/35.

271. Plaintiffs and the other subclass members have been aggrieved by Meta's violations of their statutorily protected rights to privacy in their genetic information as set forth in GIPA when Meta compelled the disclosure of their identities and other genetic information without their consent.

272. Meta's violations of GIPA, as set forth herein, were knowing and willful, or were at least in reckless disregard of the statutory requirements. Alternatively, Meta negligently failed to comply with GIPA.

273. On behalf of themselves and the subclass, Plaintiffs seek: (1) a declaration that Meta's actions violate GIPA, 410 ILCS 513/1, *et seq.*; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the subclass by requiring Meta to comply with GIPA's requirements; (2) statutory damages of $15,000 for each intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(a)(2) or, in the alternative, statutory damages of $2,500 for

each negligent violation of GIPA pursuant to 410 ILCS 513/40(a)(1); and (3) reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(a)(3).

**SIXTH CAUSE OF ACTION**
**Against Defendant Verogen**
**Violation of N.H. Rev. Stat. § 141-H:1, *et seq.*;**
**(By Plaintiffs Gardner and Starin, Individually and on Behalf of the New Hampshire Class and Meta Subclass)**

274. Plaintiffs Gardner and Starin incorporate by reference and re-allege all paragraphs above.

275. Plaintiffs Gardner and Starin are domiciled and suffered injury in New Hampshire.

276. Plaintiffs Gardner and Starin bring their claims individually and on behalf of the members of the New Hampshire Class.

277. N.H. Rev. Stat. Ann. § 141-H:2 IV prohibits disclosing to any other person that "an individual has undergone genetic testing," or the results of any genetic testing without prior written and informed consent.

278. Plaintiffs Gardner and Starin and the New Hampshire Class members uploaded or had another upload their genetic information to GEDmatch.com. They also provided accompanying personal identifying information, including at least their names and email addresses.

279. The information Plaintiffs Gardner and Starin and the Class members uploaded to GEDmatch.com is the type of information protected by N.H. Rev. Stat. § 141-H:1, *et seq*.

280. As shown above, Verogen disclosed Plaintiffs' and the putative New Hampshire Class members' genetic information, along with their identities and the fact that they had undergone genetic testing to Qiagen without their written informed consent. Verogen further disclosed Plaintiffs' and the New Hampshire

Meta Subclass members' genetic information, along with their identities and the fact that they had undergone genetic testing, to Meta without their written informed consent. Verogen also disclosed Plaintiffs' and the New Hampshire Class members' DNA analysis results to Bode without their written, informed consent. These disclosures violated N.H. Rev. Stat. § 141-H:1, *et seq*.

281. Plaintiffs and the New Hampshire Class and Subclass members have been aggrieved by Verogen's above-described violations of their statutorily protected rights to privacy of their genetic information as set forth in N.H. Rev. Stat. Ann. § 141-H:1, *et seq*.

282. Based upon Verogen's violations, Plaintiffs and the New Hampshire Classes are entitled to damages in the amount of at least $1,000 for each violation, and costs and reasonable legal fees.

**SEVENTH CAUSE OF ACTION**
**Against Defendant Verogen**
**Violation of N. M. S. A. 1978, § 24-21-1, *et seq.*;**
**(By Plaintiffs Radcliffe and Diekmann, Individually and on Behalf of the New Mexico Class)**

283. Plaintiffs Radcliffe and Diekmann incorporate by reference and re-allege all paragraphs above.

284. Plaintiffs Radcliffe and Diekmann are domiciled and suffered injury in New Mexico.

285. Plaintiffs Radcliffe and Diekmann bring their claim individually and on behalf of the members of the New Mexico Class.

286. N. M. S. A. 1978, § 24-21-1, *et seq.* prohibits transmitting genetic information of an individual without informed and written consent. "Genetic information" includes information about the genetic makeup of an individual, or the individual's family members.

287. Plaintiffs Radcliffe and Diekmann and the New Mexico Class members uploaded or had another upload their genetic information to GEDmatch.com. They also provided accompanying personal identifying information, including at least their names and email addresses.

