Frank S. Hedin (SBN 291289)
**HEDIN LLP**
535 Mission Street, 14th Floor
San Francisco, CA 94105
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
Email: fhedin@hedinllp.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

ANGELA HUTCHESON; SARA LAFLER; ALUCARD TAYLOR; KAMA DELK; ERIN RADCLIFFE; MIKHAILA DIEKMANN; CHELSEA GARDNER; ANDREW STARIN; SHARYL YEISLEY; ERICA NATHAN; PHYLLIS NICHOLS; KIRSTEN CURLEY; ROBIN COOK; and LAWRENCE NOVIDA, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

VEROGEN, INC. D/B/A GEDMATCH; QIAGEN NORTH AMERICA HOLDINGS, INC.; and META PLATFORMS, INC.

Defendants.

Case No. 24 CV 1977 JES MMP

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6)**

Date: November 12, 2025

Time: 10:00 a.m. PST

Judge: Hon. James E. Simmons, Jr.

Date Action Filed: October 24, 2024

# TABLE OF CONTENTS


I. The Court Has Subject Matter Jurisdiction Because Plaintiffs Have Suffered An Injury In Fact ..... 1

A. Plaintiffs Have Standing to Pursue their Meta Claims on Behalf of the Illinois, New Hampshire, and Oregon, Meta Subclasses ..... 2

B. Plaintiffs Have Standing to Pursue Their Law Enforcement Claims ..... 4

C. Plaintiffs Adequately Allege their Standing to Bring Claims Arising from Verogen's Disclosure of their Genetic Data to Qiagen ..... 7

II. Plaintiffs Adequately Alleged Claims Under Rule 12(b)(6) ..... 11

A. Plaintiffs Allege Viable Meta Claims under Illinois, New Hampshire, and Oregon Law ..... 11

1. Plaintiffs adequately alleged Verogen's Disclosure of Their Genetic Information Via the Pixel ..... 11

B. Plaintiffs Adequately Alleged Verogen's Disclosure of Their Identity via the Pixel. ..... 12

1. Both the Illinois and Oregon Statues Prohibit the Disclosure of the Fact that a Person has Taken a Genetic Test ..... 14

C. Plaintiffs Have Stated Viable Law Enforcement Claims Under Illinois and Oregon Law ..... 17

D. Plaintiffs Adequately Allege that Verogen, Compelled by Qiagen, Disclosed Plaintiffs' and Everyone Else's Genetic Data in the GEDMatch Database to Qiagen ..... 22

III. Plaintiffs Cook's and Novida's CIPA Claim Against Verogen (Count 12) Should Not Be Dismissed ..... 26

A. Defendants' Argument that the CIPA Claims are Time-Barred should be rejected because Plaintiffs' Claims Fall Within or Alternatively Toll the Statute of Limitations ..... 26

1. Plaintiffs can prove a set of facts to establish the timeliness of the claim ..... 26

2. Alternatively, Plaintiffs' claims toll the statute of limitations ..... 28

B. Defendants' Argument that Plaintiffs Cook's and Novida's CIPA Claim Fails to State a Claim Should be Rejected because Plaintiffs Adequately Pled Meta's Underlying CIPA Violations……………………

IV. Plaintiffs Adequately Allege that Defendants Disclosed Their Genetic Information to Bode Technology in Violation of the Relevant Statutes ..... 33

V. Conclusion ..... 35

# TABLE OF AUTHORITIES

## CASES


*Archer v. NBCUniversal Media, LLC, Inc.*, No. 2:24-cv-10744, at *7 (N.D. Cal July 2, 2025) .......... 12

*Aryeh v. Canon Bus. Sols. Inc.*, 55 Cal.4th 1185, 151 Cal.Rptr.3d 827, 292 P.3d 871, 880 (2013) .......... 28

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) .......... 11, 17

*Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) .......... 3

*Balanzar v. Fid. Brokerage Servs., LLC*, 654 F. Supp. 3d 1075, 1082 (S.D. Cal. 2023) .......... 27-29

*Balestrieri v. SportsEdTV, Inc.*, 2025 WL 2776356, at *10 (N.D. Cal. Sep. 16, 2025) .......... 13

*BedRoc Ltd., LLC v. U.S.*, 541 U.S. 176, 183 (2004) .......... 14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) .......... 11, 17-18

*Beltran v. Drs. Med. Ctr. of Modesto*, 2025 WL 1635467, at *11 (E.D. Cal. June 9, 2025) .......... 31

*Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1144 (9th Cir. 2024) .......... 1, 8-9, 35

*Bridges v. Blackstone, Inc.*, 66 F.4th 687 (7th Cir. 2023) .......... 23-25

*Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) .......... 30

*Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996) .......... 11

*Castillo v. Costco Wholesale Corp.*, No. 2:23-CV-01548JHC, 2024 WL 4785136, at *4 (W.D. Wash. Nov. 14, 2024) .......... 30

*Cervantes v. City of San Diego*, 5 F.3d 1273, 1276 (9th Cir. 1993) .......... 28

*Clifton v. Houghton Mifflin Harcourt Publ'g Co.*, 152 F. Supp. 3d 1221, 1226 (N.D. Cal. 2015) .......... 28

*Cole v. Quest Diagnostics, Inc.*, No. 2:23-CV-20647-WJM, 2024 WL 3272789, at *4 (D.N.J. July 2, 2024) .......... 30

*Courtney Cole v. LinkedIn Corp.*, 2025 WL 2963221, at *6 (N.D. Cal. Oct. 20, 2025) .......... 13

*D'Angelo v. Penny OpCo, LLC*, No. 23-CV-0981-BAS-DDL, 2023 WL 7006793, at *8 (S.D. Cal. Oct. 24, 2023) .......... 32

*Edwards v. Mubi, Inc.* No. 5:24-cv-00638, at *5-6 (N.D. Cal. Mar. 31, 2025) .......... 12

*Ewing v. Empire Cap. Funding Grp., Inc.*, No. 17CV2507-LAB (MDD), 2019 WL 1746575, n. 2 (S.D. Cal. Apr. 17, 2019) .......... 29

*Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 579 (N.D. Cal. May 2025) .......... 2, 9

*Garrison v. Whole Foods Mkt. Grp., Inc.*, 2014 WL 2451290, at *4 (N.D. Cal. Jun. 2, 2014) .... 4

*Gershzon v. Meta Platforms, Inc.*, No. 23-CV-00083-SI, 2023 WL 5420234, at *13 (N.D. Cal. Aug. 22, 2023) .... 30

*Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714 (N.D. Cal. 2023) .... 13

*Haddock v. Board of Dental Examiners*, 777 F.2d 462, 464 (9th Cir. 1985) .... 4

*Haines v. Cengage Learning, Inc.*, 2025 WL 2336089, at *5 (S.D. Oh. May 5, 2025) .... 3

*Hammerling v. Google LLC*, 615 F.Supp.3d 1069, 1093 (N.D. Cal. 2022) .... 32

*Harrison v. Great HealthWorks, Inc.*, 2017 WL 2554448, at *3 (S.D. Cal. June 13, 2017) .... 28

*In re 23andMe Holding Co., et al.*, Case No. 25-40976-357 (E.D. Mo. Bank. Ct. June 27, 2025) .... 25-26

*In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 784 (N.D. Cal. 2019) .... 10

*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) .... 6

*In re Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 795, 798 (N.D. Cal. 2022) .... 30

*In re Vizio, Inc. Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1228 (C.D. Cal. 2017) .... 33

*In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) .... 31

*Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023) .... 12

*Johnson v. Barr*, 79 F.4th 996, 999 (9th Cir. 2023) .... 8

*King v. Hard Rock Cafe Int'l (USA), Inc.*, 2025 WL 1635419, at *4 (E.D. Cal. June 9, 2025) .... 31

*Kishore v. Times Internet (UK) Ltd.*, 2024 WL 4197619, at *2 (N.D. Cal. Sep. 12, 2024) .... 3, 12

*L.B. v. LinkedIn Corporation*, 2025 WL 2782588, *16 (N.D. Cal. Sep. 30, 2025) .... 32

*Lee v. Plex, Inc.*, 773 F. Supp. 3d 755 (N.D. Cal. 2025) .... 13

*Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014) .... 1, 8, 35

*Leonard v. McMenamins, Inc.*, 2022 WL 4017674, at *5 (W.D. Wash. Sep. 2, 2022) .... 9

*Mata v. Zillow Grp., Inc.*, No. 24-CV-01095-DMS-VET, 2024 WL 5161955, at *5 (S.D. Cal. Dec. 18, 2024) .... 31

*McDonald v. Sun Oil Co.*, 548 F.3d 774, 780 (9th Cir. 2008) .... 14

*Natural Grocers v. Vilsack*, 627 F. Supp. 3d 1130, 1146 (N.D. Cal. 2022) .... 14

*Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001) ........................................ 11

*Patel v. Facebook, Inc.*, 932 F.3d 1264, 1275 (9th Cir. 2019)................................ 6

*Piccirillo v. Testequity, Inc.*, No. CV 14-8590-MWF (EX), 2015 WL 4778823, at *7 (C.D. Cal. Aug. 13, 2015) ............................................ 27-28

*Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 517 (C.D. Cal. 2021)........................... 30

*Safe Air for Everyone v. Meyer*, 373 F.3d 1035 (9th Cir. 2004)…………… 1, 8, 35

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) ..................................................................... 35

*Smith v. Google, LLC*, No. 23-CV-03527-PCP, 2024 WL 2808270, at *5 (N.D. Cal. June 3, 2024)...................................................................... 30

*U.S. v. Paulson*, 68 F.4th 528, 539 (9th Cir. 2023) ............................................ 16

