1  SEYFARTH SHAW LLP
   Aaron Belzer (SBN 238901)
2  abelzer@seyfarth.com
   2029 Century Park East, Suite 3500
3  Los Angeles, California 90067-3021
   Telephone:  (310) 277-7200
4  Facsimile:  (310) 201-5219

5  SEYFARTH SHAW LLP
   Kristine R. Argentine (*pro hac vice*)
6  kargentine@seyfarth.com
   Paul Yovanic, Jr. (*pro hac vice*)
7  pyovanic@seyfarth.com
   233 South Wacker Drive, Suite 8000
8  Chicago, Illinois 60606-6448
   Telephone:  (312) 460-5000
9  Facsimile:  (312) 460-7000

10 Attorneys for Defendants
   Verogen, Inc. and Qiagen North American Holdings,
11 Inc.

12

13            UNITED STATES DISTRICT COURT

14            SOUTHERN DISTRICT OF CALIFORNIA

15

16 ANGELA HUTCHESON; SARA           Case No. 3:24 CV 1977 JES MMP
   LAFLER; ALUCARD TAYLOR; KAMA
17 DELK; ERIN RADCLIFFE; MIKHAILA   **DEFENDANTS VEROGEN, INC.**
   DIEKMANN; CHELSEA GARDNER;       **AND QIAGEN NORTH AMERICAN**
18 ANDREW STARIN; SHARYL YEISLEY;   **HOLDINGS, INC.'S REPLY IN**
   ERICA NATHAN, PHYLLIS NICHOLS;   **SUPPORT OF MOTION TO**
19 KRISTIN CURLEY; ROBIN COOK; and  **DISMISS PLAINTIFFS' SECOND**
   LAWRENCE NOVIDA individually and **AMENDED CLASS ACTION**
20 on behalf of all others similarly situated, **COMPLAINT**

21          Plaintiffs,               Judge:  Hon. James E. Simmons, Jr
                                       Date:   November 12, 2025
22       v.                            Time:   10:00 a.m. PST
                                       Ctrm:   4B (4th Flr)
23 VEROGEN, INC. D/B/A GEDMATCH;
   QIAGEN NORTH AMERICA              Date Action Filed: October 24, 2024
24 HOLDINGS, INC.; and META
   PLATFORMS, INC.
25
            Defendants.
26

27

28

# **TABLE OF CONTENTS**

**Page**

I.    PLAINTIFFS' SALE CLAIMS FAIL...........................................................1

    A.    Plaintiffs Lack Article III Standing for the Sale Claim. ...................1

        1.    Plaintiffs' Speculation About QIAGEN's "Access" Is Insufficient. ...........................................................................1

        2.    Plaintiffs' Own Allegations Undermine Their Theory........................2

        3.    Consent Forecloses Any Injury...............................................2

        4.    Plaintiffs' "Intertwined Issues" Argument Misstates the Law. ...........3

    B.    Plaintiffs Fail to State a Claim Under 12(b)(6)...............................3

        1.    Acquisition Alone Is Not "Disclosure" Under Governing Statutes. .......................................................................3

        2.    Plaintiffs' Interpretation of "Disclosure" Is Overbroad.......................4

        3.    Plaintiffs Do Not Plausibly Allege Compelled Disclosure. ................4

II.    PLAINTIFFS' LAW ENFORCEMENT CLAIMS MUST BE DISMISSED ..........4

    A.    Plaintiffs Cannot Satisfy Article III Standing Requirements........................5

    B.    Plaintiffs Fail to Adequately Plead the Law Enforcement Claim.................6

III.    PLAINTIFFS' META CLAIMS FAIL. .......................................................8

    A.    Seven of the Plaintiffs Could Not Have been Harmed and Cannot State a Claim under State Genetic Privacy Laws because the Meta Pixel was Not Yet Installed at the Time They Allegedly Uploaded their Test Results. ............................................................8

    B.    Plaintiffs Were Not Harmed and Cannot State a Claim under State Genetic Privacy Laws Because They Have Not Alleged Facts that Would Plausibly Give Rise to a Claim Thereunder. ...................................10

    C.    Plaintiffs Novida and Cook Have Failed to State Viable CIPA Claims on Behalf of the Proposed California Class. ....................................12

IV.    CONCLUSION................................................................................14

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................4, 7

5

6

*Bowen v, Energizer Holdings, Inc.*,
   118 F.4th (9th Cir. 2024) ...........................................................................................3

7

*Bridges v. Blackstone, Inc.*,
   66 F.4th 687 (7th Cir. 2023) ..................................................................................3, 4