288. The information Plaintiffs Radcliffe and Diekmann and the Class members had on GEDmatch.com is the type of information protected by N.M.S.A. 1978, § 24-21-1, *et seq.*

289. As shown above, Verogen disclosed Plaintiffs' and the putative New Mexico Class members' genetic information to Qiagen without their written, informed consent. Verogen also disclosed Plaintiffs' and the New Mexico Class members' DNA analysis results to Bode without their written, informed consent. These disclosures violated the rights of Plaintiff and the New Mexico Class members under N. M. S. A. 1978, § 24-21-1, *et seq.*

290. Verogen's disclosures resulted from willful or grossly negligent conduct. Verogen knowingly disclosed its entire database of genetic information to Qiagen for financial gain and used it to increase the value of the sale, and also knowingly disclosed its entire database of genetic information to Bode pursuant to a commercial partnership between the companies that generates substantial revenue for Verogen.

291. Based upon Verogen's violations, Plaintiffs Radcliffe and Diekmann and the New Mexico Class are entitled to damages in the amount of $5,000 for each violation, in addition to any economic loss as the violations resulted from willful or grossly negligent conduct and costs and reasonable legal fees. N. M. S. A. 1978, § 24-21-6.

**EIGHTH CAUSE OF ACTION**
**Against Defendant Qiagen**
**Violation of N. M. S. A. 1978, § 24-21-3(A), *et seq.*;**
**(By Plaintiffs Radcliffe and Diekmann, Individually and on Behalf of the New Mexico Class)**

292. Plaintiffs Radcliffe and Diekmann incorporate by reference and re-allege all paragraphs above.

293. Plaintiffs Radcliffe and Diekmann are domiciled and suffered injury in New Mexico.

294. Plaintiffs Radcliffe and Diekmann bring their claim individually and on behalf of the members of the New Mexico Class.

295. N. M. S. A. 1978, § 24-21-3(A-B), *et seq.* prohibits obtaining, retaining, or using genetic information of an individual without informed and written consent. "Genetic information" includes information about the genetic makeup of an individual, or the individual's family members.

296. Plaintiffs Radcliffe and Diekmann and the New Mexico Class members uploaded or had another upload their genetic information to GEDmatch.com. They also provided accompanying personal identifying information, including at least their names and email addresses.

297. The information Plaintiffs Radcliffe and Diekmann the New Mexico Class members uploaded to GEDmatch.com is the type of information protected by N.M.S.A. 1978, § 24-21-1, *et seq.*

298. As shown above, Qiagen obtained, retained, and used Plaintiffs' and the putative New Mexico Class members' genetic information without their written and informed consent. Qiagen also disclosed Plaintiffs' and the New Mexico Class members' DNA analysis results to Bode without their written, informed consent. This conduct violated the rights of Plaintiffs Radcliffe and Diekmann and the New Mexico Class members under N. M. S. A. 1978, § 24-21-1, *et seq.*

299. Qiagen's obtainment, retention, and use of the genetic information of all the individuals with DNA files in Verogen's database, and its disclosure of the genetic information of all individuals with DNA files in the GEDmatch database to Bode, resulted from willful or grossly negligent conduct. Qiagen knowingly purchased the entire database of genetic information for financial gain and used it to increase its own market value. Then, Qiagen's retention of the DNA analysis results in the GEDmatch.com database undoubtedly added to Qiagen's value. By maintaining control over this extensive genetic database, Qiagen can and has leveraged this valuable resource to offer premium services to law enforcement agencies and forensic investigators, as shown in its new multi-year partnerships with Bode Technology and Othram lab. Additionally, Qiagen knowingly disclosed its entire database of genetic information to Bode pursuant to a commercial partnership between the companies that generates substantial revenue for Qiagen.

300. Based upon Qiagen's violations, Plaintiffs Radcliffe and Diekmann and the New Mexico Class are entitled to damages in the amount of $5,000 for each violation, in addition to any economic loss as the violations resulted from willful or grossly negligent conduct and costs and reasonable legal fees. N. M. S. A. 1978, § 24-21-6.