*Underhill v. Kornblum*, 2017 WL 2869734, at *6 (S.D. Cal. Mar. 16, 2017) ......................................................................................... 30

*Wisenbaker v. Farwell*, 341 F. Supp. 2d 1160, 1168 (D. Nev. 2004).................. 29

*Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1123, n.1 (9th Cir. 2024) ......................................................................................... 14

## STATUTES

18 U.S.C. §§ 2510–23......................................................................... 30

410 ILCS 513/10................................................................................ 22

410 ILCS 513/15(a) ........................................................................... 21

410 ILCS 513/30(a) ........................................................................... 4, 15

N.H. Rev. Stat. Ann. § 141-H:2 IV ........................................................ 4

## OTHER AUTHORITIES

45 C.F.R. 160.103 ............................................................................ 23

*Black's Law Dictionary* (ed. 12th 2024) ................................................ 14

Cal. Civ. Proc. Code § 340 ................................................................... 27

Ill. S. Transcript, 90th Gen. Assemb., 27th Legis. Day (Mar. 20, 1997), at 142, 145 ........................................................................................ 15

ORS 192.539(1).................................................................................. 4, 16

## I. The Court Has Subject Matter Jurisdiction Because Plaintiffs Have Suffered An Injury In Fact

"As with a motion for summary judgment, when a court is faced with a factual attack[1] on standing pursuant to Rule 12(b)(1)" – like Verogen, Inc.'s and American Holdings, Inc.'s (collectively, "Defendants") attacks on Plaintiffs' Article III standing in their motion to dismiss ("Motion") – "the court 'must leave the resolution of material factual disputes to the trier of fact when the issue of [standing] is intertwined with an element of the merits of the plaintiff's claim.'" *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1144 (9th Cir. 2024) (quoting *Leite*, 749 F.3d at 1121 & citing *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039-40 (9th Cir. 2004).

In this case, as further explained in the pertinent sections below, Defendants' Motion "raises intertwined standing and merits issues" because "the question of [Plaintiffs' Article III standing] is dependent on the resolution of factual issues going to the merits of [the] action." *See Bowen*, 118 F.4th at 1144 (quoting *Safe Air for Everyone*, 373 F.3d at 1039 (citation and internal quotation marks omitted)). And "[b]ecause 'the [standing] issue and substantive issues are so intertwined,' resolution of 'genuinely disputed facts is inappropriate.'" *Bowen*, 118 F.4th at 1145-46 (quoting *Safe Air for Everyone*, 373 F.3d at 1039). Instead, the Court "must assess Defendants' motion [to dismiss pursuant to Rule 12(b)(1)] as [it] would a motion for summary judgment, and 'leave the resolution of material factual disputes [regarding Article III standing] to the trier of fact.'" *Id.* (quoting *Leite*, 749 F.3d at 1122).

---

[1] A factual attack on jurisdiction "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). A "facial attack," by contrast "accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Id.*

### A. Plaintiffs Have Standing to Pursue their Meta Claims on Behalf of the Illinois, New Hampshire, and Oregon, Meta Subclasses

"Individuals have a time-honored right to control access to their private information and affairs." *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 579 (N.D. Cal. May 2025). Defendants do not dispute that the invasion of sensitive information, such as the fact that individuals were the subject of genetic testing, without more, is a concrete harm giving rise to Article III standing. *See id*. ("the legal injury at the heart of plaintiffs' case— the capture of personal information without a user's consent— occurs when the personal information is obtained in the first instance. The fact that misappropriated data may be anonymized by stripping it from its owner and blending it with other data does not cure or wash away the original violation").

Instead, Defendants specifically assert that Plaintiffs Hutcheson, Lafler, Delk, Taylor, Gardner, Starin, and Cook lack standing to pursue their respective Meta claims because they initially uploaded their DNA files before Verogen installed the Pixel on its website ("Website"), which Defendants say purportedly happened on January 27, 2020. (Mot. 5-6; Supp. 6). However, Plaintiffs' allegations that the Pixel was installed "*at least as early* as January 2020" refutes Defendants' contention that Plaintiffs pled themselves out of court. ¶[2]152; Supplement to Motion ("Supp.") 6. Plaintiffs never allege when the Pixel was first installed—only that it was in fact operational as early as January 2020. Without access to discovery, Plaintiffs have no way of knowing when Defendants first installed the Pixel, which is non-public information within Defendants' (and perhaps Meta's) sole control.

Similarly, the Court should reject Defendants' attempt to rely on the extrinsic affidavit of Qiagen's executive to dispute Plaintiffs' well-pled allegations that the Pixel intercepted their information, including the fact that they uploaded their DNA kits to the Website (*See, e.g.*, ¶160), because the discovery needed to resolve

[2] All references to "¶" refer to Plaintiffs' Second Amended Class Action Complaint ("SAC"), unless otherwise specified.

Defendants' standing argument is the same merits discovery required to confirm when the Pixel began operating on the Website and what specific information the Pixel transmitted. Courts routinely reject early jurisdictional attacks when they are intertwined with the merits, preferring to address factual disputes on summary judgment. *See Kishore v. Times Internet (UK) Ltd.*, 2024 WL 4197619, at *2 (N.D. Cal. Sep. 12, 2024) (collecting authority, noting courts "must leave the resolution of material factual issues to the trier of fact when the issue of subject-matter jurisdiction is intertwined with an element of the merits of the plaintiff's claim.").

*Kishore* dealt with near-identical facts, where the defendant contended that the Pixel did not actually intercept the plaintiffs' data because it was installed on a platform the plaintiffs did not use. *Id*. The court "decline[d] the invitation to decide a factual dispute at the heart of Plaintiffs' case, particularly on the *ipse dixit* of one of Defendant's executives", noting that the plaintiffs did "not yet have access to specific information about how—or on which platforms—Defendant used the Pixel." *Id*.; *See also Haines v. Cengage Learning, Inc.*, 2025 WL 2336089, at *5 (S.D. Oh. May 5, 2025) (collecting authority); *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) ("[W]here the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial."); *Frasco*, 349 F.R.D. at 579 (argument against standing if plaintiff's sensitive information was not disclosed "underscored that defendants' standing arguments are inextricably intertwined with the merits for determination later in the case.").

Additionally, and regardless of whether Defendants' factual disputes are impermissibly intertwined with merits inquiries, they cannot seek dismissal of Plaintiffs' claims on this basis because Plaintiffs allege various improper disclosure theories to different third parties which independently give rise to standing for different claims. *See* Sections I(B) and (C), *infra*. For example, even if the Court

found that Plaintiffs Delk and Taylor lacked standing to pursue their Pixel theories on behalf of the Oregon Meta Subclass, the Court should not dismiss Plaintiffs' Tenth Cause of Action for violation of Oregen's genetic privacy statute against Verogen for lack of standing because the Tenth Cause of Action is also brought on behalf of the Oregon Non-Consent to Law Enforcement Subclass, for which theory Plaintiff Taylor has standing to pursue, as stated *infra*. *See Haddock v. Board of Dental Examiners*, 777 F.2d 462, 464 (9th Cir. 1985) ("[A] complaint should not be dismissed if it states a claim under any legal theory").

Lastly, even if the Plaintiffs did lack standing for their Pixel theories (they do not), Plaintiffs Nichols and Curley, whose standing Defendants do not challenge with respect to the Pixel disclosure theories,[3] have standing to represent the Oregon Meta Subclass and the New Hampshire Meta Subclass as well as the Illinois Meta Subclass because the those states' genetic privacy statutes are substantively similar and because the resulting injury is the same. *See, e.g.*, *Garrison v. Whole Foods Mkt. Grp., Inc.*, 2014 WL 2451290, at *4 (N.D. Cal. Jun. 2, 2014) (plaintiff had standing to bring claims on behalf of class members for products he did not purchase when product labels were similar, allegedly false in the same way, and implicated the same concerns as those purchased by the plaintiff). Here, all three states' genetic privacy statues prohibit the disclosure of the fact that an individual was the subject of genetic testing (Section II(A)(3), *infra*), and the Pixel intercepted the same information for all website users. *See* N.H. Rev. Stat. Ann. § 141-H:2 IV; 410 ILCS 513/30(a); ORS 192.539(1).

### B. Plaintiffs Have Standing to Pursue Their Law Enforcement Claims

Defendants contend that the named Plaintiffs Hutcheson and Taylor asserting Illinois and Oregon law enforcement claims lack standing because neither allege

[3] Defendants do not challenge Plaintiff Nichols' and Curley's standing to bring theories on behalf of the Illinois Meta Subclass.

adequately allege disclosure of genetic information by or to law enforcement. Mot. 7-8. According to Defendants, Plaintiffs do not establish that their genetic information was accessed or viewed by law enforcement personnel through the loophole. *Id.* Defendants mischaracterize this as mere speculation about a potential future injury rather than an actual, concrete harm sufficient for Article III standing.

First, Defendants' claims that the loophole creates only "speculative" harms are contradicted by their own admissions specifically cited within the SAC, which alleges that from approximately 2019 through at least July 2023, GEDmatch suffered a loophole exploit that allowed law enforcement or other users acting on behalf of law enforcement to view DNA files not marked as "opt in." ¶ 164. The Complaint points to a Qiagen press release from November 2023 which admits that a small number of forensic genetic genealogy practitioners had circumvented GEDmatch settings in violation of Verogen's Terms of Use, enabling them to access some profiles of GEDmatch users who had not opted in. ¶ 164. This is not a speculative allegation about what might have happened—it is Verogen's own acknowledgment that unauthorized access had actually occurred.