8

9

*Cozzitorto v. Western Pacific Housing*,
   2006 WL 8459994 (N.D. Cal. Aug. 2, 2006) ..........................................................13

10

*Doe I v. Google LLC*,
   741 F. Supp. 3d 828 (N.D. Cal. 2024) .......................................................................9

11

12

*Doe v. Eating Recovery Center LLC*,
   2025 WL 2971090 (N.D. Cal. Oct. 17, 2025) ....................................................11, 14

13

*Ewing v. Empire Capital Funding Group, Inc.*,
   2019 WL 1746575 (S.D. Cal. April 17, 2019) ........................................................13

14

15

*In re Facebook, Inc. Internet Tracking Litig.*,
   956 F.3d 589 (9th Cir. 2020) .....................................................................................5

16

*Foster v. Essex Prop Trust, Inc.*,
   2015 WL 7566811 (N.D. Cal. Nov. 25, 2015) ...........................................................6

17

18

*Ghanaat v. Numerade Labs, Inc.*,
   689 F. Supp. 3d 714 (N.D. Cal. 2023) .....................................................................10

19

*Greenstein v. Noblr Reciprocal Exch.*,
   585 F. Supp. 3d 1220 (N.D. Cal. 2022) .....................................................................5

20

21

*Heerde v. Learfield Commc'ns, LLC*,
   741 F. Supp. 3d 849 (C.D. Cal. 2024) .....................................................................10

22

*I.C. v. Zynga, Inc.*,
   600 F. Supp. 3d 1034 (N.D. Cal. 2022) .....................................................................6

23

24

*Kishore v. Times Internet (UK) Ltd.*,
   2024 WL 4197619 (N.D. Cal. Sep. 12, 2024) ...........................................................8

25

*Krantz v. Old Copper Co., Inc.*,
   2025 WL 2326840 (C.D. Cal. Aug. 11, 2025) ...........................................................9

26

27

*L.B. v. LinkedIn Corporation*,
   2025 WL 2782588 (N.D. Cal. Sep. 30, 2025) .........................................................14

28

ii

*Nichols, et al. v. Meta Platforms, Inc.*,
  N.D. Cal. Case No. 24-cv-02914-JSW ........................................................... 13

*Patel v. Facebook, Inc.*,
  932 F.3d 1264 (9th Cir. 2019) ...................................................................... 2, 5

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) ........................................................................... 3

*Smith v. Trinity Broad. of Texas, Inc.*,
  2024 WL 4394557 (C.D. Cal. Sept. 27, 2024) ............................................... 10

*Stevens v. TD Bank, N.A.*,
  2025 WL 1779164 (D.N.J. June 27, 2025) ................................................... 9, 14

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ........................................................................................... 2

*Twombly v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................... 4

*In re Uber Techs., Inc., Data Sec. Breach Litig.*,
  2019 WL 6522843 (C.D. Cal. Aug. 19, 2019) ................................................... 6

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................................................... 9

**State Statutes**

410 ILCS 513/15(a) .............................................................................................. 3

410 ILCS 513/30(a) ............................................................................................ 11

Or. Rev. Stat. § 192.531(7) ................................................................................. 4

Or. Rev. Stat. § 192.531(11) ............................................................................. 11

**Other Authorities**

Illinois GIPA § 30(a) ................................................................................. 4, 10, 11

iii

Plaintiffs' claims against Defendants Verogen, Inc. (hereinafter "Verogen") and Qiagen North American Holdings, Inc. (hereinafter "QIAGEN" and, collectively, "Defendants") fall into three categories (1) Sale Claims; (2) Law Enforcement Claims; and (3) Meta Pixel Claims. All of Plaintiffs' claims asserted against Defendants Verogen and QIAGEN in their Second Amended Complaint (SAC) must be dismissed.

## I. PLAINTIFFS' SALE CLAIMS FAIL

### A. *Plaintiffs Lack Article III Standing for the Sale Claim.*

Plaintiffs' opposition does not cure the fundamental jurisdictional defect: they allege no concrete injury traceable to the acquisition of Verogen by QIAGEN. Their theory rests on speculation that QIAGEN accessed or misused genetic data post-acquisition, but the record and governing law foreclose that argument.