**NINTH CAUSE OF ACTION**
**Against Defendant Meta**
**Violation of N. M. S. A. 1978, § 24-21-3(A), *et seq.*;**
**(By Plaintiffs Radcliffe and Diekmann, Individually and on Behalf of the New Mexico Meta Subclass)**

301. Plaintiffs Radcliffe and Diekmann incorporate by reference and re-allege all paragraphs above.

302. Plaintiffs Radcliffe and Diekmann are domiciled and suffered injury in New Mexico.

303. Plaintiffs Radcliffe and Diekmann bring their claim individually and

on behalf of the members of the New Mexico Meta Subclass.

304. N. M. S. A. 1978, § 24-21-3(A-B), *et seq.* prohibits obtaining, retaining, or using genetic information of an individual without informed and written consent. "Genetic information" includes information about the genetic makeup of an individual, or the individual's family members, including information resulting from participation in genetic research or use of a genetic service. N. M. S. A. 1978, § 24-21-2(D).

305. Plaintiffs Radcliffe and Diekmann and the New Mexico Class members uploaded or had another upload their genetic information to GEDmatch.com. They also provided accompanying personal identifying information, including at least their names and email addresses.

306. The information Plaintiffs Radcliffe and Diekmann the New Mexico Meta Subclass members uploaded to GEDmatch.com is the type of information protected by N.M.S.A. 1978, § 24-21-1, *et seq.*

307. As shown above, through its operation of the Pixel on the GEDmatch.com website, Meta intercepted and obtained, retained, and used Plaintiffs' and the putative New Mexico Meta Subclass members' genetic information without their written and informed consent. The genetic information contained information specifically identifying the identity of Plaintiffs and subclass members and included genetic information resulting from their participation in genetic research or use of a genetic service. This conduct violated the rights of Plaintiffs Radcliffe and Diekmann and the New Mexico Meta Subclass members under N. M. S. A. 1978, § 24-21-1, *et seq.*

308. Meta's obtainment, retention, and use of this genetic information resulted from willful or grossly negligent conduct. Meta knowingly intercepted this private genetic information in furtherance of its own business operations, including to bolster its ability to sell targeted advertising services as described above.

309. Based upon Meta's violations, Plaintiffs Radcliffe and Diekmann and the New Mexico Meta Subclass are entitled to damages in the amount of $5,000 for each violation, in addition to any economic loss as the violations resulted from willful or grossly negligent conduct and costs and reasonable legal fees. N. M. S. A. 1978, § 24-21-6

**TENTH CAUSE OF ACTION**
**Against Defendant Verogen**
**Violation of O.R.S. § 192.531, *et seq.***
**(Plaintiffs Delk and Taylor, Individually and on Behalf of the Oregon Class and Meta Subclass, and by Plaintiff Taylor, Individually and on Behalf of the Oregon Non-Consent to Law Enforcement Subclass)**

310. Plaintiffs Delk and Taylor incorporate by reference and re-allege all paragraphs above.

311. Plaintiffs Delk and Taylor are domiciled and suffered injury in Oregon.

312. Plaintiffs Delk and Taylor brings their claim individually and on behalf of the members of the Oregon Class and Meta Subclass. Plaintiff Taylor also brings his claim on behalf of the Oregon Non-Consent to Law Enforcement Subclass.

313. Oregon's genetic privacy statute prohibits disclosing "the identify of an individual upon whom a genetic test has been performed, or the identify of a blood relative of the individual, or to disclose genetic information about the individual or a blood relative of the individual in a manner that permits identification of the individual." Or. Rev. Stat. Ann. § 192.539(1).

314. Plaintiffs Delk and Taylor and the Oregon Class members uploaded or had another upload their genetic information to GEDmatch.com. They also provided accompanying personal identifying information, including at least their names and email addresses. Plaintiff Taylor and the Oregon Non-Consent to Law

Enforcement Subclass members did not opt in or consent to law enforcement having access to their genetic information.

315. The information Verogen obtained from Plaintiffs Delk and Taylor and the Class and Subclass members is the type of information protected by O.R.S. § 192.531, *et seq.*

316. As shown above, Verogen disclosed Plaintiffs Delk's and Taylor's and the Oregon Class members' genetic information to Qiagen without their written, informed consent. Verogen also disclosed the identities of Plaintiffs Delk and Taylor and the Oregon Meta Subclass members along with the fact that they have had genetic tests performed to Meta without their informed consent. Verogen further disclosed Plaintiff Taylor's and the Oregon Non-Consent to Law Enforcement Subclass members' genetic information to law enforcement actors without their written informed consent and against their express wishes. Verogen also disclosed Plaintiffs' and the Oregon Class members' DNA analysis results to Bode without their written, informed consent. In so doing, Verogen violated O.R.S. § 192.539.