The SAC also provides detailed allegations of concrete harms from these unauthorized disclosures. Paragraphs 161 through 170 allege that Verogen disclosed the DNA files of an unknown number of individuals to law enforcement not only without their consent, but against their specific wishes. ¶¶ 161–70. The disclosed information included DNA files, names, email addresses, DNA kit numbers, and the degree to which the file was related to the law enforcement evidentiary sample. ¶ 164. Plaintiffs specifically allege that they told Verogen not to disclose their genetic information to law enforcement by selecting the opt-out privacy setting. ¶¶ 64, 314, 316. This creates a concrete injury: Plaintiffs took affirmative steps to withhold consent for law enforcement access to their genetic information, and that information was nevertheless disclosed through a loophole that Verogen itself has admitted was exploited. ¶ 164; n. 21.

Several courts have found standing in data privacy cases where the violation of statutory rights in itself constitutes the injury, not just the risk of future harm. *See, e.g. Patel v. Facebook, Inc.*, 932 F.3d 1264, 1275 (9th Cir. 2019) ("[b]ecause we conclude that [the Illinois Biometric Information Privacy Act] protects the plaintiffs' concrete privacy interests and violations of the procedures in BIPA actually harm or pose a material risk of harm to those privacy interests … the plaintiffs have alleged a concrete and particularized harm, sufficient to confer Article III standing."); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) (data privacy case finding standing where plaintiffs "adequately alleged that Facebook's tracking and collection practices would cause harm *or a material risk of harm* to their interest in controlling their personal information.") (emphasis added). Much like the biometric information at issue in *Patel* and the browsing information at issue in *In re Facebook, Inc. Internet Tracking Litig.*, genetic information is uniquely sensitive and immutable, and its disclosure raises exceptional privacy considerations that favor conferral of standing.

Defendants' characterization of Plaintiffs' allegations as speculative is further undermined by the systemic nature of the violation. This is not a case where Plaintiffs are claiming they might someday suffer harm if a security breach occurs. Rather, Verogen operated a system with a known loophole for years, law enforcement practitioners exploited that loophole to access profiles of users who had opted out, and Verogen has admitted this occurred. ¶¶ 162-70. The fact that Plaintiffs cannot identify the specific date and time their individual profiles were accessed without access to discovery does not render their injury speculative—it reflects the nature of digital disclosure, where mass access can occur without individual notification, and the early posture of the case. The Complaint alleges that Verogen profited from this arrangement by charging law enforcement approximately $700 per upload and making the service more valuable by allowing access to all DNA files, including those not marked as opt-in. ¶ 164. In other words, Plaintiffs' data was made accessible

as part of a system that Verogen admits was breached after Verogen had already monetized that access.

Lastly, as argued in Sections I(A) and (C), discovery required to ascertain the specifics of law enforcements' improper searches improperly overlaps with merits discovery on the same issues, precluding the Court from summarily dismissing claims based on these theories at this early juncture and without discovery.

### C. Plaintiffs Adequately Allege their Standing to Bring Claims Arising from Verogen's Disclosure of their Genetic Data to Qiagen

Defendant argues that "none of the Plaintiffs suffered any concrete harm as it relates to the sale of Verogen to Qiagen" because, according to the declaration of Qiagen executive (formerly an employee of Verogen), Tom Osypian, "the GEDmatch database continues to be owned and operated by Verogen" even after the acquisition, and Qiagen has "never had access to the GEDmatch database[.]" Mot. at 8 (citing Osypian Decl. ¶¶ 4-5).

However, Mr. Osypian's statements on this point are directly contradicted by Qiagen's own statements in a press release it issued on January 9, 2023, shortly after its acquisition of Verogen. In that public, investor-facing press release, Qiagen stated, in pertinent part:

> Verogen's sequencing and analysis solutions are designed for use on the MiSeq FGx® Sequencing System from Illumina, Inc. **<u>With this acquisition</u>**, QIAGEN gains exclusive distribution rights for this version of the MiSeq sequencer designed specifically for forensics applications. More than 300 MiSeq FGx Sequencing Systems have been placed to date, marking a strong entry into this market segment. The Verogen portfolio of kits for use on this sequencer includes the ForenSeq suite of kits including DNA Signature Prep, Imagen, Kintelligence and MainstAY product lines, all providing forensics experts with better answers to help solve the most complex unresolved cases.
>
> **<u>QIAGEN also gains full access to Verogen's pioneering GEDmatch database and GEDmatch PRO™ portal</u>**. GEDmatch allows users to upload genetic profiles created by other genealogy sites in order to expand the search for familial links; it currently contains more than 1.8 million genealogical profiles and continues to grow. GEDmatch PRO™ is designed to support police and forensic teams with investigative comparisons to data uploaded by consenting GEDmatch users.

Declaration of Frank S. Hedin ("Hedin Decl.") ¶ 9, Ex. H at 2 (emphasis added). Moreover, the SAC also specifically alleges that Verogen "monetize[d] the genetic information in its vast GEDmatch database" by selling "its GEDmatch.com and GEDmatch PRO databases, along with the rest of the company, to Qiagen for $150 million" in January 2023. ¶ 128. The SAC alleges that the information disclosed by Verogen to Qiagen included "the fact that each individual with a DNA file in its database had undergone genetic testing, as well as all of the accompanying information gathered by Verogen that was connected to each of these DNA files (including, inter alia, the first and last names and email addresses of the users who had uploaded the files, and the full name and gender of the person to whom the DNA file belonged)," which "can be used to identify Plaintiffs . . . as persons who had undergone genetic testing." ¶ 131.

While Defendants submitted a self-serving declaration from a Qiagen executive[4] stating that the genetic data in Verogen's database was not made available to it (Osypian Decl. ¶¶ 4-5), Plaintiffs have submitted evidence of their own (Qiagen's January 9, 2023 press release) that directly contradicts Mr. Osypian on that exact point. There is thus a disputed question of fact – going squarely to the merits of Plaintiffs' claims – concerning whether Verogen provided "full access" to and thus disclosed Plaintiffs' genetic data to Qiagen. And because the facts in dispute also serve as the basis for Defendants' attack on Plaintiffs' Article III standing, the dispute cannot be resolved by the Court in the context of the instant Motion but rather must be resolved by the trier of fact following discovery. *See Bowen*, 118 F.4th at 1145-46; *Safe Air for Everyone*, 373 F.3d at 1039; *Leite*, 749 F.3d at 1122. Indeed, "it is not the district court's role to weigh evidence that implicates both jurisdictional and merits issues; 'contested evidence is viewed in the light most favorable to the

---

[4] That Mr. Osypian, an employee of Qiagen, is "an individual with first-hand knowledge of the GEDmatch database" further demonstrates that Qiagen was indeed provided access to the GEDmatch genetics database by Verogen.

nonmoving party.'" *Bowen,* 118 F. 4th at 1148 (quoting *Johnson v. Barr*, 79 F.4th 996, 999 (9th Cir. 2023)).

According to Defendants, the Supreme Court's decision in *Transunion* – holding that sending an improperly formatted informational mailing to the plaintiff was at most a "bare procedural violation[s]" of the statute at issue, "divorced from any concrete harm" – confirms that Plaintiffs here lack Article III standing to pursue their claims arising from Verogen's disclosure of their immutable genetic data to Qiagen in violation of GIPA and the other state statutes in question. Their proposed analogy is preposterous. Verogen's disclosures of Plaintiffs' genetic data to a third party without first obtaining Plaintiffs' consent, as the SAC alleges, was not a technical violation of a "procedural" provision ancillary to the core substantive right conferred by these statutes, but rather were direct violations the core substantive rights protected by these statutes. Equally inapposite are the district court decisions cited in the Motion holding that plaintiffs lacked Article III standing to redress "technical violations" of the federal FCRA and CIPA. *See* Mot. at 9-10 (collecting cases). Like the procedural violations in *Transunion*, the procedural FCRA and CIPA provisions at issue in the cited district court decisions are a far cry from the core, substantive rights conferred by GIPA and the other state statutes that Defendants are alleged to have violated with respect to this claim – namely, a person's right be free from non-consensual disclosures of his or her immutable genetic data.

Notably, in a long line of recent decisions involving defendants' nonconsensual disclosures of other sensitive, statutorily protected data to third parties, the Ninth Circuit and its district courts have not hesitated to find existence of judiciable injuries-in-fact sufficient to satisfy Article III, even where the defendant did not use the data. *See Frasco*, 349 F.R.D. at 579 ("Individuals have a time-honored right to control access to their private information and affairs. [...] Consequently, the legal injury [...] occurs when the personal information is obtained in the first

instance.").[5] This Court should likewise hold that Defendants' alleged nonconsensual disclosures of Plaintiffs' genetic data, in violation of their state-created rights to genetic privacy, give rise to injuries-in-fact sufficient to satisfy Article III.