#### 1. Plaintiffs' Speculation About QIAGEN's "Access" Is Insufficient.

Plaintiffs assert that QIAGEN gained "full access" to the GEDmatch database following the acquisition (Dkt. 37, PageID 741-42; ¶¶ 128-130), citing a press release. But marketing language does not establish actual access or use. By contrast, Defendants submit the Osypian Declaration confirming that QIAGEN has never accessed the GEDmatch database and that Verogen continues to operate independently. (Dkt. 18-4.) Indeed, the Osypian Declaration confirms that only legacy Verogen employees and GEDmatch-dedicated personnel retained access, and Verogen's corporate parent never accessed the database. (*Id*.) In response, Plaintiffs give no weight to the Declaration and offer no factual allegations—beyond their conclusory interpretation of a press release—that QIAGEN viewed, used, or monetized the genetic data. This failure is dispositive under Article III.

In their response, Plaintiffs suggest that the fact their data was never actually accessed is immaterial because, under one of the state statutes in question, "disclosure" is defined as including the "provision of access to" certain data. (Dkt. 39, PageID 756-757.) What Plaintiffs fail to explain, however, is how they were concretely injured by the theoretical provision of access to QIAGEN if no unauthorized person ever actually

1

received their data. Even accepting this definition of disclosure, such would constitute only a technical violation of the ilk that cannot give rise to Article III standing because it does not involve any actual injury to one's privacy interests. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) (holding that Congress may not, by enacting a statutory prohibition "simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is.").

### 2.    Plaintiffs' Own Allegations Undermine Their Theory.

Even if QIAGEN obtained "access" as Plaintiffs suggest, Plaintiffs do not allege any downstream harm —such as disclosure to third parties, misuse, or breach of confidentiality. Instead, they rely only on the fact of a corporate ownership change to establish an alleged statutory violation. (Dkt. 37, PageID 756-57.) But an ownership change cannot create injury. Courts consistently find that intangible privacy interests require actual interference, not speculative risk. *See Patel v. Facebook, Inc.,* 932 F.3d 1264, 1275 (9th Cir. 2019) (standing exists where statutory violation "actually harm[s] or pose[s] a material risk of harm" to privacy interests). Plaintiffs allege neither actual interference nor speculative risk of future harm.  Further, it is unclear what that speculative risk even would be given that GEDmatch is operated exactly as it was when Plaintiffs voluntarily submitted their DNA kits. (Dkt. 18-4.)

### 3.    Consent Forecloses Any Injury.

Further, Plaintiffs' Sale Claims are premised on their allegation that they never consented to disclosure of their information in connection with a sale (dkt. 37, PageID 743-44), but the Terms of Service—incorporated into their own Complaint (dkt. 29, ¶ 165, n. 24)—expressly reserve GEDmatch's right to provide access to "individuals or entities" in the event of a merger or transfer of operations (Dkt. 18-2). Plaintiffs' attempt to dispute historical consent through extrinsic evidence is unavailing, as archived versions of the registration page confirm disclosure of these terms well before the acquisition. And

2

1    because Consent negates any alleged injury under Illinois GIPA and analogous statutes,

2    the Sale Claim must fail. 410 Ill. Comp. Stat. 513/15(a).

3                    **4.    Plaintiffs' "Intertwined Issues" Argument Misstates the Law.**

4    Finally, Plaintiffs invoke *Bowen v, Energizer Holdings, Inc.*, 118 F.4th (9th Cir.

5    2024), to argue that intertwined merits and jurisdictional issues preclude dismissal. (Dkt.

6    37, PageID 741-42.) But *Bowen* applies only where jurisdiction turns on disputed facts

7    material to the merits. Here, even crediting Plaintiffs' allegations that the acquisition alone

8    is sufficient to state a technical violation, it cannot constitute a concrete injury because

9    Plaintiffs have not articulated how their private information is being misused by QIAGEN.

10   *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Indeed, Verogen is

11   operated in the exact same manner and follows the same policies with respect to users'

12   genetic information as it had prior to the acquisition. (Dkt. 18-4.) Plaintiffs' reliance on

13   *Bowen* is misplaced as the standing inquiry here does not require resolving any factual

14   dispute.

15          **B.    *Plaintiffs Fail to State a Claim Under 12(b)(6).***

16                    **1.    Acquisition Alone Is Not "Disclosure" Under Governing Statutes.**

17   Plaintiffs concede they do not allege QIAGEN used or disseminated their data; they

18   allege only that Verogen's sale "disclosed" data by change of ownership. (Dkt. 37, Page

19   ID 741-42; dkt. 29, ¶ 128.) Courts reject this theory. In *Bridges v. Blackstone, Inc.*, the

20   Seventh Circuit held that a "run-of-the-mill corporate acquisition, without more alleged

21   about the transaction, does not result in a compulsory disclosure." 66 F.4th 687, 689-90

22   (7th Cir. 2023). Plaintiffs' reliance on QIAGEN's press release cannot cure this defect

23   because marketing statements do not transform a lawful asset transfer into a statutory

24   violation.