317. Verogen's disclosures were committed with the intent to sell, transfer or use the genetic information for commercial advantage. Alternatively, the disclosures were knowing or reckless, or at least negligent. The sale of Verogen and the GEDmatch.com database to Qiagen for $150 million was exactly that—a sale and transfer of every user's genetic information for commercial advantage. Similarly, Verogen knowingly disclosed its users' identities and the fact that they had genetic testing performed to Meta to improve Verogen's advertising, and thus, increase profits. Additionally, Verogen knowingly disclosed its entire database of genetic information to Bode pursuant to a commercial partnership between the companies that generates substantial revenue for Verogen. Finally, Verogen allowed law enforcement to access the genetic information of the users who had

expressly "opted out" of law enforcement access to increase its profit from law enforcement uploads.

318. Plaintiffs' Delk and Taylor and the Oregon Class and Subclass members' right to genetic privacy have been violated by Verogen's above-described disclosures.

319. Based upon Verogen's violations, Plaintiffs and the Oregon Class and Subclass members are entitled to damages in the amount of $250,000 for each knowing violation committed with the intent to sell, transfer, or use for commercial advantage, $100,000 for each knowing or reckless violation, $5,000 for each negligent violation, and $1,000 for each inadvertent violation that does not arise out of negligence of the defendant. They are also entitled to costs and reasonable legal fees. Or. Rev. Stat. Ann. § 192.541.

**ELEVENTH CAUSE OF ACTION**
**Against Defendant Qiagen**
**Violation of O.R.S. § 192.531, *et seq*.**
**(Plaintiffs Delk and Taylor, Individually and on Behalf of the Oregon Class)**

320. Plaintiffs Delk and Taylor incorporate by reference and re-allege all paragraphs above.

321. Plaintiffs Delk and Taylor are domiciled and suffered injury in Oregon.

322. Plaintiffs Delk and Taylor brings their claim individually and on behalf of the members of the Oregon Class.

323. Oregon's genetic privacy statute prohibits compelling the disclosure of "the identify of an individual upon whom a genetic test has been performed, or the identify of a blood relative of the individual, or to disclose genetic information about the individual or a blood relative of the individual in a manner that permits identification of the individual." Or. Rev. Stat. Ann. § 192.539(1).

324. Plaintiffs Delk and Taylor and the Oregon Class members uploaded or had another upload their genetic information to GEDmatch.com. They also provided accompanying personal identifying information, including at least their names and email addresses.

325. The information Plaintiffs Delk and Taylor and the Oregon Class members uploaded to GEDmatch.com is the type of information protected by O.R.S. § 192.531, *et seq.*

326. As shown above, Qiagen compelled the disclosure from Verogen of Plaintiffs' Delk and Taylor and the Oregon Class members' genetic information without their written, informed consent by requiring Verogen to include the database, and access to the database, in the sale. In so doing, Qiagen violated O.R.S. § 192.539.

327. Additionally, Qiagen disclosed Plaintiffs' and the Oregon Class members' DNA analysis results to Bode without their written, informed consent.

328. Qiagen's actions in compelling Verogen to disclose all the genetic information in its GEDmatch.com database, and in disclosing the data in the GEDmatch database to Bode, were committed with the intent to sell, transfer or use the genetic information for commercial advantage. Alternatively, the disclosures were knowing or reckless, or at least negligent. Qiagen's acquisition of the GEDmatch.com and GEDmatch PRO databases undoubtedly added to Qiagen's value. By gaining access to this genetic database, Qiagen can and has leveraged this valuable resource to offer premium services to law enforcement agencies and forensic investigators, as shown in its new multi-year partnerships with Bode Technology and Othram lab. The value of the database is the reason Qiagen boasted specifically of its access to this genetic information in the press release announcing

its acquisition of Verogen.[49] Moreover, Qiagen knowingly disclosed its entire database of genetic information to Bode pursuant to a commercial partnership between the companies that generates substantial revenue for Qiagen.