Nor can Defendant defeat Plaintiffs' allegations that they never consented to the disclosure of their genetic data to Qiagen (¶ 133) by relying on extrinsic evidence to claim "Plaintiffs expressly consented to the disclosure of their data in connection with a possible sale of Verogen when they registered for an account," as Defendants assert. (Mot. at 8 (citing Exhibit 1; Osypian Decl. ¶ 1)). Defendants' assertion that "each Plaintiff agreed" to the Terms of Use (including the provision concerning data transfers in the event of an acquisition) "as a condition of establishing his or her account" is completely untrue. (Mot. at 3 (citing FAC ¶ 116, n. 22; Mot., Ex. 1).) Mr. Osypian states in his declaration that, "[b]efore July 2024, GEDmatch users were shown the entire Terms of Service and Privacy Policy at the time that they created their user account, and they had to actively click an "accept" button to accept the Terms and Service and acknowledge the Privacy Policy." Osypian Decl. ¶ 2. However, Mr. Osypian's statement is refuted by publicly available evidence submitted together with this brief. Archived copies of the GEDmatch.com registration page reflect that no one who registered with the site prior to at least as recently as April 18, 2024 (including Plaintiffs) was made aware of the Terms of Use in any way, much less asked to (let alone required to) agree to be bound by Terms of Use before registering. *See* Hedin Decl. ¶¶ 2-7 & *id.*, Exs. A-F (archived versions of GEDmatch.com registration page in effect between May 7, 2009 and April 18, 2024 reflecting no disclosure of the Terms of Use to visitors, and no means by which visitors were required to accept the Terms of Use to register). Instead, Verogen

[5] *See also In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 784 (N.D. Cal. 2019) ("courts have often held that this particular type of intangible injury—disclosure of sensitive private information, even without further consequence—gives rise to Article III standing."); *Leonard v. McMenamins, Inc.*, 2022 WL 4017674, at *5 (W.D. Wash. Sep. 2, 2022) ("Numerous courts, including the Ninth Circuit, have found allegations concerning the interference with plaintiffs' control over their personal data to be sufficient for standing").

appears to only have begun disclosing the existence of the Terms of Use to visitors in a clear and conspicuous manner, and only begun requiring visitors to affirmatively agree to be bound by the Terms of Use to register for an account, *after the Curley action was filed against it in Illinois on August 30, 2024*. *See* Hedin Decl. ¶ 8 & *id.*, Ex. G (archived version of the current GEDmatch.com registration page, reflecting that Terms of Use are now disclosed and visitors are required to agree to them to register). Accordingly, Defendants' suggestion that Plaintiffs are somehow bound by the Terms of Use is totally baseless. Because a genuine dispute of fact exists on the issue of consent – an issue that also goes to the merits of Plaintiffs' claims – the issue must be resolved later in the case by the trier of fact, after completion of the necessary discovery.

## II. Plaintiffs Adequately Alleged Claims Under Rule 12(b)(6)

A motion to dismiss under Federal Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. Fed. R. Civ. P. 12(b)(6); *Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001). A court must accept all factual allegations pleaded in the complaint as true and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). To survive dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

### A. Plaintiffs Allege Viable Meta Claims under Illinois, New Hampshire, and Oregon Law

#### 1. Plaintiffs adequately alleged Verogen's Disclosure of Their Genetic Information Via the Pixel

Plaintiffs allege that the Pixel intercepted a host of Plaintiffs' activity on the Website, including but not limited to the creation of a user account, upload of a DNA file, and use of *any* of the tools on the Website, together with Plaintiffs' unique FIDs.

¶¶152, 156 (Verogen programmed its Website to include the Pixel that transmits "the FIDs of its users, *along with their activity on the website*") (emphasis added), 144 ("The Pixel tracks users as they navigate through the website"). Defendants disingenuously pretend that their disclosures are limited to the fact that users uploaded copies of their genetic tests. Mot. 11. Not so. Plaintiffs allege that the Pixel was operating throughout the Website and, as other courts have recognized, need discovery from Defendants (and potentially Meta) to determine the full extent of disclosed information. *Kishore*, 2024 WL 4197619, at *2. For this same reason, Plaintiffs' use of the Website *after* they created an account and initially uploaded their DNA kit also gives rise to their interception claim.

Likewise, Plaintiffs alleged that the Pixel was operating on the Website "from *at least as early as* January 2020", which Defendants disingenuously gloss over. ¶152 (emphasis added). As such, Plaintiffs have not pled themselves out of court. Nor can Defendants rely on an extrinsic affidavit to rebut Plaintiffs' well-pled allegations that the Pixel disclosed their information. *See* ¶¶159, 245, 280, 316.

Additionally, the Court should refuse to dismiss claims brought on behalf of the Illinois Meta Subclass on these grounds because Defendants do not raise this argument with respect to Plaintiffs Nichols and Curley of the Illinois Meta Subclass.

### B. Plaintiffs Adequately Alleged Verogen's Disclosure of Their Identity via the Pixel.

The SAC details how the Pixel, as configured by Verogen, tracks users as they navigate through the Website and discloses their private genetic information, including that they were the subject of a genetic test, together with their unique FID, to Meta. *See* ¶¶140-160. The SAC also details how with "only a person's FID and the website activity [...] any ordinary person could learn the identity of the person to whom the FID corresponds." *See* ¶¶145, 152. Courts across the country and the Ninth Circuit have applied the "ordinary person" test to find that FIDs identify consumers. *See, e.g.*, *Edwards v. Mubi, Inc.* No. 5:24-cv-00638, at *5-6 (N.D. Cal. Mar. 31, 2025)

(attached as **Exhibit A**); *Archer v. NBCUniversal Media, LLC, Inc*., No. 2:24-cv-10744, at *7 (N.D. Cal July 2, 2025) (attached as **Exhibit B**); *Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023).

Defendants do not dispute that FIDs were disclosed or that Courts routinely find that they identify individuals under the "ordinary person" standard. Instead, they spill much ink contending that, without allegations that Plaintiffs included adequate information on their Facebook profiles, Plaintiffs' unique FIDs will not correspond to a profile with information sufficient to identify them. Not so. Plaintiffs specifically allege that "[t]o create a Meta account, a person *must* provide, *inter alia*, *his or her* first and last name, birthdate, gender, and phone number or email." ¶138 (emphasis added). Each Plaintiff representing a Meta subclass also alleges that they are a Facebook account holder. *See, e.g.*, ¶39. Reading all allegations in Plaintiffs' favor, as the Court must on a Rule 12(b)(6) motion, Plaintiffs' allegations that they *must* have input *their own* information—as opposed to fabricated information, taken together with their allegations that Meta used the FIDs to identify Plaintiffs, are sufficient to state a claim. For example, the court in *Lee v. Plex, Inc.*, 773 F. Supp. 3d 755 (N.D. Cal. 2025) refused to follow *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714 (N.D. Cal. 2023) where the plaintiff alleged, as Plaintiffs do here, that his Facebook page contains his real name. *Lee*, 773 F. Supp. 3d at 772-73 (refusing to require allegations that a Facebook page was public and contains personally identifiable information, finding that "most courts have not required [...] such granular details", and noting *Ghanaat* was an exception it refused to follow); *Courtney Cole v. LinkedIn Corp.*, 2025 WL 2963221, at *6 (N.D. Cal. Oct. 20, 2025) (rejecting same argument where the plaintiff alleged "Facebook requires users to provide their names, genders, and birthdays [...] when creating an account, suggesting that this information was listed on her public profile."); *Balestrieri v. SportsEdTV, Inc.*, 2025 WL 2776356, at *10 (N.D. Cal. Sep. 16, 2025) (rejecting same argument,

noting that all plaintiff must allege is that "With [the Facebook ID], any ordinary person can look up the user's Facebook profile and name").

Defendants' argument that Verogen disclosed "identifiable" information rather than Plaintiffs' identifies also fails because both FIDs and "names" uniquely identify one individual. Black's Law Dictionary defines "identity" as "[t]he distinguishing personality or attributes of an individual." *Black's Law Dictionary* (ed. 12th 2024). The FIDs Verogen disclosed are, likewise, "unique and persistent identifiers" that correspond to only one individual. Because FIDs are unique to each user, they plainly constitute a user's identity.

Defendants' "authority" to the contrary in the context of Illinois' Biometric Information Privacy Act is in accord, as FIDs "ascertain the identity of [something or someone]." *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1123, n.1 (9th Cir. 2024). Defendants' overly restrictive interpretation also fails to define words in reference to the context and overall statutory scheme. *Natural Grocers v. Vilsack*, 627 F. Supp. 3d 1130, 1146 (N.D. Cal. 2022). Defendants offer no rationale or authority for the proposition that genetic information privacy acts that proscribe the disclosure of individuals' names should be interpreted to permit the disclosure of unique identifiers that are, for all intents and purposes, every bit as identifying a user's name.

### 1. Both the Illinois and Oregon Statues Prohibit the Disclosure of the Fact that a Person has Taken a Genetic Test

In a last-ditch effort to avoid liability for Verogen's violations of the Illinois and Oregon genetic information privacy acts, and without *any* reliance on authority, Defendants ask the Court to ignore the acts' plain language and construe phrases to strip them of meaning and cut against the statutes' purpose. Contrary to Defendants' arguments, the "first step in construing the meaning of a statute is to determine whether the language at issue has a plain meaning." *McDonald v. Sun Oil Co.*, 548 F.3d 774, 780 (9th Cir. 2008). The Ninth Circuit elaborated that "The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in

a statute what it means and means in a statute what it says there.' Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *Id.* (citing *BedRoc Ltd., LLC v. U.S.*, 541 U.S. 176, 183 (2004)).

Given the unambiguous, explicit language here, this is where the analysis begins and ends. For example, Illinois' Genetic Information Privacy Act explicitly states: "*No person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed* or the results of a genetic test in a manner that permits identification of the subject of the test, except to the following persons". 410 ILCS 513/30(a). There is nothing confusing or ambiguous in the act's plain language. When read as a whole, the provision reads exactly the same and each portion is given effect. That is, Section 30(a) prevents the unauthorized disclosure of the identity of anyone upon whom a genetic test was performed, *or* the unauthorized disclosure of the results of a genetic test in a way that can identify the subjects of the test.

Defendants' justifications to deviate from the plain meaning fail. First, there is nothing inconsistent between the Section's plain language and its title "Disclosure of person tested and test results", as the plain language of Section 30(a) discusses prohibitions on both disclosure of the identities of persons tested and the prohibition of the test results themselves.