25   Similarly, in the *In re 23andMe Holding Co.* ruling (dkt. 18-3 at pp. 18-19), the court

26   approved a sale of genetic data assets over privacy objections, holding that a change in

27   ownership "does not constitute a sale, transfer, or disclosure . . . in a manner that would

28

                                                3

violate applicable Privacy Laws" where no new access or use occurs. That court was specifically looking at many of the privacy laws at issue in this case. Consistent with that analysis, because Plaintiffs cannot allege QIAGEN accessed the data, let alone accessed it for any purpose beyond those permitted by the existing GEDmatch policies, there cannot be a privacy violation based on the sale.

### 2.    Plaintiffs' Interpretation of "Disclosure" Is Overbroad.

Plaintiffs further argue that "disclosure" includes any transfer of control (dkt. 37, Page ID 757-58), but statutory text and context foreclose that reading. Illinois GIPA § 30(a) prohibits disclosure of "the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification." Oregon law similarly defines "disclosure" as making known "a DNA sample or genetic information" to a third party. Or. Rev. Stat. § 192.531(7). Neither statute applies to a corporate transaction that does not expose data to new actors or uses. Plaintiffs' interpretation would render mergers *per se* unlawful under these statutes—a result unsupported by text, history, or precedent.

### 3.    Plaintiffs Do Not Plausibly Allege Compelled Disclosure.

Finally, Plaintiffs attempt to distinguish *Bridges* by asserting QIAGEN "mandated" disclosure as a term of the deal. (dkt. 37, Page ID 758-59; dkt. 29, ¶ 175.) But the SAC offers only conclusory statements, not factual allegations of contractual provisions or other support of this supposed mandate. This is fatal under *Twombly v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

## II.    PLAINTIFFS' LAW ENFORCEMENT CLAIMS MUST BE DISMISSED

Plaintiffs' response fails to persuade that Plaintiffs Hutcheson's and Taylor's Law Enforcement Claims under Illinois and Oregon law can survive a motion to dismiss because the facts surrounding such claims are simply too speculative.

The Law Enforcement claims are founded on only a few conclusory and misleading allegations: (1) that Hutcheson and Taylor "did not opt-in or consent to law enforcement having access to their genetic information" (dkt. 29, ¶¶ 243, 314), and (2) that for a period

of time, between 2019 and 2023, there existed a loophole in the GEDmatch Pro database through which law enforcement agents could access the information of certain users' who had not "opted-in" to allow law enforcement to access their data for purposes of identifying perpetrators of violent crime. (*Id.* ¶ 164). However, there are several threshold flaws in Plaintiffs' Law Enforcement claim that are fatal from both a standing and pleading perspective.

###    A.    *Plaintiffs Cannot Satisfy Article III Standing Requirements.*

Plaintiffs rely on various data privacy cases in support of their position that they have alleged concrete harm, asserting that the violation of a statutory right constitutes the injury. The problem is that, unlike in the cases cited by Plaintiffs where there was no question the plaintiffs' data was accessed, Plaintiffs here do not and cannot allege that their particular DNA profiles were actually accessed by law enforcement through the loophole. *See Patel,* 932 F.3d 1264 (alleging that Facebook used facial recognition in violation of BIPA anytime a Facebook user uploaded photos to Facebook, which the plaintiffs alleged they did); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) (alleging that the Plaintiffs are Facebook users and that Facebook collected their personal data after they logged off the social media platform to create detailed user profiles).

To demonstrate standing, the "named plaintiffs who represent a class must allege and show they <u>personally</u> have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1226 (N.D. Cal. 2022) (emphasis added). Therein lies the problem for Plaintiffs Hutcheson and Taylor—they never allege that their own profiles have been accessed but, rather, that some unidentified individuals' profiles were accessed through the loophole. (*See* ¶ 163.) That is not enough to plausibly state a claim. Plaintiffs admit that they do not yet know "which specific profiles were accessed" (dkt. 37, Page ID 752) and they have alleged no facts that would give rise to an inference that *their* profiles are among those that were improperly

1    viewed. Plaintiffs merely speculate that their profiles might have been accessed in this way.
2    This case is more analogous to those in which courts have found a lack of standing where,
3    as here, the plaintiffs have not alleged any violation as to them personally. *See, e.g., Foster*
4    *v. Essex Prop Trust, Inc.*, 2015 WL 7566811, *3 (N.D. Cal. Nov. 25, 2015) ("Since
5    Plaintiffs have not shown . . . that any of their information was actually stolen, their theory
6    of future harm is implausible.").