329. Plaintiffs Delk's and Taylor's and the Oregon Class members' right to genetic privacy has been violated by Qiagen's above-described conduct.

330. Based upon Qiagen's violations, Plaintiffs and the Oregon Class and Subclass members are entitled to damages in the amount of $250,000 for each knowing violation committed with the intent to sell, transfer, or use for commercial advantage, $100,000 for each knowing or reckless violation, $5,000 for each negligent violation, and $1,000 for each inadvertent violation that does not arise out of negligence of the defendant. They are also entitled to costs and reasonable legal fees. Or. Rev. Stat. Ann. § 192.541.

**TWELFTH CAUSE OF ACTION**
**Against Defendant Verogen**
**Violation of Cal. Penal Code § 631, *et seq.***
**(Plaintiffs Cook and Novida, Individually and on Behalf of the California Class)**

331. Plaintiffs Cook and Novida incorporate by reference and re-allege all paragraphs above.

332. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose:

> The Legislature thereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code§ 630.

[49] *Supra*, at 8.

333. California Penal Code§ 631(a) provides, in pertinent part (emphasis added):

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner ... willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, **or who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

334. Under CIPA, a defendant must show it had the consent of all parties to a communication.

335. At all relevant times, Verogen aided, employed, agreed with, and conspired with Meta to track and intercept Plaintiffs' and California Class Members' private internet communications while accessing Defendant's Website. These communications were transmitted to and intercepted by a third party to the communications (Meta) during the communication and without the knowledge, authorization, or consent of Plaintiffs and California Class Members.

336. Verogen intentionally inserted an electronic listening device onto Plaintiffs' and California Class Members' web browsers that, without the knowledge and consent of Plaintiffs and California Class Members, tracked and transmitted the substance of their confidential communications with Verogen to a third party.

337. Verogen willingly facilitated Meta's interception and collection of Plaintiffs' and California Class Members' private communications and genetic information by embedding the Facebook Pixel on its GEDmatch.com website.

338. Verogen’s Pixel and tracking tools constitute "machine[s], instrument[s], o contrivance[ s ]" under CIPA, and even if they do not, these tools fall under the broad catch-all category of "any other manner."

339. Verogen failed to disclose its use of the Facebook Pixel to specifically track and automatically and simultaneously transmit Plaintiffs’ and California Class Members' communications with Verogen to undisclosed third parties.

340. The private communications and genetic information that Verogen transmitted via the Facebook Pixel, includes sensitive, confidential information revealing that Plaintiffs and members of the California Class were the subject of genetic testing and received genetic services.

341. The Pixel is designed such that it transmits each of the users' actions taken on the website to a third party alongside and contemporaneously with the user initiating the communication. Thus, the communication is intercepted in transit to the intended recipient, Verogen, and before it reaches Verogen’s server.

342. As demonstrated hereinabove, Verogen violated CIPA by aiding and permitting third parties to intercept and receive its users’ online communications in real time through its Website. Such interception occurred without Plaintiffs’ and California Class Members' consent, and Meta would not have received the contents of these communications but for Verogen’s actions.

343. By disclosing Plaintiffs’ and California Class Members' Private Information, Verogen violated Plaintiffs’ and California Class Members’ statutorily protected right to privacy.

344. As a result of the above violations and pursuant to CIPA Section 637.2, Verogen is liable to Plaintiffs and California Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to

this section that the Plaintiff has suffered, or be threatened with, actual damages."

345. Under the statute, Verogen is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Verogen in the future.

**THIRTEENTH CAUSE OF ACTION**
**Against Defendant Meta**
**Violation of Cal. Penal Code § 631**
**(All Plaintiffs, Individually and on Behalf of the Nationwide Class)**

346. Plaintiffs incorporate by reference and re-allege all paragraphs above.

347. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id*.

348. Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any

person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

349. Meta is a person for purposes of § 631.

350. Meta maintains its principal places of business in California, where it designed, contrived, agreed, conspired, effectuated, and/or received the interception and use of the contents of Plaintiffs' and Class members' communications. Additionally, Meta has adopted California substantive law to govern their relationship with users, including Plaintiffs.