Second, legislative history is consistent with the act's plain language, which has been unchanged in relevant part since the act's adoption in 1997. Legislative discussion preceding the act's enactment clarifies that the purpose of the act was to encourage individuals to seek out genetic testing and evaluate their long-term health prospects without fear that their insurance companies and employers would learn of the testing, which at that time was not confidential, and discriminate against them. Ill. S. Transcript, 90th Gen. Assemb., 27th Legis. Day (Mar. 20, 1997), at 142, 145 ("in many cases, people are not even being tested because of the kinds of fear I talked about in the opening"). The legislative discussion Defendants cite is in accord. Protecting the disclosure of the fact that a person took a genetic test separately from

the results is an important protection in encouraging individuals to seek testing without fear of stigma or retribution. Should the Court narrow the act's plain language to permit disclosure of this information, insurance carriers and employers could learn which policyholders or employees underwent genetic testing and discriminate against them, assuming they have a family history of a serious hereditary disease or were otherwise concerned enough about their genetic risk to seek testing.

The same motivations and policies underlie the Oregon act, which also states that "*a person may not disclose [...] the identity of an individual upon whom a genetic test has been performed* or the identity of a blood relative of the individual, *or to disclose* genetic information about the individual or a blood relative of the individual in a manner that permits identification of the individual". ORS 192.539(1). The plain language, made even more explicit by the repeated use of "or to disclose", confirms that disclosures of *either* the identity of an individual upon whom a genetic test has been performed *or* the disclosures of genetic information in a manner permitting identification are prohibited.

Defendants cannot inject ambiguity into this prohibition's plain language by referencing Section 192.531(7)'s definition of "disclosure", because the act defines disclosure to include the disclosure of "genetic information", which in turn is defined to include "information about an individual [...] obtained from a genetic test." ORS 192.531(7), (11). The fact that a genetic test was taken in the first place is undisputably some of the most basic information obtained from a genetic test. Indeed, defining "disclosure" and "genetic information" otherwise, as Defendants contend, would lead to absurd results, with Section 192.539(1) prohibiting the disclosure of certain information (the identity of individuals having taken a genetic test) that Section 192.531(7) does not prohibit. *U.S. v. Paulson*, 68 F.4th 528, 539 (9th Cir. 2023) ("we are also bound by the canon that requires us to strive to give effect to each word and mak[e] every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or

superfluous.") (internal citations omitted). As such, Plaintiffs' interpretation gives full effect and meaning to all relevant sections while furthering the statute's purpose of encouraging genetic testing by ensuring the entire process remains confidential.

### C. Plaintiffs Have Stated Viable Law Enforcement Claims Under Illinois and Oregon Law

Defendants' Motion contends that Plaintiffs merely allege possible—not actual—disclosure of their DNA kits, and that even if disclosure occurred, Plaintiffs consented by selecting the opt-out setting. Both contentions mischaracterize the SAC and the pleading standards.

First, the SAC does not allege speculative future disclosure. Rather, it alleges Verogen operated its database with a known loophole for four years that law enforcement exploited to access opt-out profiles, and that Verogen *has admitted* this occurred. ¶ 164; n.21. Plaintiffs Hutcheson and Taylor specifically selected opt-out settings, withholding consent for law enforcement investigations. Paragraph 164 alleges the loophole allowed access to "DNA files not marked as 'opt in'"—precisely the category containing plaintiffs' profiles—and that Verogen disclosed these files "against their specific wishes," including DNA files, names, email addresses, kit numbers, and match information. *Id.*

These allegations are sufficient under the plausibility standard established in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Under *Iqbal*, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face, meaning factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal* at 678. The plausibility standard does not require plaintiffs to prove their case at the pleading stage or to plead facts establishing that disclosure certainly occurred; it requires only that the allegations, taken as true, raise a reasonable expectation that the violation occurred. *Twombly* at 556. The SAC here alleges that Plaintiffs selected opt-out settings, that Verogen operated a loophole

allowing access to opt-out profiles for years, that Verogen admitted this loophole was exploited, and that Verogen profited from law enforcement access by charging approximately $700 per upload of genetic information and making its service more valuable by allowing access to all DNA files, including those not marked as opt-in. ¶¶ 161-68. These allegations, accepted as true at the motion to dismiss stage, plausibly suggest that Plaintiffs' genetic information was disclosed through the systematic loophole.

The fact that the SAC alleges the number of affected individuals is "unknown" does not render the allegations speculative or implausible. This language reflects the pre-discovery posture of the case and the inherent nature of the violation: Verogen operated a system that allowed unauthorized access and admitted the system was breached, but has not yet disclosed which specific profiles were accessed. Plaintiffs cannot be expected to plead with specificity information that is uniquely within the defendant's possession and control. As the Supreme Court recognized in *Twombly*, asking for plausible grounds to infer a violation "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the violation. *Bell Atl. Corp.*, 550 U.S. at 545. Here, Plaintiffs have alleged that Verogen operated a loophole affecting opt-out profiles for years, that the loophole was exploited, and that they had opt-out profiles during this period. This is sufficient to raise a plausible inference that their profiles were accessed.

Verogen's reliance on its own press release language stating that "a small number" of practitioners circumvented settings to access "some" profiles is a red herring. Mot. at 18. This language does not suggest that the loophole affected only a *de minimis* number of profiles or that Plaintiffs' profiles were unlikely to be affected. Rather, it represents Verogen's carefully worded public acknowledgment designed to minimize the scope of admitted wrongdoing while confirming that the unauthorized access occurred. The SAC plausibly alleges that during the relevant four-year period,

law enforcement agencies used the GEDmatch PRO portal and uploaded evidentiary DNA files, paid Verogen approximately $700 per upload, and used tools like the One-to-Many Kinship tool that compare uploaded DNA files against all user-uploaded DNA files in Verogen's database, yielding lists of hundreds if not thousands of individuals' DNA files. ¶¶ 164-68. Given the volume of law enforcement activity, the four-year duration of the loophole's existence, and Verogen's financial incentive to maximize law enforcement access to increase revenue, it is entirely plausible that plaintiffs' opt-out profiles were accessed through the loophole.

Defendants' second argument—that even if law enforcement accessed Plaintiffs' profiles, Plaintiffs have not alleged facts sufficient to establish such access was without their authorization—similarly fails. Defendants contend that by selecting the "opt-out" option, plaintiffs expressly consented to allow their DNA profiles to be compared to kits submitted by law enforcement for certain purposes, including identification of human remains, and that users selecting opt-out are promised only that their kits will not be accessed by law enforcement to "identify perpetrators of violent crimes." Mot. at 18. Because Plaintiffs allegedly consented to some law enforcement access, Defendants argue, and because Plaintiffs never allege their DNA kits were accessed for the forbidden purpose of identifying perpetrators of violent crime but allege only that "Verogen disclosed DNA files of an unknown number of individuals to law enforcement," Plaintiffs have failed to plead they were aggrieved by any violation.

This argument conflates two entirely distinct issues: the scope of consent plaintiffs provided and the mechanism by which their data was accessed. Paragraph 120 of the Complaint describes the privacy options available to users, including the opt-out option which states: "Your kit WILL NOT be compared with kits submitted by or on behalf of law enforcement to identify perpetrators of violent crimes." ¶ 120. This creates a clear boundary: opt-out users consent to their DNA being compared for human remains identification but expressly withhold consent for violent crime

perpetrator identification. Defendants' argument that this partial consent somehow authorizes all law enforcement access is untenable. Partial consent is not blanket consent, and exceeding the scope of consent is no less a violation than proceeding without any consent.

More fundamentally, the loophole itself violated the consent framework entirely. Paragraphs 163 and 164 of the Complaint allege that the loophole "allowed law enforcement or other users acting on behalf of law enforcement, to view DNA files not marked as 'opt in,'" thereby circumventing the explicit opt-out preference and disclosing DNA files of individuals "not only without their consent, but against their specific wishes." ¶¶ 163–64. The loophole did not respect the distinction between authorized purposes (human remains identification) and unauthorized purposes (violent crime investigation)—it bypassed the consent mechanism altogether. By operating a loophole that allowed law enforcement to access opt-out profiles regardless of the stated purpose, Verogen defeated the consent structure.

The SAC also alleges that Verogen's disclosure was "for profit, monetary gain, and commercial advantage" because Verogen charged law enforcement approximately $700 per upload and made the service more valuable by allowing "access to *all* the DNA files, including those that were not marked as 'opt in.'" ¶ 168. This commercial motivation undermines any suggestion that disclosures through the loophole were limited to the narrow, authorized purpose of human remains identification. The allegation that Verogen profited by giving law enforcement access to all files, including opt-out files, plausibly suggests that the loophole was used to expand law enforcement access beyond what users consented to, not merely the specific narrow purpose for which opt-out users had provided consent.

Verogen's assertion that Plaintiffs "never allege that their DNA kits were accessed by law enforcement for the forbidden purpose of identifying perpetrators of violent crime" misapprehends the violation. The injury is not contingent on proving that law enforcement used Plaintiffs' data for a specifically forbidden investigative

purpose. The injury is the unauthorized disclosure itself—the breach of the consent framework that Plaintiffs relied upon when they selected opt-out settings. Illinois's GIPA and Oregon's genetic privacy statute prohibit disclosure of genetic information without written informed consent. 410 ILCS 513/15(a); O.R.S. 192.539(1). These statutes recognize that the disclosure itself, not the subsequent use of disclosed information, constitutes the violation. When Plaintiffs selected opt-out, they provided limited consent for one specific purpose. Any disclosure beyond that limited consent—whether for violent crime investigation, property crime investigation, or any other purpose—violates the statutes.