7         In other words, Plaintiffs' Law Enforcement claim is equivalent to a data breach
8    claim in which the plaintiff does not even allege that he or she was actually part of the
9    breach, let alone that his or her information was misused. The law is clear, "no Article III
10   standing exists if a plaintiff's theory of injury rests on an attenuated chain of inferences
11   necessary to find harm." *I.C. v. Zynga, Inc.,* 600 F. Supp. 3d 1034, 1052 (N.D. Cal. 2022)
12   (internal quotations omitted); *In re Uber Techs., Inc., Data Sec. Breach Litig.*, 2019 WL
13   6522843, at *4 (C.D. Cal. Aug. 19, 2019) (finding no standing even where plaintiffs'
14   information was part of the breach because plaintiff did not plausibly allege concrete injury
15   in the form of credible threat of fraud or identity theft). Because Plaintiffs cannot allege
16   that their particular data was accessed, they instead argue that the provision of potential
17   access, alone, constitutes the disclosure. But, again, the mere potential for access to
18   Plaintiffs' data does not constitute an actual privacy harm unless an unauthorized person
19   received that data. Plaintiffs are purposefully conflating the mere existence of a loophole
20   through which someone could potentially access Plaintiffs' data with actual access to the
21   same. The former does not constitute an actual injury without the latter.

22        **B.    *Plaintiffs Fail to Adequately Plead the Law Enforcement Claim.***

23        For the same reason, Plaintiffs Hutcheson and Taylor fail to meet the pleading
24   standard on their Law Enforcement claims as well.  Plaintiffs again admit in their response
25   that they have not pled that either Hutcheson's or Taylor's profiles were accessed by law
26   enforcement for an improper purpose.  Rather, they contend that the fact they selected the
27   "opt-out" option, combined with the existence of a loophole that resulted in certain
28

6

1   unknown people's information being accessed, is enough to state a claim because they
2   could have been in that group of people. (Dkt. 37, pg. ID 751.) But Plaintiffs must plead
3   enough facts to raise their right to relief above the speculative level, and Plaintiffs' facts
4   point only to the ***possibility*** that their profiles may have been included in an improper law
5   enforcement search based on their opt-out status—but possible is not plausible and should
6   not be accepted as such.  *Bell Atlantic Corp.,* 550 U.S. at 555.

7         Further, Plaintiffs misconstrue Defendants' argument regarding the scope of the opt-
8   out as a red herring and suggest that the actual injury in question is the "violation of the
9   consent framework." (Dkt. 39, PageID 754.) But Plaintiffs miss the point: Plaintiffs are not
10  claiming breach of contract; they are claiming unauthorized access to their genetic
11  information. They must, therefore, plead that their genetic information was actually
12  accessed in a way that was not authorized in order to state a claim. Plaintiffs admit that
13  even where they elected "opt-out," they consented to allow law enforcement to access their
14  profiles for certain purposes. (Dkt. 29, ¶ 119). Therefore, in order to state a claim, they
15  must allege that their data was accessed for an *un*authorized purpose and not one of the
16  purposes they admittedly authorized. Plaintiffs have not done that here: they never allege
17  that law enforcement used the loophole *only* to identify perpetrators of violent crimes (as
18  opposed to for the authorized purpose of identifying human remains). In other words,
19  Plaintiffs Hutcheson's and Taylor's claim that they could have been injured by law
20  enforcement's use of the loophole is doubly speculative given that 1) law enforcement did
21  not access all opted-out profiles (only those that matched to the criminal profile uploaded)
22  **and** 2) such access would not necessarily have been for a purpose to which Plaintiffs did
23  not consent. Accordingly, Plaintiffs Law Enforcement claims fail.

24        Finally, contrary to their conclusory allegations, and as is made clear in the article
25  relied on by Plaintiffs (dkt. 29, ¶ 180), Bode Technology never had access to all of the
26  genetic data in the GEDmatch database, but to only a limited set of data depending on what
27  profiles matched against the samples used. (Dkt. 34-1.) Plaintiffs again suggest that

28

providing potential or theoretical access to all of the profiles in the database constitutes a disclosure or a violation, even without any suggestion that their profiles were actually viewed. But Plaintiffs have **not** pled that Bode Technology actually gained access to *their* genetic information through any search and so they have not plausibly stated a claim based on any alleged improper disclosure to Bode Technologies.