351. Meta's Pixel and other tracking technologies, Plaintiffs' and Class members' browsers and mobile applications, and Plaintiffs' and Class members' computing and mobile devices are a "machine, instrument, contrivance, or . . . other manner."

352. At all relevant times, Meta, using its Meta Pixel and other tracking technologies, intentionally tapped or made unauthorized connections with, the lines of internet communication between Plaintiffs and Class members and the GEDmatch.com website without the consent of all parties to the communication.

353. Meta, willfully and without the consent of Plaintiffs and Class members, reads or attempt to reads, or learns the contents or meaning of Plaintiffs' and Class members' communications to GEDmatch while the communications are in transit or passing over any wire, line or cable, or were being received at any place within California when it intercepted Plaintiffs' and Class members' communications and data with GEDmatch, which maintains its principle place of business in San Diego, California, in real time.

354. Meta used or attempted to use the communications and information it received through its Pixel and other tracking technologies, including to supply analytics and advertising services.

355. The interception of Plaintiffs' and Class members' communications

was without authorization and consent from the Plaintiffs and Class members. Accordingly, the interception was unlawful and tortious.

356. Plaintiffs and the Class members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

357. Plaintiffs and Class members have also suffered irreparable injury from these unauthorized acts. Plaintiffs' and Class members' sensitive data has been collected, viewed, accessed, and stored by Meta, has not been destroyed, and due to the continuing threat of such injury, Plaintiffs and Class members have no adequate remedy at law, Plaintiffs and Class members are entitled to injunctive relief.

**FOURTEENTH CAUSE OF ACTION**
**Against Defendant Meta**
**Violation of Cal. Penal Code § 632**
**(All Plaintiffs, Individually and on Behalf of the Nationwide Class)**

358. Plaintiffs incorporate by reference and re-allege all paragraphs above.

359. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication[.]"

360. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

361. Plaintiffs' and Class members' communications to GEDmatch, including their private information and genetic data, were confidential

communications for purposes of § 632, including because Plaintiffs and Class members had an objectively reasonable expectation of privacy in this data.

362. Plaintiffs and Class members expected their communications to GEDmatch to be confined to GEDmatch, in part because of GEDmatch's consistent representations that these communications would remain confidential. Plaintiffs and Class members did not expect third parties, and specifically Meta, to secretly eavesdrop upon or record this information and their communications.

363. The Meta Pixel and Meta's other tracking technologies are electronic amplifying or recording devices for purposes of § 632.

364. By contemporaneously intercepting and recording Plaintiffs' and Class members' confidential communications to GEDmatch through the Meta Pixel and other recording technologies, Meta eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

365. At no time did Plaintiffs or Class members consent to Meta's conduct, nor could they reasonably expect that their communications to GEDmatch would be overheard or recorded by Meta.

366. Defendant utilized Plaintiffs' and Class members' sensitive genetic information for its own purposes, including advertising and analytics.

367. Plaintiffs and Class members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

368. Plaintiffs and Class members have also suffered irreparable injury from these unauthorized acts. Plaintiffs' and Class members' sensitive data has been collected, viewed, accessed, and stored by Meta, has not been destroyed, and due to the continuing threat of such injury, Plaintiffs and Class members have no

adequate remedy at law, Plaintiffs and Class members are entitled to injunctive relief.

**FIFTEENTH CAUSE OF ACTION**
**Against Defendant Meta**
**Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(All Plaintiffs, Individually and on Behalf of the Nationwide Class)**

369. Plaintiffs incorporate by reference and re-allege all paragraphs above.

370. Plaintiffs asserting claims for intrusion upon seclusion must plead (1) that the defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs have a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

371. Meta's surreptitious interception, storage, and use of Plaintiffs' and Class members interactions and communications with GEDmatch, including their provision of private information and genetic information to GEDmatch, constitutes an intentional intrusion upon Plaintiffs' and Class members' solitude or seclusion.

372. Plaintiffs and Class members expected this information to remain private and confidential given the nature of the private information, which includes information revealing the fact that they were the subjects of genetic tests, their identities, and other private interactions with the GEDmatch website.