Furthermore, the SAC plausibly alleges that the loophole was used for purposes beyond human remains identification. Verogen's November 2023 press release admitted that practitioners "circumvented GEDmatch settings in violation of [Verogen's] Terms of Use," and the Complaint specifically alleges this "was not the first time Verogen allowed law enforcement to access individuals' DNA files and other genetic information in its database against its express promises to its users." ¶¶ 164–65. The Complaint further alleges that in November 2018, Verogen disclosed genetic information to law enforcement in Utah for "an investigation of a regular assault," not human remains identification or homicide investigation. ¶ 165. These allegations plausibly suggest that the loophole was exploited for unauthorized investigative purposes, not merely for the narrow purpose for which Plaintiffs and other opt-out users had consented.

The pleading standard does not require Plaintiffs to prove at the complaint stage exactly how law enforcement used their data or to negate every conceivable authorized use. Plaintiffs have alleged they selected opt-out settings, thereby withholding consent for violent crime investigation; that Verogen operated a loophole allowing access to opt-out files; that this loophole was exploited; that Verogen profited from expanded law enforcement access; and that Verogen has a history of allowing law enforcement access for unauthorized purposes. These allegations, taken

as true and construed in Plaintiffs' favor as Rule 8 requires, plausibly establish that Plaintiffs' genetic information was disclosed without their consent and in violation of Illinois's and Oregon's genetic privacy statutes. The fact that discovery may be necessary to establish precisely when Plaintiffs' profiles were accessed and for what specific investigative purposes does not render the Complaint suitable for dismissal at the pleading stage, and Defendants' Motion should therefore be denied.

### D. Plaintiffs Adequately Allege that Verogen, Compelled by Qiagen, Disclosed Plaintiffs' and Everyone Else's Genetic Data in the GEDMatch Database to Qiagen

Defendants argue that Plaintiffs "have failed to state a viable claim" against Verogen for disclosing their genetic data to Qiagen, and have failed to state a claim against Qiagen for compelling Verogen to disclose their genetic data to it, because "because they expressly consented to the disclosure of their information to any entity that GEDmatch might merge with." (Mot. at 19.). The argument is nonsense.

As explained above, the SAC plainly alleges that none of the Plaintiffs consented to Verogen's disclosure of their genetic data to Qiagen. ¶ 133. Moreover, the evidence submitted by Defendant to the contrary (Mr. Osypian's statement that Plaintiffs would have been required to agree to be bound by the Terms of Use to register) is conclusively refuted by Plaintiffs' evidence reflecting the registration pages in effect on GEDmatch.com up until at least as recently as April 18, 2024, including during the time period Plaintiffs registered for GEDmatch.com accounts. *See* Hedin Decl. ¶¶ 2-7 & *id*., Exs A-F.

Grasping at straws, Defendants next argue that "Plaintiffs have failed to allege that Qiagen actually accessed their data" or "that Qiagen did anything other than acquire Verogen." (Mot. at 20.) This completely misses the mark. For example, GIPA prohibits "disclosures" of persons' genetic information absent informed written consent, and defines "disclosure" by incorporating the definition of "disclosure" found in HIPAA. *See* 410 ILCS 513/10 ("'Disclosure' has the meaning

ascribed to it under HIPAA, as specified in 45 CFR 160.103."). HIPAA, in turn, defines "disclosure" as the "the release, transfer, **provision of access to**, or divulging in any manner of information outside the entity holding the information." 45 C.F.R. 160.103 (emphasis added). And the SAC alleges that Qiagen issued a public press release on January 9, 2023 admitting that, as a result of its acquisition:

> **QIAGEN also gains full access to Verogen's pioneering GEDmatch database and GEDmatch PRO™ portal.** GEDmatch allows users to upload genetic profiles created by other genealogy sites in order to expand the search for familial links; it currently contains more than 1.8 million genealogical profiles and continues to grow.

¶ 130; *see also* Hedin Decl., Ex. H. And it can reasonably be inferred that the only way Qiagen "gain[ed] full access to Verogen's . . . GEDmatch database" was because Verogen "provided" such "access" to Qiagen. Moreover, the SAC further alleges that Verogen "knowingly and purposefully disclosed to Qiagen the genetic information of every individual with a DNA file in its database at that time—including the genetic information of all of the Plaintiffs and members of the Classes," ¶ 130—all without anyone's "informed, written consent." ¶ 133. The SAC alleges the specific type of information disclosed (¶¶ 131-132), as well as the purpose for which the disclosures were made ("for profit and commercial gain"). ¶ 134. These allegations, coupled with Qiagen's press release, as sufficient to state a claim against Verogen for disclosing Plaintiffs' genetic data to Qiagen in violation of statutes in question.

Nor is there any merit in Defendants' argument that Plaintiffs fail to allege "facts that would support a claim that Qiagen compelled disclosure of Plaintiffs' DNA kits, for example, by alleging 'that any term of the deal mandated prohibited disclosure." (Mot. at 22.) In support, Defendants rely entirely on the U.S. Court of Appeals for the Seventh Circuit's decision in *Bridges v. Blackstone, Inc.*, 66 F.4th 687 (7th Cir. 2023), which is readily distinguishable. The plaintiffs there alleged claims against the defendant for compelling the disclosure of their genetic data from Ancestry, a company the plaintiffs had provided their genetic data to and which the

defendant then acquired, in violation of section 30 of GIPA. *Bridges*, 66 F.4th at 688. In affirming the district court's dismissal of plaintiffs' GIPA claims, the Seventh Circuit concluded that the plaintiffs had failed to adequately allege "that [the defendant] compelled disclosure of protected genetic information *simply by acquiring Ancestry*." *Id.* at 690 (emphasis added). In reaching this conclusion, the Seventh Circuit considered that "the plaintiffs did not allege, for example, that any term of the deal mandated prohibited disclosure," and found "[t]he fact that the acquisition took the form of an all-stock purchase further cuts against the plaintiffs' theory of liability." *Id.* Based on the plaintiffs' allegations, "[a]ll [the Seventh Circuit] c[ould] say with certainty about [the defendant's] all-stock acquisition of Ancestry is that a change in ownership occurred—nothing more"—leaving the court unable to "plausibly infer that a run-of-the-mill corporate acquisition, without more alleged about that transaction, results in a compulsory disclosure within the meaning of Section 30." *Id.* "That inference requires more well-pleaded facts." *Id.*

In this case, unlike in *Bridges*, the SAC *does* contain "more well-pleaded facts" about Qiagen's acquisition of Verogen, including specifically about Verogen's disclosure of the genetic data it had amassed on GEDmatch.com to Qiagen. As previously discussed, the SAC alleges that "Verogen sold its GEDmatch.com and GEDmatch PRO databases, along with the rest of the company, to Qiagen for $150 million." ¶ 128. The SAC quotes to an investor-facing press-release issued by Qiagen on January 9, 2023, where the company boasts that, "with this acquisition . . ., Qiagen also gains full access to Verogen's pioneering GEDmatch database and GEDmatch PRO portal." ¶ 130. The SAC further alleges that Qiagen violated the genetic privacy statutes of Illinois, Oregon, and New Mexico "by compelling Verogen to disclose," and by "obtain[ing]" from Verogen, "all the genetic information contained in the GEDmatch database as part of the sale of Verogen," explaining:

> Unsurprisingly, Qiagen did not purchase the GEDmatch database solely for Verogen's benefit. The value of a database containing genetic information of nearly 2 million individuals, including their genealogical

> connections, is obvious. The vast database allows Qiagen to offer enhanced services to law enforcement agencies and forensic teams, increasing its revenue and profit. Further, the tools available on GEDmatch.com that allow law enforcement to search for familial links in turn allow Qiagen to charge premium prices for access to its database, leading to higher profits. Qiagen clearly recognized the value of the database as it specifically boasted of the acquisition of and access to the database in its press release about its purchase of Verogen, stating that Qiagen gained "full access to Verogen's pioneering, GEDmatch database and GEDmatch PRO portal." . . .
>
> Given the enormous value of the database at the time of the sale, as well as its future value, Qiagen required Verogen to include the database, and importantly, access to the database, as part of the sale of Verogen to Qiagen. In doing so, Qiagen compelled Verogen to disclose the genetic information of all individuals in its database. It did so without the written, informed consent of any of those individuals.

¶¶ 172, 175.

Thus, here, unlike in *Bridges*, Plaintiffs do allege facts plausibly demonstrating that Verogen's disclosure of the genetic data in the GEDmatch.com data was "mandated" by "a term of the deal," *Bridges*, 66 F.4th at 690 – including by quoting Qiagen's own words from a press-release in which it admitted that, as a result of the acquisition, it would "gain[] full access to Verogen's pioneering GEDmatch database" – i.e., that Verogen would be required to "disclose" (within the meaning of the relevant statutes) that database to Qiagen as a result of the transaction. And the deal here, unlike the all-stock transaction in *Bridges*, involved Qiagen paying "$150 million in cash" for "the full acquisition of Verogen." *See* Hedin Decl., Ex. H at 2. Plaintiffs thus adequately alleged the necessary facts, which Defendants cannot contest at this same, which were missing from the complaint in *Bridges*, to demonstrate that Verogen disclosed Plaintiffs' genetic data to Qiagen and that Qiagen compelled Verogen to do so.