## III.    PLAINTIFFS' META CLAIMS FAIL.

### A.    *Seven of the Plaintiffs Could Not Have Been Harmed and Cannot State a Claim under State Genetic Privacy Laws Because the Meta Pixel Was Not Yet Installed at the Time They Allegedly Uploaded their Test Results.*

There is no actual dispute that the Meta pixel was first installed on the GEDmatch website in January 2020 and that Plaintiffs Hutcheson, Lafler, Delk, Taylor, Gardner, Starin, and Cook uploaded their genetic test results to the GEDmatch website prior to that time—when the Meta pixel was not in use. Plaintiffs disclaim the accuracy of their own pleading that the Pixel was installed "as early as" January 2020 and suggest that the Court should infer that they have no idea when the pixel was first used because that information is not publicly available. (Dkt. 37, PageID 736.) Given that Plaintiffs got the exact month and year of the installation of the Pixel correct, such allegation should not be disregarded in favor of an inference that the pixel *could* have been years earlier, as Plaintiffs now argue.

The *Kishore v. Times Internet (UK) Ltd.* case on which Plaintiffs rely is inapposite because, in that case, the Plaintiffs' allegations contradicted the corporate declarant's version of events whereas, in the present case, the declaration of Tom Osypian confirms Plaintiffs' allegation regarding that the pixel was first "operational" in January 2020. *Kishore*, 2024 WL 4197619 (N.D. Cal. Sep. 12, 2024); *compare* Dkt. 29, ¶ 152 with Dkt. 18-4, ¶ 3. Therefore, all parties agree as to the relevant date the pixel was installed and that fact should be accepted as true. Because Plaintiffs Delk, Taylor, Gardner, and Starin did not upload a DNA profile on Verogen's GEDmatch.com website and simultaneously have their "genetic information" (i.e. the fact that they took a test) disclosed to Meta during the

8

applicable limitations period, they do not meet the definitions for Plaintiffs' proposed "Oregon Meta Subclass" (dkt. 29, ¶ 200) and "New Hampshire Meta Subclass" (dkt. 29, ¶ 200), respectively, and so cannot represent those classes. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) ("A class representative must be part of the class.") Plaintiffs' suggestion that Plaintiffs Nichols and Curley (both Illinois residents) can represent the New Hampshire and Oregon Meta Subclasses is flatly wrong because "[c]ourts in the Ninth Circuit have consistently held that a plaintiff in a putative class action lacks standing to assert claims under the laws of states other than those where the plaintiff resides or was injured." *See Krantz v. Old Copper Co., Inc.*, 2025 WL 2326840, at *11 (C.D. Cal. Aug. 11, 2025).

To avoid the inevitable fact that the Meta pixel was not yet installed when these Plaintiffs uploaded their test results, Plaintiffs now claim that it was not just the fact of the upload, but *all of their activity* on the GEDmatch website that revealed the fact that they underwent genetic testing. (Dkt. 37, PageID 745-46.) The problem is that Plaintiffs have failed to allege anywhere in their SAC that they did anything on the GEDmatch website other than create an account and upload their genetic test results. (Dkt. 29, ¶¶ 40, 47, 62, 68, 83, 87, 101.) That is, they have not alleged any additional actions they took on the website, what information was allegedly transmitted to Meta as a result of those actions, or how those actions revealed the fact that they had undergone genetic testing. It is not enough for Plaintiffs to allege merely that the Meta pixel was used—Plaintiffs must allege how they used the website and what information was allegedly transferred as a result thereof. *See Stevens v. TD Bank, N.A.*, 2025 WL 1779164, at *4 (D.N.J. June 27, 2025) (dismissing complaint where the plaintiff "fail[ed to] connect the Pixel's functionality in the abstract to him individually"); *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 839 (N.D. Cal. 2024) (similar). This is especially true where the critical information that must be transferred to give rise to a claim under these statutes is the fact that Plaintiffs underwent a genetic test. Plaintiffs' allegations are insufficient, and their claims must be dismissed.

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.**    ***Plaintiffs Were Not Harmed and Cannot State a Claim under State Genetic Privacy Laws Because They Have Not Alleged Facts that Would Plausibly Give Rise to a Claim Thereunder.***

Plaintiffs also failed to allege facts sufficient to establish a violation of the state genetic privacy laws under which they bring suit. First, Plaintiffs have not sufficiently pled that the disclosure of a Facebook ID constitutes the disclosure of their "identities"—or even that their Facebook IDs could be used to ascertain their identities—because they have not alleged that their Facebook profiles contain their names or other identifying information or that their profiles are publicly accessible. It is not sufficient to allege, generally, that Facebook policy requires people to use their real names: Plaintiffs must allege that they, themselves, could actually be identified from their Facebook profiles. *See Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849 (C.D. Cal. 2024); *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023); *Smith v. Trinity Broad. of Texas, Inc.*, 2024 WL 4394557, *3 (C.D. Cal. Sept. 27, 2024).