373. Plaintiffs and Class members did not consent to, authorize, or know about Meta's intrusion at time it occurred. Plaintiffs and Class members never agreed that Meta could intercept, store, and use this data.

374. Meta's intentional intrusion on Plaintiffs' and Class members' solitude or seclusion would be highly offensive to a reasonable person. Plaintiffs and Class members reasonably expected that their information would not be collected by Meta, which was not a party to any of their communications with GEDmatch.

375. The surreptitious taking and interception of sensitive data, including private data and genetic information, from thousands, if not millions, of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

376. The offensiveness of this conduct is all the more apparent because Meta's interception, storage, and use of this information was conducted inconspicuously in a manner that Plaintiffs and Class members would be unable to detect and was contrary to the actual representations made by Verogen via the GEDmatch.com website.

377. Given the highly sensitive nature of the data that Meta intercepted, such as private details about genetic information, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

378. As a result of Defendant's actions, Plaintiffs and Class members have suffered harm and injury, including, but not limited to, an invasion of their privacy rights.

379. Plaintiffs and Class members have been damaged as a direct and proximate result of Meta's invasion of their privacy and are entitled to just compensation, including monetary damages.

380. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class members for the harm to their privacy interests as well as a disgorgement of profits made by Meta as a result of its intrusions upon Plaintiffs' and Class members' privacy.

381. Plaintiffs and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Meta's actions,

directed at injuring Plaintiffs and Class members in conscious disregard of their rights. Such damages are needed to deter Meta from engaging in such conduct in the future.

382. Plaintiffs also seek such other relief as the Court may deem just and proper.

**SIXTEENTH CAUSE OF ACTION**
**Against Defendant Meta**
**Unjust Enrichment**
**(All Plaintiffs, Individually and on Behalf of the Nationwide Class)**

383. Plaintiffs incorporate by reference and re-allege all paragraphs above.

384. Meta received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

385. Meta received benefits from Plaintiffs and Class members in the form of the Plaintiffs' and Class members' highly valuable data, including private information and genetic data, that Meta wrongfully intercepted from Plaintiffs and Class members without authorization and proper compensation.

386. Meta intercepted, stored, and used this data for its own gain, providing Meta with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of its platforms, algorithms, and advertising services.

387. Had Plaintiffs known of Meta's misconduct, they would not have provided any of their data to Meta or used GEDmatch's services.

388. Meta unjustly retained these benefits at the expense of Plaintiffs and Class members because Meta's conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

389. The benefits that Meta derived from Plaintiffs and Class members

rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles in California and every other state for Meta to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

390. Meta should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Meta received, and such other relief as the Court may deem just and proper.

**SEVENTEENTH CAUSE OF ACTION**
**Against Defendant Meta**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
**(All Plaintiffs, Individually and on Behalf of the Nationwide Class)**

391. Plaintiffs incorporate by reference and re-allege all paragraphs above.

392. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

393. Meta engaged in unlawful business practices in connection with its forced interception of Plaintiffs' and Class Members' Private Information to GEDmatch, in violation of the UCL.

394. The acts, omissions, and conduct of Meta as alleged therein constitute "business practices" within the meaning of the UCL.

395. Meta violated the "unlawful" prong of the UCL by violating, inter alia, Plaintiffs' and Class Members' rights to privacy, state and federal privacy statutes, and state consumer protection statutes.

396. Meta's acts, omissions, and conduct also violate the unfair prong of the UCL because those acts, omissions, and conduct, as alleged therein, offended public policy (including the federal and state privacy statutes and state consumer

protection statutes, such as CIPA) and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiffs and Class Members.

397. The harm caused by Meta's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Meta's legitimate business interests other than Meta's conduct described therein.

398. As a result of Meta's violations of the UCL, Plaintiffs and Class Members are entitled to injunctive relief. This is particularly true since the dissemination of Plaintiffs' and Class Members' information is ongoing.

399. As result of Meta's violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property, including but not limited to access to their private and personal data. Plaintiffs and Class Members would not have used Meta's services or the GEDmatch.com website had they known Meta was breaching confidentiality and intercepting their private information for its own advertising purposes and profits

400. The unauthorized access to Plaintiffs' and Class Members' private and personal data also has diminished the value of that information.