Qiagen's concession that it "gained full access" to Verogen's database, which Defendants cannot dispute at this stage, also makes Defendants' reliance on *In re 23andMe Holding Co., et al.*, Case No. 25-40976-357 (E.D. Mo. Bank. Ct. June 27, 2025) entirely misplaced. Mot. at 21-22. In fact, opposite of that concession here, an express condition of the sale's approval there was that the data *not* be disclosed to

any person who did not already have access to it. *Id*. at 18. Moreover, *23andMe* cuts against Defendants' position. There, the bankruptcy court only approved the sale *after* eighteen states that objected clarified that they would not oppose the sale given that 23andMe was acquired by an affiliate, not a third party, and given assurances that customers in the database would receive advance notice of the sale, so they could adjust their consents or delete account information. *See* Hedin Decl., Ex. I at 3, n.3 (States' Supplement to Their Objection to the Debtors' Proposed Sale of Customers' Assets (Dkt. 687), Case No. 25-40976-357, Dkt. 803 (E.D. Mo. Bank. Ct. June 18, 2025)).[6] Neither of those key facts are present here. ¶¶ 129 (Defendants not affiliated), 133 (no advance notice). If anything, the extreme diligence and extensive factual and legal briefing considered in *23andMe* only underscores the sensitivity of Plaintiffs' genetic information and cautions against summarily disposing of such important claims on a motion to dismiss without the benefit of any discovery. *See, e.g.*, Hedin Decl., Ex. J (Report of Consumer Privacy Ombudsman, Case No. 25-40976, Dkt. 718, at 105 (E.D. Mo. Bank. Ct. June 11, 2025) (117-page report recommending, as best practice, that 23andMe obtain separate, affirmative consent from each customer to sell their data)).

## III. Plaintiffs Cook's and Novida's CIPA Claim Against Verogen (Count 12) Should Not Be Dismissed

### A. Defendants' Argument that the CIPA Claims are Time-Barred should be rejected because Plaintiffs' Claims Fall Within or Alternatively Toll the Statute of Limitations

#### 1. Plaintiffs can prove a set of facts to establish the timeliness of the claim

Defendants' statute of limitations argument assumes the only time the Pixel disclosed that Plaintiffs had undergone genetic testing was at the time the genetic

[6] The consenting states noted how the purchasers' "sole owner and executive is the founder, chief executive (pre-bankruptcy), current board member, and a major owner of the Debtors." *Id*. at n.3.

tests were uploaded, thereby making Plaintiffs' CIPA claims only accrue at the time of upload. (Supp. at 8.) By assuming so, Defendants argue that the claims accrued only through Plaintiff Cook's 2017 upload and Plaintiff Novida's 2024 upload and are time barred under CIPA's one-year statute of limitations. *Id.*; Cal. Civ. Proc. Code § 340. On this basis alone, Defendants assert the affirmative defense that the statute of limitations expired.

First, plaintiffs are not required to specifically anticipate or plead around an affirmative defense. *Piccirillo v. Testequity, Inc.*, No. CV 14-8590-MWF (EX), 2015 WL 4778823, at *7 (C.D. Cal. Aug. 13, 2015) ("There is no requirement, however, that affirmative defenses, including statutes of limitation, appear on the face of the complaint."). Rather, "[a] complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Balanzar v. Fid. Brokerage Servs., LLC*, 654 F. Supp. 3d 1075, 1082 (S.D. Cal. 2023) (internal citations omitted). Plaintiffs clearly can prove that the Pixel disclosed their Private Information one year prior to filing the original complaint.

Here, although not required to, Plaintiffs allege that, upon information and belief, the Pixel can follow a consumer to different websites and across the Internet even after clearing browser history, and discloses a variety of Private Information beyond uploaded genetic tests, including but not limited to: "how long users spend on a particular web page, which buttons the users clicks, which pages they view, the text or phrases they type into various portions of the website, including their mitochondrial and Y haplogroup results from their DNA test and the kind of DNA test users took, and the fact that GEDMatch's users uploaded their DNA file to GEDMatch." ¶¶ 143-145. The natural conclusion is that the Pixel disclosed an array of Plaintiffs' Private Information on numerous occasions.

In spite of these allegations, Defendants attempt to limit the scope of accrual to only the disclosure of genetic information, which wrongfully shrinks and conflates the scope of CIPA with the genetic information protection laws involved in this

action. The fact that plaintiffs need not plead around an affirmative defense does not give defendants license to speculate about when alleged misconduct occurred. *Piccirillo*, 2015 U.S. Dist. 4778823, at *7; *Clifton v. Houghton Mifflin Harcourt Publ'g Co.*, 152 F. Supp. 3d 1221, 1226 (N.D. Cal. 2015) (denying a motion to dismiss where the complaint's allegations did not preclude the possibility that infringing acts continued into the limitations period).

Moreover, courts have also repeatedly held that separate violations of the same right can trigger its own statute of limitations period. *Balanzar v. Fid. Brokerage Servs., LLC*, 654 F. Supp. 3d 1075, 1082 (S.D. Cal. 2023) ("CIPA's one-year statute of limitations does not bar [p]laintiff's suit at the Motion to Dismiss stage"); *Aryeh v. Canon Bus. Sols. Inc.*, 55 Cal.4th 1185, 151 Cal.Rptr.3d 827, 292 P.3d 871, 880 (2013) (stating it is "long settled that separate, recurring invasions of the same right can each trigger their own statute of limitations."). Even without these details, courts have found complaints not time-barred when the plaintiff simply alleged the conduct "occurred during the relevant limitations period." *Harrison v. Great HealthWorks, Inc.*, 2017 WL 2554448, at *3 (S.D. Cal. June 13, 2017). Plaintiffs alleged that their Private Information was repeatedly disclosed during the time period relevant to this action. ¶ 126.

**2. Alternatively, Plaintiffs' claims toll the statute of limitations**

Under Ninth Circuit precedent, tolling questions "ordinarily require[] reference to matters outside the pleadings, and [are] not generally amenable to resolution on a Rule 12(b)(6) motion, where review is limited to the complaint alone." *Cervantes v. City of San Diego*, 5 F.3d 1273, 1276 (9th Cir. 1993).

Regardless, even if Plaintiffs' claims fall outside the one-year statute of limitations, the limitations period was tolled by the delayed discovery rule. "Under California law, the delayed discovery rule applies when a plaintiff demonstrates that a reasonable investigation at the time would not have revealed a factual basis for that

particular cause of action." *Balanzar v. Fid. Brokerage Servs., LLC*, 654 F. Supp. 3d 1075, 1083 (S.D. Cal. 2023) (internal quotations omitted.) Here, the Plaintiffs did not consent to Meta's eavesdropping nor could they reasonably expect or discover that their communications with GEDmatch would be disclosed to third parties. ¶ 362.

In addition, under the delayed discovery rule "[a] plaintiff must show that they could not have made an earlier discovery despite reasonable diligence." *Balanzar*, F. Supp. 3d at 1083. But whether a plaintiff exercised reasonable diligence or was alerted to misconduct prior to the limitations period is a question to address after discovery; to dismiss at the pleading stage would be premature. *Id.*

Plaintiff Novida's claims are also subject to equitably tolling. Although CIPA claims have only a one-year statute of limitations, claims may be equitably tolled for the duration a claim was pending in court. *See Ewing v. Empire Cap. Funding Grp., Inc.*, No. 17CV2507-LAB (MDD), 2019 WL 1746575, n. 2 (S.D. Cal. Apr. 17, 2019) (commenting plaintiff's dismissed CIPA claim would be tolled if reasserted); *Wisenbaker v. Farwell*, 341 F. Supp. 2d 1160, 1168 (D. Nev. 2004) (tolling the statute of limitations 289 days for the time during which plaintiff's prior dismissed action was pending before the previous federal district court).

Defendants request the Court to take judicial notice of the fact that Plaintiff Novida joined *Nichols, et. al. v. Meta Platforms, Inc.* on August, 21, 2024, wherein he alleged that the use of the Pixel on GEDmatch.com violated California law after he uploaded his DNA kit in 2024. (*See* Defs.'s Supp. Mem. at 8, 9.) Defendants also note that the *Nichols* lawsuit was voluntarily dismissed on August 6, 2025. (*Id.* at n. 7). In accordance with *Ewing* and *Wisenbaker*, Plaintiff Novida's claim should at least be tolled for the 350 days it was pending before the previous federal court.

### B. Defendants' Argument that Plaintiffs Cook's and Novida's CIPA Claim Fails to State a Claim Should be Rejected because Plaintiffs Adequately Pled Meta's Underlying CIPA Violations

CIPA § 631(a) prohibits third parties to a communication from "willfully and without the consent of all parties to the communication, or in any unauthorized manner, read[ing] or attempt[ing] to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state."

Courts have consistently sustained federal Wiretap Act or CIPA § 631(a) claims involving the Pixel or similar Pixel technology, finding that such technology transmits "contents" of communications and not just "record information." *See, e.g., Castillo v. Costco Wholesale Corp.*, No. 2:23-CV-01548JHC, 2024 WL 4785136, at *4 (W.D. Wash. Nov. 14, 2024) (finding that the plaintiffs' search information transmitted to Meta constitutes "contents" of a communication under the Wiretap Act and CIPA); *Cole v. Quest Diagnostics, Inc.*, No. 2:23-CV-20647-WJM, 2024 WL 3272789, at *4 (D.N.J. July 2, 2024) (information allegedly intercepted by the Pixel "constitutes content under CIPA"); *Smith v. Google, LLC*, No. 23-CV-03527-PCP, 2024 WL 2808270, at *5 (N.D. Cal. June 3, 2024) (sustaining CIPA claim because the complaint alleged "the kinds of information that the [Pixel technology] would have been able to transmit, and it alleges the mechanism for transmission"); *Gershzon v. Meta Platforms, Inc.*, No. 23-CV-00083-SI, 2023 WL 5420234, at *13 (N.D. Cal. Aug. 22, 2023) (same); *In re Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 795, 798 (N.D. Cal. 2022) (sustaining claims where plaintiffs "put forward evidence that Meta receives information through the Pixel" and the information transmitted to Meta by its Pixel would "not merely reveal the name of a Facebook user or group").