Further, Plaintiffs do not state a claim under either the Illinois or Oregon statute because neither protects the mere fact that a person has undergone genetic testing (as opposed to the results of genetic testing). Plaintiffs advocate that under a "plain reading" of the Illinois law, "Section 30(a) prevents the unauthorized disclosure of the identity of anyone upon whom a genetic test was performed, *or* the unauthorized disclosure of the results of a genetic test in a way that can identify the subjects of the test." (Dkt. 37, PageID 749.) But the first clause of this purported disjunctive says nothing regarding the fact that someone took a genetic test: as Plaintiffs read it, this clause would prohibit only "disclosure of the identity" of a person who has taken a test. Under this reading, one would violate the statute by disclosing the Plaintiffs' identities only (even if not in connection with the fact that they underwent a test). This is plainly not what the quoted language means. When read

10

1    as a whole, as it must be, it is clear that that statute's intent is to prevent the disclosure of

2    the *results* of a genetic test in connection with a person's identity.

3        Even if the Court were to accept Plaintiffs' interpretation, Plaintiffs have taken

4    liberties with the statutory language. Section 30(a) provides that "[n]o person may disclose

5    or be compelled to disclose the identity of any person upon whom a genetic test <u>is</u>

6    performed or the results of a genetic test . . ."  410 ILCS 513/30(a). Plaintiffs substitute the

7    word "was" as if it were interchangeable (dkt. 37, p. 15), but the use of the term "is

8    performed" suggests a limitation on the party performing the test whereas, here, Verogen

9    has allegedly revealed only the fact that a genetic test *was* performed at some point in the

10   past by some other entity (not that it *is* performing genetic testing).

11       Finally, Plaintiffs' argument that "[t]he fact that a genetic test was taken in the first

12   place" constitutes "information obtained from a genetic test" that meets the definition of

13   "genetic information" under Oregon law is unavailing. Plaintiffs promote their own

14   position as the "plain meaning" of the statute and suggest that using the statutory

15   definitions is somehow an improper attempt to "inject ambiguity." (Dkt. 37, PageID 750.)

16   But the statute plainly defines "genetic information" as "information about an individual

17   or the individual's blood relatives *obtained from a genetic test*," which would not include

18   the mere fact that a person underwent testing under any reasonable reading of that phrase.

19   ORS 192.531(11) (emphasis added).

20       As Judge Chhabria aptly observed in a recent order granting summary judgment in

21   favor of the defendant in a CIPA claim based on similar Meta pixel allegations, the

22   application of decades-old legislation to new technologies is often a poor fit such that it is

23   "borderline impossible to determine whether a defendant's online conduct fits within the

24   language of the statute." *Doe v. Eating Recovery Center LLC*, 2025 WL 2971090, at *1

25   (N.D. Cal. Oct. 17, 2025). This fact requires courts to consider the entire statute in context

26   and in light of its stated purpose rather than to rely on hyper-technical interpretations of

27   cherry-picked passages that suit the Plaintiffs' position.

28

Considering the stated intent of the statutes in question here and reading them as a whole, the respective state legislatures were not concerned with the disclosure of the mere fact that a person took a genetic test. Plaintiffs' suggestion that only those with "a family history of a serious hereditary disease" or those who were "otherwise concerned enough about their genetic risk to seek testing" pursue such tests is belied by the fact that every one of them appears to have undergone genetic testing themselves for the entirely distinct purpose of conducting personal genealogy research. (Dkt. 37, PageID 750.) Their claim to any privacy interest in this allegedly sensitive information is further undermined by the fact that each of them publicly disclosed, not only the fact that they underwent genetic testing, but the results of their genetic testing, to the more than 2 million people with GEDmatch accounts. This is not the type of situation contemplated by the Illinois and Oregon legislatures when they passed their respective genetic privacy laws.

### C.     *Plaintiffs Novida and Cook Have Failed to State Viable CIPA Claims on Behalf of the Proposed California Class.*

Plaintiffs first attempt to avoid the fact that their CIPA claims were not timely filed by now claiming that their CIPA claims are based, not on the initial upload of their genetic tests, but on their post-upload use of the website. But as discussed *supra*, Plaintiffs have not alleged that they took *any* actions on the GEDmatch website aside from creating an account and uploading their genetic test results (dkt. 29, ¶¶ 101, 106), let alone what specific information was allegedly transmitted or whether any of that information constitutes the "contents" of any communication. Plaintiffs allege, generally, the different types of actions that users might hypothetically engage in or that the Meta pixel might hypothetically capture but do not allege that they, themselves, took any of these actions. (*See, e.g.*, Dkt. 29, ¶ 144.) Plaintiffs' CIPA claims are limited to the initial upload of their test results (the only conduct they allege they undertook on the website), which occurred more than a year before their complaint was filed. Thus, these claims are time-barred.