401. In the alternative to those claims seeking remedies at law, Plaintiffs and Class Members allege that there is no plain, adequate, and complete remedy that exists at law to address Meta's unlawful and unfair business practices. Therefore, Plaintiffs and members of the proposed Class are entitled to equitable relief to restore Plaintiffs and Class Members to position they would have been in had Meta not engaged in unfair competition, including an order enjoining Meta's wrongful conduct, restitution, and disgorgement of all profits accruing to Meta as a result of its unlawful and unfair practices.

**EIGHTEENTH CAUSE OF ACTION**
**Against Defendant Meta**
**Invasion of Privacy Under California's Constitution**
**(All Plaintiffs, Individually and on Behalf of the Nationwide Class)**

402. Plaintiffs incorporate by reference and re-allege all paragraphs above.

403. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and private information, including genetic data; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to interceptions without Plaintiffs' and Class Members' knowledge or consent.

404. At all relevant times, by using Facebook's Tracking Pixel and other tracking technologies to communicate private information, Meta intentionally invaded Plaintiffs' and Class Members' privacy rights under the California Constitution.

405. Plaintiffs and Class Members had a reasonable expectation that their communications, identity, Private Information, including genetic data, and other data would remain confidential, and that Meta would not intercept these communications and information on GEDmatch's website.

406. Plaintiffs and Class Members did not authorize Meta to transmit their private information to Meta or to allow Meta to intercept, receive, and view those communications.

407. This invasion of privacy is serious in nature, scope, and impact, in part, because it relates to sensitive genetic data. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right.

408. As a result of Meta's actions, Plaintiffs and Class Members have

suffered harm and injury, including but not limited to an invasion of their privacy rights.

409. Plaintiffs and Class Members have been damaged as a direct and proximate result of Meta's invasion of their privacy and are entitled to just compensation, including monetary damages.

410. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests because of its intrusion upon Plaintiffs' and Class members' privacy.

411. Plaintiffs and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Meta's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Meta from engaging in such conduct in the future.

412. Plaintiffs also seek such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendants as follows:

A. For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Classes and Plaintiff's attorneys as Class Counsel to represent the Classes;

B. For an order declaring that Defendants' conduct violates the statutes referenced above;

C. For an order finding in favor of Plaintiffs and the Classes and against Defendants on all counts asserted herein;

D. For all injunctive release the court finds appropriate;

E. For compensatory, statutory, and punitive damages in amounts stated above and to be determined by the Court and/or jury;

F. For prejudgment interest on all amounts awarded; and

G. For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expense and costs of suit.

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: September 19, 2025

Respectfully Submitted,

By: *_/s/ Frank S. Hedin_*
Frank S. Hedin

**HEDIN LLP**
Frank S. Hedin (SBN 291289)
1395 Brickell Ave, Ste 610
Miami, Florida 33131
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
E-Mail: fhedin@hedinllp.com

**FREED KANNER LONDON & MILLEN LLC**
Jonathan M. Jagher (pro hac vice forthcoming)
jjagher@fklmlaw.com
923 Fayette Street
Conshohocken, PA 19428
Tel.: (610) 234-6486

**FREED KANNER LONDON & MILLEN LLC**
Nichols R. Lange (pro hac vice forthcoming)
nlange@fklmlaw.com
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60069
Tel.: (224) 632-4510

**CARROLL SHAMBERG LLC**
Katrina Carroll, (pro hac vice forthcoming)
katrina@csclassactions.com
Kyle Shamberg (pro hac vice forthcoming)
111 West Washington Street, Suite 1240
Chicago, IL 60602
Office: 872-215-6205
Mobile: 847-848-1384

**MCGUIRE LAW, P.C.**
David L. Gerbie (pro hac vice forthcoming)
dgerbie@mcgpc.com
Andrew T. Heldut (pro hac vice forthcoming)
aheldut@mcgpc.com
Joseph Dunklin (pro hac vice forthcoming)
jdunklin@mcgpc.com
55 W. Wacker Drive, 9th Floor
Chicago, IL 606061
Tel.: (312) 893-7002

*Counsel for Plaintiffs and Putative Classes*