Defendants argue that Plaintiffs fail to sufficiently allege that Meta intercepted the "content" of Plaintiffs' communications. Federal courts in California analyze an alleged CIPA violation in the same way as a federal Wiretap Act violation, 18 U.S.C.

§§ 2510–23. *See, e.g., Underhill v. Kornblum*, 2017 WL 2869734, at *6 (S.D. Cal. Mar. 16, 2017); *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 517 (C.D. Cal. 2021); *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020). The Ninth Circuit has held that "contents" of an online communication under the Wiretap Act "refers to the intended message conveyed by the communication." *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). In their motion to dismiss, Defendants attempt to characterize the information alleged in the SAC as "record information" *i.e.* Plaintiffs' name, address, general webpage information, or other identity information, Supp. at 10.

Defendants next assert that Plaintiffs "failed to allege exactly what was intercepted by Meta or how it constitutes 'content' within the meaning of the CIPA." (*Id.* At 11). In support, Defendants cite to the cases *King v. Hard Rock Cafe Int'l (USA), Inc.*, 2025 WL 1635419, at *4 (E.D. Cal. June 9, 2025) and *Beltran v. Drs. Med. Ctr. of Modesto*, 2025 WL 1635467, at *11 (E.D. Cal. June 9, 2025), where plaintiffs' CIPA claims were dismissed for failing to describe the specific underlying information the Pixel allegedly intercepted. But the complaints in these cases are distinguishable. Here, Plaintiffs clearly allege that Meta intercepted the "intended message" of their communications with GEDmatch.com because, as described previously, upon information and belief, the Pixel transmitted information such as "the text or phrases [Plaintiffs] type into various portions of the website, including their mitochondrial and Y haplogroup results from their DNA test and the kind of DNA test users took" in addition to the standard record information such as a Facebook ID. ¶ 144. Plaintiffs have thus sufficiently pled their CIPA claims.

Regardless, the fact that Plaintiffs used specific, varied, comparison tools on GEDmatch.com to compare their genetic test results to others in the database (¶ 6) divulges their "personal interests, queries, and habits." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 605. Meta itself admits that its Pixel may receive individuals' "interactions", or "things that [they]'ve done on an app or website".

*Review your activity off Meta technologies*, FACEBOOK, https://www.facebook.com/help/2207256696182627. Which "illustrate[s] that Meta, through its Pixel, has access to the content of individuals' searches on websites." *Mata v. Zillow Grp., Inc.*, No. 24-CV-01095-DMS-VET, 2024 WL 5161955, at *5 (S.D. Cal. Dec. 18, 2024) (finding that plaintiff plausibly alleged Meta intercepted the content of plaintiff's communications.) *See also Hammerling v. Google LLC*, 615 F.Supp.3d 1069, 1093 (N.D. Cal. 2022) (noting that "a person's personal search engine queries ... are contents")). Thus, Plaintiffs' allegations are sufficient for the Court to reasonably infer that Meta intercepted the "contents" of their communications at this stage.

Defendants' argument that Plaintiffs failed to allege that Meta "read or attempted to read" any alleged "contents" of the alleged "communications" fares no better. Specifically, Defendants argue that the allegations that Meta "processes," "analyzes," and "assimilates" information it receives through the Pixel into datasets does not constitute "reading or attempting to read" the "communications." Supp. at 11. However, Plaintiffs also allege that Facebook views or reads the contents of communications when or if it eventually deletes or anonymizes the sensitive information that it receives; because it must first view that information to identify it as containing sensitive information suitable for removal. ¶ 195.

Defendants cite to *L.B. v. LinkedIn Corporation*, 2025 WL 2782588, *16 (N.D. Cal. Sep. 30, 2025) in support of their argument that Plaintiffs are required to plead facts creating a "coherent story" of how Meta read the specific communications between plaintiffs and the websites plaintiffs visited. But Defendants strategically omit that the *LinkedIn* plaintiffs' allegations were determined to be "conclusory recitations of an element of the … claim, so they [were] not entitled to a presumption of truth." *Id*. Here, no such determination can be made. Plaintiffs have pled details well beyond mere conclusory recitations of CIPA. Furthermore, a plaintiff is not expected to prove or even know how or when its communications were captured at

the pleading stage. *See In re Vizio, Inc. Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1228 (C.D. Cal. 2017); *D'Angelo v. Penny OpCo, LLC*, No. 23-CV-0981-BAS-DDL, 2023 WL 7006793, at *8 (S.D. Cal. Oct. 24, 2023) ("a pleading standard to the contrary would require the CIPA plaintiff to engage in a one-sided guessing game because the relevant information about data capture typically resides uniquely in the custody and control of the CIPA defendant and its third-party recorder."). The same applies here, and Plaintiffs need not plead additional facts showing exactly how they know Meta read or attempted to read the information at issue prior to discovery.

**IV. Plaintiffs Adequately Allege that Defendants Disclosed Their Genetic Information to Bode Technology in Violation of the Relevant Statutes**

Finally, Defendants move to dismiss Plaintiffs' claims arising from Defendants' disclosure of Plaintiffs' genetic data to Bode Technology, arguing that "Plaintiffs have failed to plausibly allege that their genetic information was disclosed to Bode Technology because simply making the GEDmatch database available for use does not constitute a disclosure of the genetic information of every person in that database[.]" Supp. at 13.

This argument fails because the SAC specifically alleges that "Qiagen and Verogen collectively disclosed the genetic information of all persons with genetic data in the GEDmatch databases to Bode Cellmark Forensics, Inc. d/b/a Bode Technology ('Bode')—also without notifying, or obtaining any form of consent from, any of these individual—to enable Bode to use the database for genetics research" and that "Verogen and QIAGEN made all of the genetic data in the GEDmatch databases available to Bode to use in performing genealogical comparisons and research." ¶¶ 179-180. The SAC further alleges:

> Qiagen and Verogen collectively disclosed the genetic information of all GEDmatch users to [Bode]—also without notifying, or obtaining any form of consent from, any of these individuals—to enable Bode to use the database for its own genealogical research purposes. (¶ 15);
>
> Since the acquisition [of Verogen], Qiagen has indeed leveraged this valuable resource [i.e., the GEDmatch.com genetics database] for profit. It recently announced a new multi-year partnership with Bode

Technology, the largest private U.S. forensics lab, where Bode will be the "exclusive global commercial partner for the GEDmatch PRO genealogy database." (¶ 173);

Qiagen can and has leveraged this valuable resource [i.e., the GEDmatch.com genetics database] to offer premium services to law enforcement agencies and forensic investigators, as shown in its new multi-year partnerships with Bode Technology and Othram lab. Additionally, Qiagen knowingly disclosed its entire database of genetic information to Bode pursuant to a commercial partnership between the companies that generates substantial revenue for Qiagen. (¶ 299.)

Verogen has also generated revenue from its partnership with Bode, pursuant to which Verogen makes the GEDmatch database and the genetic information stored in it to Bode. (¶ 224);

Qiagen has also generated revenue from its partnership with Bode, pursuant to which Qiagen makes the GEDmatch database and the genetic information stored in it to Bode. (¶ 235); and

None of the Plaintiffs or Class members, nor anyone else whose genetic information is housed in the GEDmatch database, were notified of or provided consent to authorize Verogen and Qiagen's disclosure of their sensitive genetic information to Bode. (¶ 181).

These allegations, which must be accepted as true at this stage of the litigation, adequately demonstrate that Defendants "disclosed" their genetic data to Bode without the requisite consent.

Defendants nonetheless attempt to disprove these factual allegations in its supplemental brief in support of the Motion. Relying on the study cited in the SAC that addressed *some* of Defendants' disclosures of genetic data to Bode, Defendant asserts that "Bode Technology researchers were not given all GEDmatch users' genetic information; rather, the GEDmatch database was used in this study as all users use it—to compare their samples against the database to determine if there were any matches." Supp. at 14. Plaintiffs disagree with Defendants' interpretation of the study and the nature of the data disclosed to Bode, and, again, have specifically alleged that "Qiagen and Verogen collectively ***disclosed the genetic information of all persons with genetic data in the GEDmatch databases to Bode***[.]" ¶ 179 (emphasis added). Any dispute over the veracity of these factual allegations can only be resolved after an exchange of the necessary discovery concerning the precise

nature and extent of Defendants' disclosures of genetic data to Bode. *See Bowen*, 118 F.4th at 1145-46; *Safe Air for Everyone*, 373 F.3d at 1039; *Leite*, 749 F.3d at 1122. At this stage of the case, the Court should find that the factual allegations of the SAC adequately state claims against Defendants Verogen and Qiagen for disclosing Plaintiffs' genetic data to Bode.

## V. Conclusion

Based on the foregoing, the Court should deny Defendants' Motion to Dismiss in full pursuant to Rule 12(b)(1) and 12(b)(6). However, if the Court deems any of the claims inadequately pleaded, Plaintiffs request leave to amend. There has been no prior judicial evaluation of the pleadings and Defendants cannot demonstrate bad faith, dilatory motive, or prejudice. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

Dated: October 29, 2025

*/s/ Frank S. Hedin*
Frank S. Hedin (SBN 291289)
**HEDIN LLP**
535 Mission Street, 14th Floor
San Francisco, CA 94105
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
Email: fhedin@hedinllp.com

Jonathan M. Jagher
**FREED KANNER LONDON & MILLEN LLC**
jjagher@fklmlaw.com
923 Fayette Street
Conshohocken, PA 19428
Tel.: (610) 234-6486

*Attorneys for Plaintiffs and the Putative Class*