1    Plaintiffs Novida and Cook also claim that the statute of limitations was tolled by
2    the delayed discovery rule, but their claim that they did not or "could not reasonably expect
3    or discover that their communications with GEDmatch would be disclosed to third parties"
4    within the limitations period is blatantly false. Both Plaintiffs Novida and Cook were
5    plaintiffs in a 2024 lawsuit filed against Meta in which they raised allegations identical to
6    those they raise here. *See Nichols, et al. v. Meta Platforms, Inc.*, N.D. Cal. Case No. 24-
7    cv-02914-JSW. Plaintiffs not only knew of the facts that underly their present claims more
8    than a year before they filed the Second Amended Complaint, but they but filed a lawsuit
9    against Meta based thereon. Even assuming the applicability of the delayed discovery rule,
10   Plaintiffs would have had one year from the date they learned that the Meta pixel was used
11   on the GEDmatch website to file suit, and they undisputably knew that fact when they filed
12   their claim against Meta in 2024.

13   Plaintiffs Novida and Cook also now argue that their claims were timely because the
14   statute of limitations was equitably tolled during the pendency of that prior lawsuit. But
15   equitable tolling does not apply where plaintiffs voluntarily dismiss their claims and then
16   try to re-file against a different defendant after the expiration of the statute of limitations.
17   Under federal law, when a plaintiff voluntarily dismisses their claim, it is as if the lawsuit
18   was never filed and, in order to timely re-file it, they must do so within the statute of
19   limitations. *See, e.g., Cozzitorto v. Western Pacific Housing*, 2006 WL 8459994, (N.D.
20   Cal. Aug. 2, 2006) ("When a complaint is dismissed without prejudice, it is as if it never
21   existed. . . . To reinstate his case, a plaintiff must re-file a new action <u>and the statute of
22   limitations is not tolled</u>."). Plaintiffs' cited cases involved circumstances in which the
23   plaintiffs' claims were *in*voluntarily dismissed and in which the later-filed claim was
24   against the same defendant as the prior claim and, so, are inapposite. *See Ewing v. Empire
25   Capital Funding Group, Inc.*, 2019 WL 1746575, * 2, n. 2 (S.D. Cal. April 17, 2019).

26   Finally, Plaintiffs have not sufficiently alleged that Meta "read or attempted to read"
27   the "contents" of any of their alleged communications because they fail to allege any facts

28

13

to support their conclusory recitation that Meta intercepted the "intended message" of their communications. Again, while Plaintiffs generally allege the types of data that hypothetical users might type into the website (dkt. 29, ¶¶ 6, 144), Plaintiffs never allege that *they* typed any specific information into the website or did anything other than create an account and upload test results. Without alleging what information the Meta pixel allegedly shared about *them*, Plaintiffs cannot state a plausible claim by merely reciting what the Meta pixel is theoretically capable of. *See Stevens*, 2025 WL 1779164 at *4 (dismissing complaint where the plaintiff "fail[ed to] connect the Pixel's functionality in the abstract to him individually"). Moreover, Plaintiffs allege no facts regarding what information was allegedly transmitted to Meta and in what form such that Plaintiffs have failed to allege a "coherent story" regarding how Meta might have "read" those contents. *See L.B. v. LinkedIn Corporation*, 2025 WL 2782588, *16 (N.D. Cal. Sep. 30, 2025). And Plaintiffs fail to make anything other than conclusory allegations that their data was read by Meta "in transit," which is also required to state a CIPA claim. *Eating Recovery Center LLC*, 2025 WL 2971090, *5-6.

## IV.    CONCLUSION

WHEREFORE, Defendants Verogen, Inc. and Qiagen North American Holdings, Inc. hereby request the Court for entry of an order dismissing each of Plaintiffs' claims against them stated in the Second Amended Class Action Complaint with prejudice, and for any other relief the Court deems appropriate.

DATED: November 5, 2025                    SEYFARTH SHAW LLP


BY: */S/ KRISTINE ARGENTINE*
                                                    Kristine Argentine
                                                    Aaron Belzer
                                                    Attorneys for Defendants

321643510v.2

14